## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NOELLE LeCANN, KRISTIN SELIMO, and TANIA FUNDUK, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE ALIERA COMPANIES, INC., formerly known as ALIERA HEALTHCARE, INC.,<br><br>Defendant. | Case No.:<br><br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Noelle LeCann, Kristin Selimo, and Tania Funduk, by and through their undersigned counsel, bring this lawsuit on behalf of themselves and all other similarly situated participants in purported Health Care Sharing Ministry ("HCSM") plans offered and administered by Defendant The Aliera Companies, Inc., formerly known as Aliera Healthcare, Inc. ("Aliera" or "Defendant"). Plaintiffs allege as follows based on personal knowledge concerning all facts related to themselves and their plans, and on information and belief concerning all other matters:

## NATURE OF THE ACTION

1.     This case arises from Defendant's sale of illegal health insurance to Plaintiffs and the Class members. Defendant has marketed and sold, and continues to market and sell, illegal health insurance masquerading as legitimate HCSM plans that would purportedly provide benefits mirroring traditional health insurance.

2.     Defendant has falsely portrayed the plans as HCSM plans—even though Defendant and the plans plainly do not meet the requirements under federal law and state law for HCSMs[1]—in an illegal scheme devised to avoid otherwise applicable federal and state laws regarding health insurance, including limitations on the percentage of premiums that can be diverted to purposes other than the payment of benefits.

3.     Defendant has sold, administered, and operated illegal insurance, charging Plaintiffs and the other Class members hundreds of dollars or more every month and diverting most of that money to itself and its principals, thereby reaping massive illegal profits for Defendant at the expense of Plaintiffs and the Class members.

---

[1] Defendant offers and has offered purported HCSM plans under different names and with slightly different features. For purposes of this lawsuit, however, none of Defendant's plans qualifies as true HCSMs, and all of them have been plagued by the same misrepresentations regarding the nature and characteristics of the plans.

4.      Defendant's marketing and sales scheme has been an extremely lucrative—but illegal—arrangement by which Defendant has kept approximately 84 cents of every dollar that Plaintiffs and the Class members paid, in flagrant violation of the limitations imposed by federal law that generally limits administrative costs and profits to 15% of premiums paid. In addition, Defendant delayed and failed to pay covered medical expenses incurred by Plaintiffs and the Class.

5.      Defendant did not disclose to Plaintiffs and Class members during the Class period that several state regulators found that the plans offered by Defendant were not qualified as HCSMs and that Defendant was illegally selling insurance and that those regulators therefore entered Cease and Desist Orders preventing Defendant from continuing its scheme in those states.

6.      Nevertheless, Defendant continued to sell the plans to Plaintiffs and the Class as HCSM plans and continued to take monthly premiums from Plaintiffs and other Class members.

7.      Plaintiffs now seek injunctive, declaratory and monetary relief requiring Defendant to reverse and refund the unlawful premium charges during the Class period and to require Defendant to pay for the medical expenses that Plaintiffs and the Class have incurred when they were members of Defendant's plans during the Class period. Plaintiffs also seek to enjoin Defendant from further conducting its

illegal scheme.

## THE PARTIES

**A.    Plaintiff Noelle LeCann**

8.    Plaintiff Noelle LeCann is and was at all relevant times a resident and citizen of New York.

9.    Defendant marketed and sold to Plaintiff LeCann an illegal insurance plan that Defendant misrepresented as an HCSM plan that would provide medical coverage to Plaintiff and her spouse.

10.    From early 2018 through late 2019, Plaintiff LeCann maintained purported HCSM plans through Defendant and paid to Defendant premiums of approximately $1,700 per month.

11.    Aliera collected these premiums from Plaintiff LeCann by automatic withdrawals from Plaintiff LeCann's bank account.

12.    When Plaintiff LeCann needed surgery to repair her shoulder, Defendant issued a pre-authorization letter for the surgery.

13.    Plaintiff LeCann had the surgery, but when Plaintiff and her doctor submitted bills for payment, Defendant delayed payment and has continued to refuse to pay the bills.

14.    Defendant continuously delayed and refused to pay for Plaintiff

LeCann's medical bills but continued to collect premiums from Plaintiff.

15.    Plaintiff LeCann made numerous attempts to resolve the dispute with Defendant, but each time Defendant stalled, delayed, and avoided resolving the dispute, frustrating and impeding Plaintiff's attempts to resolve the dispute without litigation.

16.    After multiple unsuccessful efforts to resolve her dispute with Defendant, Plaintiff stopped paying premiums, and Defendant therefore terminated her policy in late 2019.

17.    Plaintiff LeCann continues to receive demands for payment of the medical bills that Plaintiff submitted to Defendant for payment and that should be paid by Defendant under the terms of its policies with Plaintiff LeCann.

### B.    Plaintiff Kristin Selimo

18.    Plaintiff Kristin Selimo is and was at all relevant times a resident and citizen of Boonton Township, New Jersey and a member of Defendant's health care plans.

19.    Defendant marketed and sold to Plaintiff Selimo an illegal insurance plan that Defendant misrepresented was an HCSM plan that would provide medical coverage to Plaintiff and her family.

20.    Plaintiff Selimo has maintained Defendant's plan and paid to Defendant

monthly premiums of approximately $900.00 per month beginning January 2018.

21.    Plaintiff Selimo has paid to Aliera all monthly premiums demanded by Defendant.

22.    Despite Plaintiff Selimo paying the required premiums, Defendant has refused to pay covered medical bills relating to Ms. Selimo's pregnancy and her October 2019 labor and delivery, as well as medical bills for Ms. Selimo's children.

23.    Despite assuring Ms. Selimo that the medical bills would be covered, Defendant has unreasonably delayed and protracted payment. Plaintiff Selimo continues to receive demands for payment of the medical bills and those bills will soon be placed in collections.

24.    Plaintiff Selimo made numerous attempts to resolve the dispute with Defendant, but each time Defendant stalled, delayed, and avoided resolving the dispute, frustrating and impeding Plaintiff's attempts to resolve the dispute without litigation.

### C.    Plaintiff Tania Funduk

25.    Plaintiff Tania Funduk is and was at all relevant times a resident and citizen of Atlanta, Georgia and has been the owner of a putative HCSM plan issued by Defendant.

26.    Defendant marketed and sold to Plaintiff Funduk an illegal insurance

6

plan that Defendant misrepresented was an HCSM plan that would provide medical coverage to Plaintiff.

27.    Plaintiff Funduk maintained Defendant's plan and paid to Defendant monthly premiums of approximately $500 per month.

28.    Plaintiff Funduk paid to Aliera all monthly premiums demanded by Defendant.

29.    When Plaintiff and her doctors submitted covered bills to Defendant for payment, Defendant delayed payment and has continued to refuse to pay the bills. For the purpose of impeding payment, Defendant employed tactics such as stating without any reasonable basis that the bills be re-submitted or re-processed and that Plaintiffs' policy had been cancelled.

30.    Defendant continuously delayed and refused to pay for Plaintiff Funduk's medical bills but continued to collect premiums from Plaintiff.

31.    Plaintiff Funduk made numerous attempts to resolve the dispute with Defendant, but each time Defendant stalled, delayed, and avoided resolving the dispute, frustrating Plaintiff's attempts to resolve the dispute without litigation.

**D.    Defendant**

32.    Defendant The Aliera Companies, Inc. is a Delaware corporation with its headquarters at 990 Hammond Drive, Atlanta, Georgia 30328. It is incorporated

as a for-profit business, without any religious affiliation. It was originally incorporated in 2015 under the name Aliera Healthcare, Inc., but it changed its name to The Aliera Companies, Inc. in July 2019. Shelley Steele, the wife of Timothy Moses, incorporated Aliera and has at all relevant times served as Aliera's Chief Executive Officer. Chase Moses, the son of Timothy Moses and Shelley Steele, has at all relevant times served as Aliera's President.

33.    Because there are state and federal legal limitations on who can offer HCSM plans, Defendant acted in concert with third parties, including Unity Healthshare, LLC ("Unity") and Trinity Healthshare, Inc. ("Trinity"), to issue its putative HCSM plans in an attempt to give those plans an appearance of legality. Defendant marketed, issued, sold, and administered the plans at issue in this action and misrepresented the plans as HCSM plans by using Unity and Trinity (the "affiliated companies") that Defendant held out as HCSMs, even though those companies, as operated and/or created by Aliera, did not (and do not) meet the qualifications for an HCSM under federal or Georgia law.

34.    In substance, Defendant is a *de facto* illegal insurer that issues contracts for distributing individual losses and paying benefits upon the occurrence of

particular contingencies.[2] As an insurer that is headquartered in Georgia, whose activities have been and are controlled and directed from within Georgia, and that has sold its unlawful insurance contracts to citizens of Georgia (including Plaintiff Funduk) as well as citizens of other states, Defendant is subject to Georgia law with regard to each and every claim asserted herein and is subject to the laws and regulations of Georgia pertaining to insurance.

35.    Defendant and the affiliated companies Defendant has used to carry out its unlawful scheme have combined their respective property, experience, labor, and know-how to form a joint undertaking, acting in accordance with an agreement to cooperate in a particular line of conduct and achieve a particular result. They have portrayed themselves and operated as a single enterprise, such that a reasonable consumer would not appreciate any meaningful difference between Aliera and these other companies (such as Trinity). By way of one example, although Aliera claims to merely administer and provide support in connection with putative HCSM plans "offered" by Trinity, one of the products that has been offered (supposedly by

---

[2] Georgia law defines insurance broadly. "'Insurance' means a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specified amount or benefits upon determinable contingencies." O.C.G.A. § 33-1-2(4). Similarly, "'[i]nsurer' means any person engaged as indemnitor, surety, or contractor who issues insurance, annuity or endowment contracts, subscriber certificates, or other contracts of insurance *by whatever name called*." O.C.G.A. § 33-1-2(5) (emphasis added).

Trinity) during the Class period is called "AlieraCare." The AlieraCare Member Guide in effect during the Class period opens by welcoming consumers "to Aliera Healthcare, Inc | Trinity Healthshare." Additionally, although the HCSM plans in question have supposedly been offered by the affiliated companies, it is Aliera that collects payments from, communicates with, and handles claims involving customers. Defendant has conducted the business and activities that are the subject of this action in concert with and as a joint enterprise with these affiliated companies.

## JURISDICTION AND VENUE

36.    This Court has original jurisdiction over the parties and these claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

37.    Plaintiffs are citizens of New York, New Jersey, and Georgia, respectively, and Defendant is a citizen of Georgia and Delaware for diversity purposes.

38.    The proposed Class that Plaintiffs seek to represent consists of approximately 100,000 individuals.

39.    Plaintiffs and the Class members have paid to Defendant over $200 million and presented many millions of dollars in covered medical bills to Defendant for payment that Defendant has wrongfully denied and/or delayed in paying.

40.    This Court has subject matter jurisdiction over this class action because

it involves citizens of different states, more than 100 class members, minimal diversity, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

41.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in and is a citizen of Georgia, has minimum contacts with Georgia, and has purposefully availed itself of the privilege of conducting business in this state. Many of the actions and decisions at issue in this action occurred in this District, where Defendant has its headquarters and conducts its business, and Plaintiffs' and the Class members' claims arise from the actions taken and decisions made by Defendant within this District. Additionally, the State of Georgia has a unique and vested interest in regulating these entities and protecting both its citizens and citizens of other states from the unlawful conduct of entities whose principal place of operation is in Georgia. There are thousands of Class members who are Georgia residents and who suffered injuries here.

42.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events giving rise to these claims occurred in this District, including Defendant's decisions to sell the plans at issue in this case, Defendant's approval of the memberships by Plaintiffs and the Class, Defendant's demands for payment and processing of payments, Defendant's

collection of the funds paid by Plaintiffs and the Class, and Defendant's administration of the plans.

43.    In all material regards, the conduct and activities of Defendant complained of herein have been controlled, directed, and executed by Defendant from or within the State of Georgia.

## **FACTUAL ALLEGATIONS**

44.    Aliera was incorporated and is operated by the Moses family, including Timothy Moses[3], his wife Shelley Steele, and their son Chase Moses.

45.    Before forming Aliera, Timothy Moses had been the Chairman, President, and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after Mr. Moses was charged with felony securities fraud and perjury. *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.).

46.    Timothy Moses was sentenced to more than six years in prison for securities fraud and perjury and was ordered to pay $1.65 million in restitution. After serving his prison term, his probation was revoked because he lied to his supervising probation officer about his financial dealings and because he failed to disclose secret bank accounts.

_____

[3] Throughout this Complaint, references to "Mr. Moses" refer to Timothy Moses; all references to Chase Moses use his full name.

47.    As soon as Mr. Moses' supervised release was terminated in April 2015, he and his family set into motion the events giving rise to this case.

48.    In May 2015, Shelley Steele formed HealthPass USA LLC, a Georgia limited liability company. In December 2015, Shelley Steele incorporated Aliera Healthcare, Inc. in Delaware.

49.    Approximately five months later, in April 2016, Aliera Healthcare registered with the Georgia Secretary of State, identifying Shelly Steele as CEO and CFO.

50.    In July 2017, HealthPass USA LLC merged with Aliera Healthcare, with Aliera being the surviving entity.

51.    Upon information and belief, at all times relevant to this Complaint Timothy Moses has exercised and continues to exercise control of Aliera through his wife and son.

52.    In late 2015 or early 2016, Aliera began selling "direct primary care medical home" ("DPCMH") plans. In general, DCPMH plans cover limited services such as primary care visits and certain lab services. However, they do not provide coverage for hospitalization or emergency room treatments and do not comply with the Patient Protection and Affordable Care Act (the "ACA").

53.    Upon information and belief, sometime in 2016, Mr. Moses, Ms. Steele,

and Aliera's owners and executives devised a plan to profit by attempting to exploit the fact that HCSMs are exempt from the ACA and state insurance laws and regulations.

54.    A bona fide HCSM plan allows people of a similar religious faith to join together to share responsibility for medical expenses. By joining and making voluntary contributions, HCSM members have some assurance their medical expenses will be paid for by individuals in the same faith community.

55.    Bona fide HCSMs are generally exempt from federal and Georgia insurance laws and regulations, including the ACA. But for the statutory exemptions given bona fide, qualified HCSMs, such plans would constitute "insurance" under both federal and Georgia law.

56.    Defendant planned to reap significant illegal profits by misusing the laws regarding HCSMs to avoid federal and state insurance laws (including those laws that regulate and limit the percentage of funds that an insurer collects that may be kept for the insurer's own purposes) and to offer to consumers like Plaintiffs and the Class members what was in fact illegal insurance.

57.    Aliera does not meet the legal requirements to be an HCSM because, among other reasons, it is incorporated as a for-profit company and it has not been in existence since 1999. As a result, to further the scheme, the Moseses and Aliera

sought to offer purported HCSM plans through a separate entity.

58.    Aliera first attempted to do so in 2016 using an entity called Anabaptist Healthshare ("Anabaptist"), a small non-profit Mennonite entity located in Virginia. At that time, Anabaptist had only a few hundred members and limited assets.

59.    Because Anabaptist had been recognized by the Department of Health and Human Services as an HCSM, Mr. Moses, his family, and Aliera sought to use Anabaptist as part of their scheme to illegally and fraudulently avoid the ACA and state insurance laws, including, in particular, the ACA's medical loss ratio which requires that insurers spend at least 80 or 85 percent of premiums on medical claims and health care quality improvements. *See* 42 U.S.C. § 300gg-18(b)(1)(A).

60.    In 2016, Timothy Moses approached the leaders of Anabaptist, including Tyler Hochstetler, and convinced those leaders to partner with Aliera to market and sell DCPMH plans and Anabaptist's HCSM plans.

61.    In late 2016, Anabaptist formed Unity for the purpose of partnering with Aliera, and soon thereafter, Aliera began marketing Unity HCSM plans pursuant to a contract with Unity that granted Aliera the exclusive license to market, sell, and administer Unity products.

62.    Eventually the relationship between Aliera and Anabaptist fractured after Anabaptist discovered that Aliera was violating its agreement with Unity,

misappropriating member funds, and that Timothy Moses was a convicted felon and wrongfully diverting funds to himself from the partnership operating account.

63.    In Summer 2018, Unity terminated its relationship with Aliera and litigation ensued between Anabaptist and Aliera, eventually resulting in a Georgia court entering an injunction against Aliera and appointing a receiver to protect Anabaptist and its members from further misappropriations by Aliera and Mr. Moses.

64.    With its relationship with Unity terminating, Aliera's owners and executives were without any HCSM that they could misuse to continue offering Aliera's fraudulent yet extremely profitable products.

65.    To that end, on June 27, 2018, Aliera caused Trinity to be incorporated and put in place as CEO of that entity, William Thead III, a former Aliera employee and a close friend of the Moseses who officiated Chase Moses' wedding.

66.    According to Trinity's most recent federal report to the IRS, William Thead remains the company's sole employee. Furthermore, David Thead serves as Trinity's secretary and treasurer, and Trinity's "audit firm selection was performed by Aliera Healthcare, Inc."

67.    Trinity has at all times constituted a mere shell entity operated, administered, and directed by Aliera solely to serve Aliera's purposes.

68.    As set forth in more detail below, Trinity does not qualify as an HCSM under federal law or Georgia law because, among other things, it has not existed since December 31, 1999, and it has no legitimate predecessor entity it could rely on to satisfy that requirement.

69.    At the time of its incorporation, Trinity had no members. Aliera's plan (before being enjoined) was to unilaterally transition Unity members into Trinity after Trinity was created.

70.    Trinity's bylaws contain certain Christian-oriented statements that proclaim, for example: a belief that "the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority"; a belief "in the triune God of the Bible"; a belief that "Jesus Christ was God in the flesh—fully God and fully man"; and a belief "that all people are born with a sinful nature and can be saved from eternal death only by . . . trusting only in Christ's atoning death and resurrection . . . ."

71.    Those expressions were included as part of Defendant's effort to create the appearance that Trinity was an HCSM, even though it was not.

72.    Notwithstanding the Christian overtones of Trinity's bylaws, the form statement of beliefs that are advertised to consumers and that members agree to when they join Defendant's plans are very different, more secular and generic, and make

no specific reference even to Christianity. They instead proclaim, for example, that "personal rights and liberties originate from God," that "every individual has a fundamental religious right to worship God in his or her own way," that individuals have a "moral and ethical obligation" to assist others, and that individuals have a "fundamental right of conscience" to direct their own healthcare. *See* https://www.trinityhealthshare.org /about/statement-of-beliefs/.

73.    On August, 13, 2018, Aliera and Trinity entered into an agreement that, much like Aliera's former agreement with Unity, gave Aliera exclusive license to develop, market, sell, and administer purported HCSM plans "offered" by Trinity.

74.    Aliera's agreement with Trinity provides that 65% of the money provided by HCSM members would go directly to Aliera and that of the 35% of the money retained by Trinity, 54.2% would go to reimbursing Aliera for various administrative expenses and commissions and 44.3% would go to member reserves. Thus, for every dollar paid by Plaintiffs and Class members to Aliera for participating in a purported HCSM plan, 84% is funneled directly to Aliera and only 16% remains to cover medical claims.

75.    This allocation is the reverse of the way legitimate insurers and HCSMs are structured, in which most of the premiums or member contributions are used to cover medical expenses. Because Defendant offers *de facto* insurance coverage to

individuals, the ACA's mandated medical loss ratio dictates that Defendant is subject to the 15% cap on non-medical costs such that 85% of premiums[4] collected must go to "reimbursement for clinical services provided to enrollees" plus "activities that improve health care quality."[5] 42 U.S.C. § 300gg-18(b)(1)(A)(ii).

76.    By retaining 84% of member contributions as "fees" and diverting excessive fees to Aliera's owners, Defendant is in violation of the ACA medical loss ratio mandate. Aliera's draconian fees bear no relationship to the cost of administering the plans and are wrongly siphoned to and retained by Aliera's owners, saddling Plaintiffs and other Class members with millions of dollars in covered but unpaid medical bills and with excessive "contributions" or premiums.

77.    At all relevant times, Aliera designed, marketed, and sold the pseudo-HSCM plans at issue in this case to Plaintiffs and the Class using affiliated companies that did not in fact qualify as HCSMs under federal or Georgia law.

78.    Defendant sold plans to thousands of new members who paid a monthly fee to Defendant to participate in Defendant's purported HCSM plans.

79.    In its marketing and sales materials, Defendant concealed from

---

[4] The "small market" requirement is 80%.

[5] Insurers generally report less than 1% of premiums collected are expended on such quality improvement activities.

Plaintiffs and the Class that Defendant's plans did not qualify as HCSM plans under the federal law (including the ACA) or Georgia law because Trinity was created after December 31, 1999 and had no qualifying predecessor entity, and for other reasons. *See* 26 U.S.C. § 5000A(d)(2)(B)(IV) (To be an HCSM the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999.").

80.    Defendant falsely and misleadingly represented that Trinity was offering Plaintiffs and the Class memberships in an HCSM—including doing so in the 2018 and 2019 Member Guides, on membership identification cards, and online and in other marketing and advertising materials—when, in reality, neither Aliera nor Trinity qualify as HCSMs under federal or Georgia law, as Defendant knew or should have known.

81.    Under the ACA, an HCSM's members must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs;" an HCSM must have been "in existence at all times since at least December 31, 1999;" and an HCSM's members must have shared medical expenses "continuously and without interruption since at least December 31, 1999" (*see* 26 U.S.C. § 5000A(d)(B)(ii)(I)-(V)).

20

82.    Defendant cannot qualify as an HCSM under the ACA because:

a.    Aliera and Trinity were formed after December 31, 1999 and members have not shared medical expenses "continuously and without interruption since December 31, 1999." Defendant has never been recognized as an HCSM by any federal or state governmental agency (including HHS or IRS), and several states have investigated and enjoined Defendant and/or its affiliated companies from conducting its business because Defendant does not meet the legal requirements of an HCSM and is actually selling illegal insurance. Trinity—which was formed in 2018, had no members at the time it was created, and has no valid predecessor entity whose experience it can rely on—has likewise not operated since 1999 and has no predecessor on whose experience it can lawfully rely to satisfy that requirement.

b.    Membership in Defendant's plans is not "faith based," and members share no common sectarian beliefs. Instead, Aliera allows any individual to be a member regardless of their faith or any connection to a faith community.

c.    Defendant's members do not play a role in determining benefit guidelines (such as through a vote or election of representatives); determining procedures for allocating benefits; determining which medical expenses will be covered; or determining who gets paid benefits and when. Instead, Aliera alone develops membership guidelines; determines which medical expenses get covered; and retains total discretion to determine which claims will be paid without member input. While Aliera holds itself out as member-organized and member-run organization, in reality Aliera, like a traditional insurer, is the sole and final arbiter of the plans and benefit claims, and its members play no material role in managing the plans.

83.    In addition to failing to meet federal HCSM requirements, Aliera and Trinity independently fail to meet Georgia HCSM requirements pursuant to O.C.G.A. 33-1-20. Among other things:

a.    Neither Defendant nor its affiliated companies have been operated as faith-based organizations.

b.    Membership is not limited to people who share a similar faith, and the non-sectarian principles members affirm prior to enrolling in the pseudo-HCMS plans do not even match the Christian beliefs set forth in the bylaws of the affiliated companies.

c.    Defendant's plans are available to members of any faith or no faith at all. Aliera's training materials acknowledge that members' subscribing to a purported set of vague "beliefs" is a pro forma administrative step, and Defendant's sales agents are instructed that the "beliefs" to be are "basically . . . saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Hindu God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can."

d.    Neither Defendant nor its affiliated companies "facilitate" the transfer of funds between members as contemplated by legally constituted HCSMs. Instead, Members make payments directly to Defendant, and Defendant in turn assumes full risk and makes payments to members from a pool of money. As with traditional insurance, members pay monthly premiums.

e.    Members' contributions/premiums are not voluntary. If members do not pay, their plans are terminated (as Plaintiffs were after they stopped paying), and they cannot contribute further to other members or receive payment for their medical expenses from other members. As such, Defendant's plans constitute insurance, not legitimate HCMS plans, where members receive payments

from members of the same faith community where they do not have the ability to pay contributions or pay for those medical expenses.

f.   Defendant does not provide a written monthly statement to participants that discloses the total dollar amount of qualified needs submitted, as well as the amount actually published or assigned to participants for their contribution.

84.   Defendant has regularly accepted and enrolled members in its purported HCSM plans regardless of any faith-based affiliation. In practice, Defendant enrolls "all comers."

85.   Contrary to Defendant's repeated representation (in its promotional materials, member guides, and on membership cards) that neither it nor its affiliated companies are offering insurance, that is in substance what is being offered, albeit the insurance so offered is illegal.

86.   Defendant frequently includes statements disavowing that the plans are insurance solely in order to support the false assertion that the plans are legitimate HCSM plans.

87.   Defendant uses other contrivances to create the trappings of an HCSM, but they are shams that are for appearance and do not meet the substantive requirements of a legally constituted and operated HCSM.

88.   For example, Defendant uses a "ShareBox" to create the false impression that it operates the plans to allow for the kind of medical cost sharing

that is a part of a true HCSM, but in fact the plans are operated like insurance, not an HCSM, and the so-called ShareBox is mere window dressing in its actual operation.

89.    Defendant's plans have been and are marketed, sold, and administered as "health care plans," a term that by law connotes an insurance plan. *See, e.g.*, O.C.G.A. § 33-20-3(3).

90.    Defendant's plans resemble insurance in every material respect, other than providing the promised coverage. Because Defendant is not a legal HCSM, and due to the nature of the benefits offered, its plans are not exempt from the ACA, and the plans constitute insurance under applicable federal and Georgia law.

91.    Defendant's plans involve an application process that is materially indistinguishable from the process of applying for insurance (including completing a medical history), an underwriting process to determine each member's monthly fee, the assumption of risk by Defendant for costs associated with members' healthcare needs, and the carving out from coverage of certain preexisting conditions and other needs. Defendant's products even use the same "metals nomenclature" as traditional insurance plans offered under the ACA, with plans marketed as "bronze," "silver," or "gold."

92.    While Defendant offers members insurance, it is not a legal insurer and has not been authorized or certified by Georgia or any other state to sell or issue the insurance it offers to members, including Plaintiffs. Defendant failed to disclose these material facts to Plaintiffs and the Class.

93.    Throughout the Class period, in the Member Guides Defendant falsely and misleadingly represented that its plans are "faith based medical needs sharing membership[s]"; that members "voluntarily share healthcare needs" among one another; and that "membership is based on a tradition of mutual aid, neighborly assistance, and burden sharing."

94.    Defendant and the Moses family contrived, formed, and operated Aliera and its affiliated companies as a means to obtain exorbitant illegal payments and profits, and they misused (and continue to misuse) Aliera and Trinity (and Unity previously) to cause consumers like Plaintiffs and Class members to pay thousands or tens of thousands of dollars in premiums per year that were and are then funneled to Aliera and its principals. Defendant misrepresented the plans' true and illegitimate purpose and operation in this material regard, among others.

95.    Aliera's draconian fees bear no relationship to the cost of administering the plan and are wrongly siphoned to and retained by Aliera's owners as profit,

saddling Plaintiffs and other Class members with thousands of dollars in medical

bills and premiums that, by law, should be rebated.

96.    In addition to its misrepresentations, Defendant has failed to make

material disclosures that members would need to know to make an informed choice

regarding potential membership. Among other things, Aliera failed to inform

potential members in promotional materials, membership materials (including past

and present Member Guides), or supplemental materials that:

      a.    Aliera was formed by or at the direction of Timothy Moses, for his benefit and his family's benefit, and that Mr. Moses was a felon and had previously been convicted of securities fraud and perjury and had his bail revoked while on parole because he lied about his financial assets;

      b.    Aliera's former partner, Anabaptist Healthshare, severed its ties to Aliera and the Moseses after discovering that Aliera and the Moseses were misappropriating member funds for their own benefit and using Anabaptist as a pawn to further Aliera's attempt to profit from illegal insurance contracts while evading regulation as an insurer;

      c.    Trinity was formed at the behest of Aliera and its owners, after Anabaptist severed ties to Aliera, so that Aliera and its owners could use Trinity as their new pawn to continue their illicit scheme to sell insurance illegally;

      d.    A number of courts and state regulators have ordered Aliera to stop selling the plans at issue in their respective states and/or warned consumers against purchasing the plans because they constitute illegal insurance;

     e.    More than 80% of member contributions were diverted to Defendant and its owners and managers rather than to paying member claims; and

     f.    Members are entitled to the rights afforded to them by the ACA and Georgia laws that prohibit discrimination, unfair claims settlement practices, multi-level informal dispute resolution procedures, and binding arbitration.

97.    Defendant presently advertises that Trinity or an unspecified predecessor entity has been in existence and shared medical expenses continuously and without interruption since 1997. *See* https://www.trinityhealthshare.org/wp-content/uploads/TrinityHealthShareFederalDefinition2.pdf. In reality, Trinity did not exist until 2018; it had no members as of the date it was formed; and it has no predecessor entity.

98.    Aliera has offered various baseless theories of how Trinity supposedly functions through a predecessor organization. One such claim is that Trinity should be given "pre-1999 credit" because the "Baptist association of churches have been in existence and sharing since the 1600s."

99.    Another contrived theory Defendant has offered for its claim that Trinity has "effectively" existed since 1997 is based on Trinity's agreement with a Georgia church that helped its members share medical costs since 1997. Among other deficiencies in that argument is that Trinity did not enter into the contract until 2020, approximately two years after Trinity was formed. *See* https://www.trinity

healthshare.org/2020/01/trinity-healthshare-announces-agreement-with-faith-driven-life-church/. Even if Trinity's shell contract could somehow make Trinity a bona fide HCSM prospectively, it would be irrelevant prior to 2020.

100.  Plaintiffs and the Class relied upon Defendant's material misrepresentations that the plans being offered were legitimate and legal HCSMs that would provide medical coverage, rather than the illegal and fraudulent contrivance they actually were, the true purpose of which was to circumvent state and federal insurance laws in a scheme to funnel money collected as premiums or "contributions" to Defendant and the individuals who controlled Defendant.

101.  Defendant's misrepresentations go to the entire legitimacy, nature, legality, and even existence of the plans sold and operated by Defendant. The pervasive nature, extent, and character of Defendant's misrepresentations precluded any customer or potential customer from making a knowing and informed consent or agreement to participate in the illegal insurance plans sold by Defendant that are at issue here.

102.  During the Class period, Defendant knew, or at a minimum should have known, that its pseudo-HCSM plans did not qualify as HCSM plans, but Defendant has nevertheless continued to represent its plans as qualifying HCSM plans, and has continued to charge and take significant payments from Plaintiffs and the Class.

Defendant has done so as part of its illegal scheme to avoid federal and state insurance regulations, including the ACA limitation on the percentage of revenue that an insurer can use for its own purposes rather than healthcare-related purposes.

103.    All of the claims asserted in this Complaint are governed by the law of Georgia (both its choice-of-law rules and its substantive provisions). Georgia is not only the forum state but is also where Defendant is headquartered, where Defendant carried out the unlawful conduct complained of in this Complaint, and where Plaintiffs and the Class were harmed as a result of the illegal conduct described herein.

104.    The actions of Defendant complained of herein were taken willfully, maliciously, in bad faith, and with the specific intent to cause harm to Plaintiffs and the Class, and Defendant's actions have in fact caused the intended harm to Plaintiffs and the Class. To the extent that punitive damages are available as a remedy for the specific claims set forth herein, therefore, such punitive damages are unlimited. O.C.G.A. § 51-12-5.1(f).

**TRINITY'S SHAM DISPUTE RESOLUTION PROCEDURES**

105.  In furtherance of Defendant's scheme to illegally divert to Defendant and its owners the premiums it collected, Defendant has regularly and routinely delayed and denied payment on claims that are covered by the plans.

106.  To that end, during much of the Class period, Defendant imposed a dispute resolution procedure that required any member who disagreed with a determination regarding payment of a claim to utilize a byzantine, six-step internal dispute-resolution procedure that involves no medical professionals and violates the ACA, among other laws. The ACA requires that any internal claim appeal process have no more than two levels of internal appeals and must involve medical professionals. *See* 45 C.F.R. § 147.136.

107.  When members' claims remain unpaid after that appeal process, they were then required to participate in mediation, which was then to be followed by mandatory arbitration before the American Arbitration Association that is binding on the member, but by its terms is not binding on Trinity ("the aggrieved sharing member agrees to be legally bound by the arbitrator's final decision"). Arbitrations "shall be held in Atlanta GA" and are conducted "subject to the laws of the State of Georgia."

108. The arbitration provision was in plain violation of Georgia law that forbids such provisions in insurance contracts. O.C.G.A. § 9-9-2.

109. Besides being illegal under federal and Georgia law, Defendant did not design the aforementioned dispute resolution process and eventual arbitration as a *bona fide* means to settle disputes but, instead, designed and misused the process as a means to delay and deny covered claims; force members to accept unreasonable settlements for covered claims; force members to incur costs that would make it impossible or impractical to recover covered claims; deny legally required recourse to the court system; allow Aliera's owners to illegally funnel a large portion of member contributions into their own pockets; unreasonably extend the time for payment of those claims that were eventually paid; and saddle members with substantial medical costs that should have been covered under the plans.

110. At other times during the Class period, Defendant has employed dispute-resolution procedures that while not unlawful on their faces were used as a means of delaying resolution of and denying Plaintiffs' and the Class members' claims.

111. At all times, Aliera, not Trinity, Unity, or any other independent third party, has handled claims determinations and appeals under the plans at issue.

112.   Upon information and belief, most claims that have been subject to the sham dispute resolution process involved covered claims, but were wrongly delayed and/or denied by Aliera in its capacity as administrator. Defendant intentionally designed the purported dispute resolution procedures and arbitration provisions as a mechanism to further Defendant's scheme to avoid paying covered claims.

113.   For the foregoing reasons, among others, and because the mechanism provided by Defendant to resolve claim disputes was illegal and designed and used to facilitate the denial of covered claims, in each and every instance in which Defendant has delayed or denied honoring and paying a claim, that action of Defendant is illegal and ultra vires and Defendant is estopped from denying the claim. By law and equity, Defendant must honor and pay all such claims that have been submitted to it for payment during the Class period at least when the illegal claim procedure was in effect.

## DEFENDANT IS SANCTIONED AND ENJOINED IN SEVERAL STATES BUT CONTINUES SELLING ILLEGAL PLANS TO CONSUMERS

114.   Defendant's knowledge of facts and events during the Class period is based in part upon findings by numerous courts and governmental agencies that Defendant was illegally selling its plans and that the plans were not qualified as HCSM plans and instead were illegal insurance.

115.   Defendant and/or its affiliated companies have been investigated, sued, enjoined, and subjected to cease and desist orders in several jurisdictions, all or most of which have determined that Defendant's plans do not qualify as HCSMs and that Defendant is engaged in the unauthorized business of insurance.

116.   In April 2018, the Maryland Insurance Commissioner and Aliera entered into a Consent Order mandating that Aliera pay a civil fine and cease selling its plans in Maryland. In February 2020, Maryland found that Aliera was actively trying to sell unauthorized health insurance plans in Maryland in violation of state law and the April 2018 Consent Order.

117.   In April 2019, the Washington State Office of the Insurance Commissioner ("OIC") issued a final investigative report following its receipt of complaints about Defendant dating back to September 2018, shortly after Trinity was formed. The Washington OIC found that Aliera had provided unfair, deceptive, and/or misleading information to prospective agents, potential consumers, and the general public about the nature of its products. In May 2019, the Washington OIC issued cease and desist orders to Defendant.

118.   Also in May 2019, the New Hampshire Insurance Department issued a press release advising consumers that Aliera may be operating illegally in New Hampshire and noting that it was "concerned about potential fraudulent or criminal

activity on the part of Aliera." The New Hampshire Insurance Commissioner issued a cease and desist order against Defendant in October 2019 that prohibited it from selling or renewing its health insurance products in that state.

119.    In July 2019, the State of Texas filed suit against Aliera alleging that it was illegally engaged in the business of insurance and noting that rather than being the HCSM it claimed to be, Aliera "is a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to 'administrative costs.'" A Texas court entered a temporary restraining order prohibiting Aliera and its affiliates from enrolling any new customers in Texas. The hearing to convert that TRO to a preliminary injunction was continued after Aliera agreed not to accept new business in Texas or expend funds outside the ordinary course of business until the case is resolved.

120.    In August 2019, Colorado's Division of Insurance issued Cease and Desist Orders directing Defendant to immediately stop selling unauthorized insurance in Colorado, finding that Defendant's conduct in selling plans in Colorado was "fraudulent, creates an immediate danger to public safety, and/or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury." Colorado Cease and Desist Order, Aug. 12, 2019 at page 4, ¶33.

121.    In December 2019, the Connecticut Insurance Department issued a

Cease and Desist Order directing Defendant to stop selling its plans in Connecticut after finding that Defendant did not qualify as an HCSM and that Aliera was illegally acting as an insurer in Connecticut. Connecticut ordered Defendant to immediately cease and desist from acting as insurers in the State of Connecticut.

122. Defendant's business dealings have been the subject of litigation between Aliera and Anabaptist, and in April 2019, the Fulton County, Georgia, Superior Court enjoined Aliera from unilaterally transitioning any Anabaptist/Unity members into Trinity plans, as Defendant had planned to do, and appointed a receiver to oversee certain assets at issue in that litigation. In November 2019, the receiver submitted his initial report, in which he found that Aliera had commingled Unity- and non-Unity-related funds in a single bank account exclusively controlled by Aliera. *Aliera Healthcare, Inc. v. Anabaptist Healthshare, LLC, et al*, 2018-cv-308981 (Fulton Super. Apr. 25, 2019) ("Georgia Injunction").

123. Testimony from officers of Anabaptist in that case revealed that by January 2018 Aliera was not properly segregating members' periodic contributions and was not segregating plan assets, but instead "unilaterally allocated revenues in the manner in which Aliera saw fit, keeping as much of the incoming member funds for Aliera's own benefit as it desired." Georgia Injunction, Page 12, ¶ 68.

124. Timothy Moses admitted in that case that Aliera had made material

misrepresentations to Florida regulators regarding Aliera plan funds. *Id.* at ¶ 70.

125. Despite these findings by courts and state regulators, Defendant continues to market, sell, and administer its plans to Plaintiffs and the Class as HCSM plans and continues to demand and take premiums from Plaintiffs and the Class, all without disclosing the existence or findings of these ongoing judicial and regulatory actions. Defendant continues to do so in most states in the United States.

126. The products that Defendant sold to Plaintiffs and the Class members presented Plaintiffs and the Class members (without their knowing) with the worst of all worlds. On the one hand, the plans sold did not qualify as HCSM plans under the ACA and Georgia law, and Plaintiffs and the Class members were denied the protections inherent in doing business with a legitimate religious-based, non-profit entity operating with a bona fide HCSM. On the other hand, although the plans were in substance insurance contracts, Defendant sought to deny Plaintiffs and the Class the legal protections to which policyholders are entitled.

## CLASS ACTION ALLEGATIONS

127. This action is brought by Plaintiffs individually and on behalf of the Class described below (the "Class") pursuant to Rule 23, subdivisions (a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

128. Plaintiffs seek certification of the following Class:

> All current and former participants in Aliera plans from 2017 forward who have made periodic payments to Defendant to participate in plans presented as HCSM-compliant plans.

129.  Excluded from the Class are (1) any Judge or Magistrate Judge presiding over this action and their family members and employees; (2) Defendant, its corporate parents, subsidiaries and affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (3) persons who properly and timely request to be excluded; (4) the legal representatives, successors, or assigns of any such excluded persons or entities; and (5) residents of California, Colorado, Missouri, and Washington states.

130.  The Class consists of many thousands of Defendant's policyholders or members and is so numerous that joinder of all members is impracticable.

131.  Although the exact number of members is unknown to Plaintiffs at this time, the identities and addresses of the members of the Class can be readily determined from business records maintained by Defendant.

132.  Plaintiffs' claims are typical of those belonging to Class members.

133.  Plaintiffs' claims stem from Defendant's improper and illegal practices as alleged in this Complaint.

134.  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced in complex class action litigation.

135.   Plaintiffs and their counsel have no interests which are adverse to those belonging to the Class members that Plaintiffs seek to represent.

**Rule 23(b)(1)**

136.   Class action status is warranted under Rule 23(b)(1)(A).

137.   Prosecuting separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

138.   Class action status is also warranted under Rule 23(b)(1)(B).

139.   Prosecuting separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

**Rule 23(b)(2)**

140.   This action is appropriate as a class action pursuant to Rule 23(b)(2). Plaintiffs seek injunctive and declaratory relief for the Class. Defendant has acted in a manner generally applicable to each member of the Class.

141.   Defendant's unlawful practices, if not enjoined, will subject Plaintiffs

and Class members to enormous continuing future harm and will cause irreparable injuries to such policyholders.

142.   The adverse financial impact of Defendant's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiffs and Class members.

**Rule 23(b)(3)**

143.   This action is also appropriate as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3). Common questions of law and fact predominate over any individualized questions. Common legal and factual questions include the following:

a.   Whether Defendant's plans were HCSM plans;

b.   Whether Defendant's plans were illegal insurance plans or were falsely represented *not* to be insurance;

c.   Whether Defendant violated federal law or state law by offering and selling its plans to Plaintiffs and the Class or by administering the plans;

d.   Whether Defendant knew during the Class period that the plans it sold to Plaintiffs and the Class members were not HCSM plans and constituted insurance;

e.   Whether Plaintiffs and Class members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

f.   Whether Plaintiffs and Class members are entitled to declaratory relief; and

g.    Whether Plaintiffs and Class members are entitled to preliminary or permanent injunctive relief, or other equitable relief, against Defendant.

144.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a.    Given the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant has committed against them;

b.    Absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

c.    Once Defendant's liability has been adjudicated claims of all Class members can be determined by the Court;

d.    This action will ensure an orderly and expeditious administration of the claims and foster economies of time, effort, and expense, and ensure uniformity of decisions concerning Defendant's actions;

e.    Without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds derived from its wrongful conduct; and

f.    This action does not present any undue difficulties that would impede its management by the Court as a class action.

145.   A class action is superior to other available means for the fair and efficient adjudication of this controversy for other reasons as well. The injuries suffered by individual Class members are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address

Defendant's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

146.   Plaintiffs cannot be certain of the form and manner of a proposed notice to Class members until the Class is finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail or email will be given to Class members who can be identified specifically. In addition, notice may be published in appropriate publications, on the Internet, in press releases and in similar communications in a way that is targeted to reach class members. The cost of notice, after class certification, trial, or settlement before trial, should be borne by Defendant.

147.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## COUNT I
## MONEY HAD AND RECEIVED

148.   Plaintiffs re-allege and incorporate the preceding allegations as if set forth fully herein.

149.  Plaintiffs bring this claim on behalf of themselves and on behalf of the Class against Defendant.

150.  Plaintiffs paid Aliera for the purported HCSM plans covering Plaintiffs and/or their families. The Class members made similar monthly payments to Defendant for purported HCSM plans.

151.  Defendant had no right to receive or retain any of such payments.

152.  Defendant and its principals used the payments of Plaintiffs and the Class members for their own purposes and profits and to pay for the administrative costs of running their business, but not for providing the actual services that were advertised (*i.e.*, coverage for medical bills), as required by law.

153.  Plaintiffs and the Class members made their payments to obtain coverage for medical expenses through what purported, falsely, to be legal and proper HCSM plans, but in reality, the plans in question were not HCSM plans, and Defendant had no right to receive or retain any of said payments.

154.  The plans Defendant sold and in which it enrolled Plaintiffs and the Class were illegal insurance contracts that Defendant had no right or permission to sell under federal law or the law of Georgia, the state in which at all material times Defendant has been located and conducted the unauthorized activities that are the subject of this action.

155.  It would be unjust and improper to allow Defendant to retain the money Plaintiffs and the Class members directly conferred to Defendant, and Defendant should not in equity and good conscience be permitted to keep the funds that Plaintiffs and the Class members have paid to Defendant.

156.  The payments made by Plaintiffs and the Class to Defendant justly belong to Plaintiffs and the Class and should be returned to them.

157.  Plaintiffs, on behalf of themselves and the Class members they seek to represent, have demanded return of the funds that they and Class members paid to Defendant, and Defendant has failed and refused to comply with that demand.

158.  The payments that Plaintiffs and the Class have made to Defendant constitute monies had and received that Plaintiffs and the Class are entitled to recover from Defendant together with interest, punitive damages, and the costs of litigation, including attorneys' fees.

**COUNT II**
**UNJUST ENRICHMENT**

159. Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 147 of this Complaint as if set forth fully herein.

160.  Plaintiffs bring this claim on behalf of themselves and on behalf of the Class against Defendant.

161.  Plaintiffs and the Class members paid Defendant each month for Defendant's purported HCSM plans covering themselves and their families.

162.  Defendant retained Plaintiffs' and the Class members' payments, and Plaintiffs and the Class members conferred a direct benefit on Defendant.

163.  Defendant and its principals used the payments of Plaintiffs and the Class members for Defendant's own purposes and profits and to pay for the administrative costs of running Defendant's business, but not for providing the actual services that were advertised (*i.e.*, coverage for medical bills), contrary to law.

164.  Plaintiffs and the Class members made their payments as purported "contributions" for what they believed was an HCSM plan, but in reality, Defendant and the companies with which it worked (*e.g.*, Trinity) were not HCSMs and the plans in question were not HCSM plans.

165.  Rather than apply payments from Plaintiffs and the Class members to pay for participants' covered medical expenses, the covered medical claims of other Class members, or improving the quality of healthcare, Defendant kept for itself the substantial majority of the contributions by Plaintiffs and the Class primarily as profit.

166.  Defendant would be unjustly enriched if it were allowed to retain the money Plaintiffs and the Class members have paid to Defendant, and Defendant

should not in equity and good conscience be permitted to keep the funds that Plaintiffs and the Class members paid to Defendant.

167. Defendant's inequitable conduct caused Plaintiffs and other Class members to pay to Defendant thousands of dollars or tens of thousands annually, payments to which Defendant were not legally permitted to receive or retain.

168. The failure to compensate Plaintiffs and the Class members for the extensive benefits conferred upon Defendant renders the transactions between Plaintiffs and the Class members, on the one hand, and Defendant, on the other hand, unjust.

169. There being no contractual provision that expressly controls the subject matter of the instant claims, equity requires that Defendant pay restitution of the amounts paid by Plaintiffs and the Class and unjustly retained by Defendant, plus interest, punitive damages, and the costs of litigation, including attorneys' fees.

**COUNT III**
**BREACH OF CONTRACT AND**
**<u>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

170. Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 147 of this Complaint as if set forth fully herein.

171. Plaintiffs bring this claim against Defendant on behalf of themselves and on behalf of the Class.

172. All contracts include a duty to comply with the applicable rules of law.

173. The transactions between Defendant and the Class members (including Plaintiffs) created certain enforceable rights and duties regarding the handling and payment of members' claims and the allocation of members' premium payments ("contributions"). Defendant breached its contractual duties by directing an illegally large share of those payments to its own personal profits and that of its principals and by refusing to pay medical expenses that should have been covered, all of which actions have been in bad faith by Defendant.

174. Defendant further breached the implied covenant of good faith and fair dealing by taking members' payments and using them for personal profits and that of its principals, by refusing to pay medical expenses that should have been covered, and by misrepresenting the true nature of the products being sold to members, which were not HCSMs but were in fact unlawful contracts of insurance.

175. Defendant's breaches of contract, including its breaches of the implied covenant of good faith and fair dealing, have caused Plaintiffs and the Class members to suffer damages in an amount to be proven at trial.

## COUNT IV
## CONVERSION

176. Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 147 of this Complaint as if set forth fully herein.

177.  Plaintiffs bring this claim against Defendant on behalf of themselves and on behalf of the Class.

178.  Plaintiffs paid thousands of dollars in monthly premiums to Defendant to obtain coverage for themselves and/or their families. Plaintiffs paid these monthly contributions to Defendant to participate in a purported HCSM plan offered by Defendant and to pay for medical expenses and the medical expenses of other Class members and to pay for the reasonable administration costs of the plans.

179.  Other Class members similarly made monthly payments to Defendant to participate in a plan that would provide coverage for their medical expenses and the expenses of other Class members.

180.  Defendant had a duty to maintain and preserve Plaintiffs' contributions for their proper and legally permitted purposes (covering Plaintiffs' and Class members' medical expenses) and to prevent their diminishment through wrongful acts.

181.  Defendant has, without legal right, exercised dominion and control over contributions (*i.e.*, premiums) paid by Plaintiffs and Class members that were intended to cover Plaintiffs' and the Class's medical expenses and has wrongfully and without authority taken for itself, its owners, and certain third parties more than 80% of those contributions primarily as administrative costs and profit, rather than

using the contributions for the intended and rightful purpose, all in hostility to the rights of Plaintiffs and Class members.

182. The funds that Plaintiffs and the Class members paid to Defendant constitute specific and identifiable funds earmarked for a specific purpose.

183. Plaintiffs and the Class members have demanded return of their money from Defendant, and Defendant has failed to return the funds.

184. Defendant continues to wrongfully and unlawfully retain these funds without the authorization of Plaintiffs or members of the Class, and Defendant intends to permanently deprive Plaintiffs and the members of the Class of their contributions for Defendant's own profit rather than applying those payments to Plaintiffs' and Class members' benefits claims and/or refunding to Plaintiffs and the Class excess premiums received.

185. As a direct and proximate result of that wrongful conversion, Plaintiffs and the Class members have suffered and continue to suffer damages.

186. Defendant has converted for its own use the periodic payments made by Plaintiffs and the Class.

187. Plaintiffs and the Class have been damaged in an amount to be determined at trial, including special, general and punitive damages, interest, and the costs of litigation and attorneys' fees.

## COUNT V
## BREACH OF FIDUCIARY DUTY/CONFIDENTIAL RELATIONSHIP

188.  Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 147 of this Complaint as if set forth fully herein.

189.  Plaintiffs bring this claim on behalf of themselves and on behalf of the Class against Defendant.

190.  The transactions and facts governing the relationship between Defendant on the one hand and Plaintiffs and the Class members on the other give rise to a fiduciary or confidential relationship between the parties, such that Defendant owed a heightened a duty of the utmost good faith to Plaintiffs and the Class members.

191.  Plaintiffs and Class members placed an enormous amount of trust in Defendant, parties of vastly superior power and bargaining position; provided Defendant with many millions of dollars of payments annually for plans offered by Defendant, and empowered Defendant to allocate those funds to cover members' medical expenses, administer the plans, and make crucial healthcare decisions.

192.  Defendant invited and accepted its power, responsibility, position of trust, and member contributions, and in turn, Plaintiffs and Class members weakened their ability to make their own healthcare choices while reasonably assuming that

Defendant would place member interests above the individual interests of Defendant and its owners and the interests of other third parties.

193.  Defendant retained substantial discretion with respect to the use and allocation of Plaintiffs' and the Class members' money and the control of Plaintiffs' and the Class members' healthcare, both in the initial determination of any claim and in the appeals process that would be prohibited if Defendant called these plans what they were (*i.e.*, insurance contracts).

194.  In addition to the discretion Defendant arrogated to itself, Defendant purported to protect and facilitate the faith-based and community structure of the plans offered by Defendant, and by doing so, elevated its relationship with Plaintiffs and Class members above a simple commercial relationship.

195.  Defendant further elicited trust and reliance from Plaintiffs and the Class members by misrepresenting that Defendant met the requirements of an HCSM, and that it had been continuously operating a sharing ministry since December 1999, almost twenty years before Trinity was even created.

196.  As a fiduciary, Defendant was required to place member interests, including Plaintiffs' interests, above its own. Defendant was required to exercise its position of trust with due care and good faith; provide members with all material

information and act honestly in all respects; and avoid conflict of interests and avoid favoring another's interests over the interests of its members.

197.  In violation of those duties, Defendant squandered, stole and diverted more than 80% of its members' contributions to Aliera's owners, *de facto* owner Timothy Moses, to Trinity, and to other third parties, all without Plaintiffs' or the Class members' knowledge, consent, or authorization.

198. Defendant had a fiduciary obligation to primarily use member contributions to cover claims and pay reasonable administration costs of the business. Instead, Defendant failed to protect and favor members' interests and allowed its owners and other third parties to line their pockets while members were left with millions of dollars in covered but unreimbursed medical expenses.

199.  Defendant violated its duty of candor to members despite its superior knowledge and proprietary knowledge, skill, and position of trust, and despite knowing that it was in a position that requires the utmost good faith.

200.  Defendant made materially false and misleading representations and failed to provide material information that members and potential members would need to know to make an informed choice about joining or continuing to participate in Defendant's plans, including: that Aliera was formed by—or at the direction—of Timothy Moses (a felon convicted of securities fraud); that Aliera's former partner

severed ties after accusing Aliera and Mr. Moses of misappropriating member contributions; that a Georgia court had appointed a receiver to provide oversight over Aliera after concluding that "Aliera's course of conduct evinces a threat of misappropriation of the plan assets"; that Aliera caused Trinity to be incorporated by a former Aliera employee and close family friend of Mr. Moses so that Aliera could continue selling illegal insurance; and that a number of states had found that Defendant was illegally selling insurance and was not authorized to sell HCSM plans, was misleading consumers, and was engaged in fraudulent advertising and misrepresentations.

201. Plaintiffs and the Class suffered damages as a proximate result of Defendant's fiduciary breaches.

202. Plaintiffs and Class members each paid monthly hundreds or thousands of dollars and incurred millions of dollars in covered but unreimbursed medical expenses based upon Defendant's breaches and its materially false and misleading information to members.

203. Defendant failed to provide members and potential members with material information they would need to know to determine whether to enter or remain in the plans; and Defendant failed to protect and misappropriated member contributions.

204.  Many Class members' medical bills, including Plaintiffs', are outstanding, meaning Plaintiffs and Class members are and will be subjected to collection efforts and enforcement actions.

205.  By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Defendant all damages and costs permitted by law, including actual, nominal, general, and punitive damages and their costs and attorneys' fees.

## COUNT VI
## INTENTIONAL OR, IN THE ALTERNATIVE, NEGLIGENT MISREPRESENTATION

206.  Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 147 of this Complaint as if set forth fully herein.

207.  Plaintiffs bring this claim on behalf of themselves and on behalf of the Class against Defendant.

208.  Defendant—in its promotional and membership materials, including on its websites, in membership identification cards (the equivalent of an insurance card), and in 2018 and 2019 Member Guides—made materially false and misleading representations and failed to disclose material statements that Defendant had a duty to disclose to Plaintiffs and Class members, including those described below.

209.  For example, Defendant falsely and misleadingly represented that:

a.   Aliera and/or Trinity were legitimate HCSMs, when they were and are not.

b.  The plans offered by Defendant were *not* insurance, when the plans were actually illegal insurance contracts.

c.  Monthly payments would go to covering members' medical expenses when, in fact, 84% of payments were being converted by Defendant and its principals for uses other than paying members' medical expenses.

d.  There was a permissible, legitimate, fair and meaningful claim dispute resolution procedure when, in fact, the dispute resolution procedures were illegal and were designed and used by Defendant to facilitate Defendant's wrongful denial of covered claims.

210.  Defendant had a duty to disclose the foregoing information based on its superior and proprietary knowledge and based on the special relationship, privity, and fiduciary duty Defendant shared with members, including Plaintiffs and the Class.

211.  Defendant made the foregoing false and misleading representations and omissions recklessly or with actual knowledge of their falsity.

212. In the alternative, Defendant made the false and misleading representations negligently, as Defendant lacked any ground—much less a reasonable ground—to believe that Aliera's plans were legitimate HCSM plans. Moreover, the plans offered by Defendant were insurance under federal law and

Georgia law. Defendant was not authorized as an insurer by federal or state law to sell or issue the plans offered by Defendant.

213.  Defendant had a duty to not act negligently and to impart accurate information to Plaintiffs and other Class members due to its relationship with Plaintiffs and Class members and/or its superior knowledge of the facts and circumstances underlying the issuance of the plans and Defendant's interactions with courts, regulatory bodies, and attorneys general.

214.  Defendant made the foregoing misrepresentations and failed to provide accurate and complete material information to induce Plaintiffs and Class members to purchase the plans offered by Defendant and to continue paying periodic fees that Defendant then diverted to its owners, including Aliera's *de facto* owner, Timothy Moses.

215.  Plaintiffs and the Class justifiably and reasonably relied on the materially false and misleading representations contained in Defendant's promotional materials, membership materials (including its 2019 Member Guide), and websites, or otherwise acted without the aforementioned material information which Defendant had a duty to disclose.

216.  Plaintiffs and Class members purchased and maintained Defendant's plans and paid periodic premiums reasonably believing that Defendant's plans were

legal and legitimate HCSM plans, rather than shams designed to avoid federal and state insurance laws and permit Defendant to loot the plans; that the premiums would be used by Defendant to fund medical expenses; and that Defendant would pay medical expenses.

217.  As a proximate result of Defendant's materially false and misleading misrepresentations and material omissions, Plaintiffs and the Class suffered damages, including many millions of dollars in payments, as well as unreimbursed medical expenses.

218.  Many Class members' medical bills, including Plaintiffs, are outstanding, meaning Plaintiffs and Class members are subjected to harassment, collection efforts, and potential enforcement actions.

219.  By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Defendant all damages and costs permitted by law, including actual, nominal, general, and punitive damages, costs, and attorneys' fees.

## COUNT VII
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. 10-1-390 *et seq.*

220.  Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1-147 and 208-216 of this Complaint as if set forth fully herein.

221.  Plaintiffs bring this claim for violation of the Georgia Fair Business Practices Act ("GFPBA") against Defendant on behalf of themselves and the Class.

222.  The purpose of the GFBPA is "to protect consumers . . . from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state." O.C.G.A. § 10-1-391(a).

223.  The GFBPA declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions," including "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade," [a]dvertis[ing] goods or services with intent not to sell them as advertised," and "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. §§ 10-1-393(b)(5), (7), (9), (12).

224. Defendant committed unlawful acts as defined by the GFBPA. Defendant—in its promotional and membership materials, including on its website, membership identification cards (the equivalent of an insurance card), and its 2018 and 2019 Member Guides, as well as in its other dealings with Plaintiffs and the Class members—made materially false and misleading representations and failed to disclose material statements that it had a duty to disclose to Plaintiffs and Class

members, including the misrepresentations and omissions described elsewhere in this Complaint.

225. Defendant engaged in unfair and deceptive acts in violation of the above-noted provisions of the Georgia FBPA by, at a minimum, making material misrepresentations regarding the plans it sold, including that the policies were qualified HCSM policies and *not* insurance.

226. Defendant owed and continues to owe Plaintiffs and the Class a duty to refrain from the above-described unfair and deceptive practices and to disclose the true nature of the pricing, legality, and qualifications of the plans Defendant sold.

227. Defendant's unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs and the Class, and were likely to and/or did, in fact, deceive reasonable consumers, including Plaintiffs and the members of the Class.

228. Plaintiffs and the members of the Class acted upon Defendant's material misrepresentations and omissions regarding the qualified HCSM status of the plans. These material misrepresentations by Defendant proximately caused damages to Plaintiffs and the Class, including damages from Defendant obtaining payments from Plaintiffs and the Class, failing to pay for medical expenses and exposing Plaintiffs and the Class to liability on medical bills.

229.   Plaintiffs and the members of the Class suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair and deceptive practices and omissions and/or misrepresentations.

230.   Plaintiffs and the members of the Class are entitled to recover damages and exemplary damages (for intentional violations) pursuant to O.C.G.A. § 10-1-399(a).

231.   Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under O.C.G.A. § 10-1-399.

232.   More than 30 days prior to this filing, Plaintiffs LeCann and Selimo sent a letter complying with Ga. Code. Ann. § 10-1-399(b) to all Defendant on behalf of themselves and the other members of the proposed Class. That notice was dated April 28, 2020 and received by Defendant no later than May 4, 2020. Plaintiffs notified Defendant about the statutory claims asserted in this Complaint and provided demands to resolve those claims. Defendant has failed and refused to provide the relief demanded therein in accordance with the GFBPA.

## COUNT VIII
## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT, O.C.G.A. 10-1-370 *et seq.*

233.   Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1-147 and 208-216 of this Complaint as if set forth fully herein.

234.   Plaintiffs bring this claim on behalf of Plaintiffs and the Class.

235.   Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 *et seq.* (the "UDTPA"), provides that it is a deceptive trade practice for a person or entity to engage in any of twelve types of conduct, including by:

> a.    "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have," O.C.G.A. § 10-1-372(a)(5);

> b.    "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another," O.C.G.A. § 10-1-372(a)(7);

> c.    "[a]dvertis[ing] goods or services with intent not to sell them as advertised," O.C.G.A. § 10-1-372(a)(9); and

d.    "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding," O.C.G.A. § 10-1-372(a)(12).

236.  Defendant engaged in a deceptive trade practice in violation of the UDTPA by falsely representing that the plans it marketed as HCSMs qualified as true HCSM plans. In so doing, Defendant falsely represented that its products had approval, characteristics, uses, and benefits they do not have, that its products were of a particular standard, quality, or grade when they were not, and that its affiliated companies had approval and status they did not have. Defendant further engaged in conduct that creates a similar likelihood of confusion or misunderstanding among the consuming public to whom Defendant's conduct was targeted and directed.

237.  Defendant engaged in a deceptive trade practice in violation of the UDTPA by advertising its purported HCSM plans as a legitimate, legal, and effective alternative to regular health insurance while simultaneously directing and intending to direct more than three fourths of all the funds paid by members to administrative costs and Defendant's own profits, rather than to covering members' healthcare needs, and while employing an unlawful dispute-resolution protocol that was designed to delay and avoid the obligation to pay for members' healthcare expenses. In this respect among others, Defendant advertised its goods and services

with the intent not to sell them as advertised and otherwise engaged in conduct that creates a similar likelihood of confusion or misunderstanding among the consuming public to whom Defendant's conduct was targeted and directed.

238.  Defendant's deceptive trade practices in violation of the UDTPA are ongoing and likely to damage Plaintiffs and the Class members in the future. With respect to existing and former members, such as Plaintiffs, numerous claims have not been paid, either because they are still outstanding, are tied up in Defendant's unlawful dispute-resolution procedure, or have been wrongfully denied.

239.  Moreover, Defendant continues to actively market its purported HCSM plans through various means, including the internet, meaning that Defendant is continuing to draw in new unsuspecting victims on a daily basis.

240.  Trinity's website makes the following misrepresentations, among others, about the quality, standards, characteristics, approval, and benefits of Defendant and its products and makes the following advertisements despite Defendant having no intention to sell its products as advertised:

    a.    "Trinity HealthShare offers a wide range of Health Care Sharing Ministry programs . . . ." In reality, none of Defendant's plans qualify as HCSM plans, and they are in substance illegal contracts of insurance.

b.    Trinity is "[a] non-profit Health Care Sharing Ministry." In reality, Defendant's plans are not HCSM plans but rather unlawful contracts of insurance, and even though Trinity is incorporated as a non-profit entity, it is in substance a puppet for and arm of Aliera, a multi-million-dollar for-profit enterprise.

c.    Defendant's plans are "designed to reduce costs and put the power of choice back into the hands of individuals and families." In reality, because of Defendant's practice of delaying and refusing to pay claims and its unlawful, sham dispute-resolution procedures, plan participants receive no corresponding benefit for their monthly payments. Defendant's plans are designed only to increase the revenue and profits of Defendant and its principals.

d.    Trinity's "ministry . . . traces its sharing of medical needs among members back to 1997." Trinity was formed in 2018 with no members and has no predecessor entity. Regardless of any contracts it might or might not have entered into in the last two years, Trinity does not and cannot satisfy the requirement that an

HCSM have been continuously operating since 1999 (let alone 1997).

e.    Trinity's "members hold a common set of religious beliefs, such as 'bear one another's burdens' (Galatians 6:2) and 'share with the Lord's people who are in need' (Romans 12:13a). We also believe that we should refrain from abusing our bodies because they are the temple of the Holy Spirit (1 Corinthians 6:19)." In reality, the "statement of beliefs" that Defendant requires plan participants to agree to are generic, secular beliefs untied to the Bible or any particular scripture or faith and conflict with Trinity's by-laws.

f.    Trinity's plans "align[] with . . . individual state laws." Defendant offered its purported HCSM plans in states in which Trinity does not qualify as an HCSM, including Georgia. In addition, Defendant failed to disclose that it was under investigation, had been sued, and had been subjected to injunctions and cease and desist orders in multiple states precisely for failing to comply with those states' laws.

g.    "When a member has an eligible medical need arise, . . . the medical expenses will be shared amongst other Trinity HealthShare participants." In reality, Defendant engages in a pattern, practice, and *de facto* policy of delaying and denying members' claims, leaving members on the hook for those expenses even after paying into Defendant's plan for extended periods of time.

241.  Plaintiffs and the Class members have suffered monetary and non-monetary losses as a result of Defendant's conduct in violation of the UDTPA, and they will continue to suffer harm until such time as an injunction is granted prohibiting Defendant from further violating the UDTPA.

242.  Defendant's violations of the UDTPA were willful, intentional, malicious, and knowing.

243.  Plaintiffs and the Class seek a judicial declaration that Defendant has violated the UDPTA, as well as an injunction prohibiting Defendant from engaging in the conduct giving rise to this claim, including by prohibiting Defendant from representing that any Aliera plans qualify as HCSMs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for

relief as follows:

a) An Order certifying this action to proceed on behalf of the Class and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

b) An Order enjoining Defendant, its representatives, and all others acting with it or on its behalf from unlawfully marketing, selling, and continuing to charge Plaintiffs and the Class for the pseudo-HCSM plans at issue;

c) An Order providing preliminary and permanent injunctive relief enjoining Defendant, its representatives, and all others acting with it or on its behalf, from marketing, selling, or charging for the pseudo-HCSM plans;

d) A Declaratory Judgment that the plans that have been marketed, sold and operated by Defendant constitute illegal insurance;

e) A Judgment awarding Plaintiffs and the Class such restitution, disgorgement, and/or other equitable relief as the Court deems proper;

f) A Judgment awarding Plaintiffs and the Class a full refund of all premiums paid while participating in the pseudo-HCSM plans;

g) A Judgment awarding Plaintiffs and the Class reimbursement for all medical expenses incurred by Plaintiffs and the Class that have been submitted and not previously paid;

h) A Judgment awarding Plaintiffs and other Class members who might be entitled to such relief actual, compensatory, statutory, punitive, and/or exemplary damages;

i) A Judgment awarding Plaintiffs and the Class their attorneys' fees and other costs; and

j) An Order or Judgment awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Plaintiffs and the Class demand a trial by jury.

Dated: June 5, 2020.[6]

Respectfully submitted,

PARKS CHESIN & WALBERT, P.C.

By: __/s David F. Walbert_____
    David F. Walbert
Georgia Bar No. 730450
Jennifer K. Coalson
Georgia Bar No. 266989
75 14th St NE 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 873-8000
Email: dwalbert@pcwlawfirm.com
Email: jcoalson@pcwlawfirm.com

Stephen J. Fearon, Jr
Paul Sweeny
Pro Hac Vice Applications to be Filed
**SQUITIERI & FEARON, LLP**
32 East 57th Street
12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**Attorneys for Plaintiffs and the Proposed Class**

---

[6] Pursuant to Local Rule 7.1(D), undersigned counsel certifies that this filing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).