## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NOELLE LeCANN, KRISTIN SELIMO, and TANIA FUNDUK, on behalf of themselves and others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>THE ALIERA COMPANIES, INC., formerly known as ALIERA HEALTHCARE, INC.,<br><br>     Defendant. | Civil Action File<br><br>No. 1:20-cv-2429-AT |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR COMPEL ARBITRATION

David F. Walbert
Georgia Bar No. 730450
Jennifer K. Coalson
Georgia Bar No. 266989
**Parks, Chesin & Walbert, P.C.**
75 14th St. NE, 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 873 – 8000
dwalbert@pcwlawfirm.com
jcoalson@pcwlawfirm.com

Stephen J. Fearon, Jr.
*Admitted Pro Hac Vice*
Paul Sweeny
*Admitted Pro Hac Vice*
**Squitieri & Fearon, LLP**
57th St., 12th Floor
New York, New York 10022
Telephone: (212) 421 – 6492
stephen@sfclasslaw.com
paul@sfclasslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

## Table of Contents

I.    ALIERA'S PRODUCTS ARE INSURANCE. ........................................................ - 2 -

    A.  Why Aliera Wanted a Health Care Sharing Ministry ................................ - 2 -

    B.  HCSM Requirements Have Been Ignored ................................................ - 7 -

    C.  Aliera's Plans Are "Insurance." .............................................................. - 12 -

    D.  Rulings of State Agencies Confirm That Aliera's Products Are Not Protected by Their Contrived HCSM Relationships. ............................................. - 18 -

II.   ARBITRATION IS NOT REQUIRED IN THIS CASE ........................................ - 21 -

    A.  Motions to Compel Arbitration Generally .............................................. - 21 -

    B.  The Arbitration Provision And The "Delegation" Provision, To The Extent There is One, Are Illegal and Void. ........................................................ - 23 -

    C.  No Arbitration Agreement Exists That Covers Plaintiffs' Claims. .......... - 27 -

III.  MEDIATION IS NOT A PREREQUISITE TO THIS ACTION ............................. - 34 -

    A.  Plaintiffs Have Not Failed to Satisfy a Condition Precedent to Suit. ....... - 34 -

    B.  If There Were a Mediation Requirement Here, It Would Be Unenforceable as a Matter of Law. ................................................................................. - 36 -

IV.   CONCLUSION ........................................................................................ - 37 -

Plaintiffs' claims arise from a scheme devised by Aliera to illegally sell and administer insurance plans under the misrepresentation that the plans are exempt from federal and state insurance laws, supposedly because Aliera works in conjunction with supposed healthcare sharing ministries ("HCSM"). Aliera seeks to compel arbitration based on a provision in Member Guides [Doc. 12-14] at 12, but its motion is misplaced for several reasons. Chief among them, arbitration requirements are illegal and unenforceable in insurance contracts under applicable law. O.C.G.A. § 9-9-2(c)(3); *McKnight v. Chi. Title Ins. Co.*, 358 F.3d 854, 857 (11th Cir. 2004).

To prevail on its motion, Aliera would have to establish that the health care plans at issue are ***not*** insurance, and in addressing that issue, the Court must "give to the party denying [the arbitration] agreement the benefit of all reasonable doubts and inferences that may arise." *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1360 (N.D. Ga. 2015). In fact, the record contains undeniable proof that the plans Aliera sold were "insurance," thus rendering the arbitration provision illegal.

Aliera neglects to mention either the controlling law on this issue or recent rulings against it involving the same plans and arbitration provision at issue here. *See Jackson v. The Aliera Cos.,* No. 2:19-cv-1281-BJR, 2020 WL 2733722 (W.D. Wash. May 26, 2020). In *Jackson,* Plaintiffs "sufficiently alleged that Trinity is an insurance company [and] the AlieraCare plans that Defendants created, marketed and sold are

insurance." *Id.* at \*7. Therefore, since Washington prohibits arbitration provisions in insurance contracts, like Georgia, *Jackson* held that Aliera's "dispute resolution procedures are illegal." *Id.*

## I.   ALIERA'S PRODUCTS ARE INSURANCE.

### A.   *Why Aliera Wanted a Health Care Sharing Ministry.*

Aliera was incorporated and is operated by the Moses family – Timothy Moses, his wife Shelley Steele, and their son Chase Moses. Timothy Moses has been convicted of securities fraud and perjury, *United States v. Moses*, 1:04-cr-508-CAP-JMF (N.D. Ga.), and his probation was revoked for lying to the United States about his financial dealings and secret bank accounts. *Id.* at Doc. 150. Soon after his sentence was completed in April 2015, Moses undertook the scheme at issue here.[1]

The scheme is simple in concept. A for-profit company selling health care insurance is subject to extensive regulation by state laws. *See* O.C.G.A. §§ 33-1-1 *et seq*. In addition, the Patient Protection and Affordable Care Act ("ACA") strictly limits insurers' administrative costs and profits.  At least 85% of premiums must go

---

[1] Shelley Steele incorporated Aliera Healthcare, Inc. in Georgia in 2016. (Ex. 1). Aliera began selling primary care medical home plans, which cover limited services and do not comply with the ACA if standing alone. *Aliera Healthcare, Inc. v. Anabaptist Healthshare, et al.*, No. 2018CV308981 (Fulton Super. April 25, 2019) (the "Fulton Injn.") at 4 (¶¶ 15–16) (Ex. 2), *aff'd*, 844 S.E.2d 268 (Ga. Ct. App. June 4, 2020); Receiver's Initial Report from the *Anabaptist* Litigation (Ex. 3) at 4 (¶ 5) (redactions by parties to *Anabaptist* litigation; unredacted version filed under seal).

to "reimbursement for clinical services provided to enrollees" plus "activities that improve health care quality."[2] 42 U.S.C. § 300gg-18(b)(1)(A)(i). By virtue of statutory exemptions, 26 U.S.C. § 5000A(d)(2)(B)(ii) & O.C.G.A. § 33-1-20, a legally qualified HCSM can operate outside these state and federal constraints. Because an HCSM must be a charitable 501(c)(3), however, its principals cannot take distributions, profits, or excessive compensation.[3] Moses sought to circumvent those limitations by combining a purported HCSM with Aliera and funneling the premiums to the for-profit Aliera and its principals. The scheme is completely illegal, however, because the entities Moses and Aliera used do not satisfy HCSM requirements, and the health care plans sold fall well within the legal definition of "insurance."

1.    *Aliera's first HCSM effort.* In 2016, after his release from prison, Moses approached Anabaptist Healthshare ("Anabaptist"), which had functioned as an HCSM for a small 300-person Mennonite community in Virginia. Fulton Injn. at 2 (¶¶ 2, 5), 5 (¶¶ 18–20). Moses hoped to exploit Anabaptist's regulatory exemption to sell Aliera's products, and Anabaptist sought to "expand its HCSM nationwide" by

---

[2] Insurers spend less than 1% of premiums collected on "quality improvement." *See* Centers for Medicare & Medicaid Services, "The 80/20 Rule: How Insurers Spend Your Health Insurance Premiums" (Feb. 15, 2013) at 6, *available at* https://www.cms.gov/CCIIO/ Resources/Files/ Downloads/mlr-report-02-15-2013.pdf. The "medical loss ratio" for "small market" insurers is 80%, rather than 85%. 42 U.S.C. § 300gg-18(b)(1)(A)(ii).

[3] 26 U.S.C. §§ 501(c)(3) & 5000A(d)(2)(B)(ii)(I); 26 C.F.R. § 1.501(c)(3)–1(f)(2)(ii)-(iv).

partnering with Aliera. *Id.* at 4-5. The Anabaptist board chair and director also personally stood to reap huge sums under a dubious "profit-sharing" arrangement[4] that would pay them each $2.50 per month for every enrolled member. *Id.* at ¶ 44. Aliera and Anabaptist entered into a contract providing for the creation of a new Anabaptist subsidiary, Unity Healthshare LLC ("Unity"), to serve as Aliera's HCSM. *Id.* at 6 (¶ 35); *see also* Ex. 4. Under the agreement, Aliera had exclusive authority to sell any and all health care products to Unity members; Unity had no right to sell any HCSM products. Ex. 2 at 7 (¶ 40). Aliera was responsible for "designing and implementing" all Unity plans, marketing them, cost sharing, and controlling the operation and general business banking of Unity. *Id.* (¶ 42). In short, as the Fulton County Superior Court later found, "[Anabaptist]/Unity delegated the administration of virtually all aspects of the Unity HCSM plans and plan assets to Aliera." *Id.* at 22.

Premiums were paid to Aliera, not Unity [Doc. 12-2] at 3, and the division of funds was heavily skewed in Aliera's favor and against the interests of the members, far out of line with ACA requirements that apply to nonexempt insurance. *See* Ex. 3

---

[4] *See supra* at 3 & n.3. While the payments here were technically "from" Aliera, that simply reflects how the parties papered their scheme. All premiums for Unity's HCSM products should have been the property of the non-profit, ACA-exempt Unity. *See, e.g.*, Fulton Injn. at 22 (monthly participation of members must be owned by the HCSM). In the Fulton County litigation, no party challenged the legality of the HCSM exemption of Anabaptist or Unity, of course, since an adverse ruling would have crushed their own interests as well as their adversary's.

at 14–18. Irregularities abounded in the operation of the Aliera-Unity business, including among others, Aliera's improper handling of Unity's finances; Aliera's inability to provide Unity with an accounting; Aliera's failure to segregate Unity funds; Aliera's assertion of ownership over Unity members accounts, which alone would preclude HCSM status; and Moses writing $150,000 of checks to himself from Unity's operating account without authorization. Fulton Injn. at 11–14, 22. Moses falsely represented to insurance regulators that funds related to Unity products were segregated, and he admitted that Aliera "unilaterally allocated revenues in the manner in which Aliera saw fit, keeping as much of the incoming member funds for Aliera's own benefit as it desired." *Id*. at 11–12 (¶¶ 67–70). Anabaptist terminated the agreement on August 10, 2018. *Id*. at 14 (¶70).

2. *Aliera's second HCSM effort*. With Unity gone and not even the pretense of an HCSM to use, Moses and Aliera created a new shell, Trinity Healthshare, Inc. ("Trinity"). On June 27, 2018, Aliera caused Trinity to be incorporated and installed William Thead III as CEO and sole employee. Ex. 5 at 5 (Item 2(a)), 7. Thead was a former Aliera employee and close friend of the Moses family who officiated Chase Moses' wedding. Fulton Injn. at 15–16 (¶94).

That Trinity is a mere shell operated, administered, and directed by Aliera solely to serve Aliera's purposes is apparent from the Management and

Administration Agreement executed by Aliera and Trinity on August 13, 2018. Ex. 6 at 12 ("Trinity Agreement"). The stated purpose was to allow Aliera to market "Trinity's healthcare sharing ministry programs" alongside Aliera's existing products, but in fact, no such Trinity HCSM programs existed because "Trinity currently ha[d] no members." *Id.* at 1. What Trinity did have was a pending 501(c)(3) application. *Id.* The Trinity Agreement gave Aliera full control over the business:

- Aliera is granted "an exclusive license to develop, market and sell" Trinity's purported HCSM plans to people "in the public markets who will acknowledge the standard of beliefs and other requirements as deemed necessary by Trinity, and agreed upon by Aliera." *Id.* at ¶ 1(a), (c).

- Aliera alone is "responsible for plan design (defining the schedule of medical services…), and pricing of the Plans," and Aliera has the right "at its sole discretion" to develop and manage non-insurance health care products and include them in Trinity's purported HCSM plans. *Id.* at ¶ 1(b).

- Aliera alone develops membership guidelines, determines which medical expenses are covered, and has total discretion to determine payment of claims. *Id.* at ¶¶ 1(a), (b). Aliera processes medical claims through a third-party administrator "which may be an affiliate of Aliera." *Id.* at ¶ 1(f).

- Aliera has exclusive authority "to accept any enrollment from members in the Plans in its sole discretion." *Id.* at ¶ 1(d). "Members who are enrolled in any Plan are permitted to change components of Plans as directed by Aliera," and Aliera can unilaterally substitute components of a member's plan "upon notice to the members of any Plan." *Id.*

- Trinity must use Aliera's auditor. Id. at ¶ 1(i).

- One-third of Trinity's Board of Directors can be current owners or employees of Aliera, and there is no restriction on Trinity board members being past Aliera employees or current Aliera family members or business associates. *Id.* ¶ 1(k).

- Aliera has a license to use all of Trinity's trademarks for marketing. Trinity, on the other hand, disavows any right to use Aliera IP.  *Id*. at ¶ 2(a).

- Aliera has complete ownership of the Membership Roster developed through all sales, marketing, and enrollment efforts. Trinity is not even allowed "to contact" any plan members, nor can Trinity use any information in the Membership Roster "for any purpose" without prior written consent from Aliera. *Id*. at ¶ 1(d).

Members' premiums are paid to Aliera Healthcare, [Doc. 12-2] at 3, and 65% of the premiums are kept outright by Aliera.  Ex. 7 at 21[5] (State of Washington Office of the Insurance Commission, Final Report (Apr. 8, 2019)) ("Washington Report"). *See* FED. R. EVID. 803(8)(A)(iii)). Of the 35% to Trinity, a further 54.2% of that goes to Aliera for expenses and commissions, with only 44.3% going for member medical expenses. *See also* Trinity Agreement at 14. In sum, 84% of each premium dollar goes to Aliera and only 16% to cover medical claims, Ex. 7 at 21, the opposite of the ACA's 15% limit on administrative costs and profit. *See supra* at 2-3.

## B.   *HCSM Requirements Have Been Ignored.*

Neither Unity nor Trinity conducted a legitimate HCSM in their dealings with Aliera. They simply provided a shell while Aliera ran and controlled everything from concept to creation to operation, with the money taken from members going to Aliera

---

[5] Citations to the Washington Report are to the pages of the PDF document being filed as Exhibit 7. They differ slightly from pagination in the Report itself because the title page and Executive Summary are separately numbered in the Report.

and, for the most part, remaining there. Even assuming arguendo that a legitimate HCSM can outsource some aspect of its operations without losing its HCSM status, this Court need not decide where a line might be drawn as to how much could be contracted out. Here, Aliera is the *entire* operation, controlling everything, including membership, premiums, and claims. Trinity and Unity simply provide a front for Aliera's illegal business.

HCSM status fails for several other reasons. Federal and state statutes spell out requirements for an entity to qualify as an HCSM, one of which is that the organization or its "predecessor" has been "in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously ...since at least December 31, 1999."[6] 26 U.S.C. § 5000A(d)(2)(B)(ii)(IV). In Trinity's case, it had no conceivable status as an HCSM because it was not formed until 2018. At the time it was formed, it had no members, much less members "sharing" expenses, and it has no legitimate predecessor entity on whose experience it could rely to satisfy the December 31, 1999 cutoff. Presently, Trinity claims 1997 as the date since it or some unspecified predecessor has been continuously sharing

---

[6] The cutoff date "ensures that the ministries provide care that possesses the reliability that comes with historical practice. Second, it accommodates religious health care without opening the floodgates for any group to establish a new ministry to circumvent the Act." *Liberty Univ. v. Lew,* 733 F.3d 72, 102 (4th Cir. 2013).

medical expenses. *See* www.trinity_healthshare.org/wp-content/uploads/Trinity HealthShareFederalDefinition2.pdf. Among other flaws in that argument, Trinity did not enter into the alleged contract until 2020, approximately two years after Trinity was formed. *See* https://www._trinityhealthshare.org/2020/01/trinity-healthshare-announces-agreement-with-faith-driven-life-church/. Even if Trinity's shell contract could somehow make Trinity an HCSM prospectively, it would be irrelevant prior to 2020, as Trinity was admittedly not sharing "continuously and without interruption" prior to that date.[7]

Neither do Unity, Trinity, or Aliera satisfy the faith-based requirement of HCSMs. Prior to its association with Moses and Aliera, Anabaptist had operated within a small, closely knit religious community of the same faith, but that was all abandoned with the creation of Unity and the partnership with Aliera. To be an HCSM, an entity must be "faith-based" and "[l]imit its participants to those who are *of a similar faith.*" O.C.G.A. § 33-1-20(a)(1) (emphasis added). But Unity was designed just to capture the maximum number of people possible across the United

---

[7] Trinity's attempted historical justifications for HCSM status in its defense before the Washington Insurance Commissioner were laughable. Ex. 7 at 23. For example, Trinity argued that it should receive HCSM status because some Baptist churches had been "sharing" since the 1600's. *Id.*

States. The shared Mennonite faith was gone, replaced by a set of "principles" that were so general they could include anyone. [Doc. 12-5] at 11.

Members are not screened for religious tenets or beliefs. They are just presented with a "statement of beliefs" that is secular and generic, not even referring to Christianity[8] (let alone any particular Christian sect) or any other religion. *See, e.g.,* https://www.trinityhealthshare.org/about/statement-of-beliefs/. Trinity marketing material acknowledges it does not adhere to the "same faith" requirement in the following Q&A: "Can different faiths enroll in Trinity HealthShare? Yes!" https://www. calhealth.net/Secular-non-religious-health-sharing-plan.htm#different-faiths The advert goes on to say: "Whether Christian, Jewish, Muslim, or non-denominational, there's just a statement of belief that's required with Trinity HealthShare health plans. Technically, you don't need a specific faith to qualify." Trinity's "statement of beliefs" is described as just saying "that a person can practice their belief in their own way." *Id*. Sales training materials confirm that the plans are available to members of any faith or members of no faith at all. Ex. 7 at 13–14.[9]

---

[8] The HCSM concept has a Christian origin, sometimes attributed to the statement that Christians should "[b]ear one another's burdens" in Epistle to the Galatians, Verse 2, Ch. 6.

[9] Those materials acknowledge that agreement to the stated vague "beliefs" is a mere pro forma step. Defendant's sales agents are instructed that the "beliefs" are "basically...saying that you believe in a higher power…. It does not… matter as long as we all believe that there is a higher

The Trinity Agreement directs Aliera to "sell the HCSM plans to individuals in the public markets" so long as members "acknowledge" a "standard of beliefs." Ex. 6 at 2 ¶ 1(a). Since Trinity had *no* members at the time, by definition its members had no common or similar faith, and any beliefs it might later come up with required *Aliera's* approval. *Id.* Movant is left having to argue that a supposedly faith-based sharing ministry can have its faith dictated by a for-profit entity whose only apparent "faith" is self-enrichment.

Following the traditional operation of an HCSM, Georgia law requires that HCSM plan members actually share one another's burdens based on need and a member's present ability to help. A legal HCSM is "facilitator among participants" that "matches" "participants who have…medical needs" with "other participants with the present ability to assist those with…medical needs."[10] O.C.G.A. § 33-1-20(a)(2). The Aliera-Trinity-Unity plans do not operate at all like that. ***Mandatory*** monthly premiums are based on the plan and the member's plan coverage. The "present ability to assist those with needs" is no factor. If a member loses her/his job or is otherwise

---

power and we're all living our life that the best way that we possibly can." Sales materials further present the plans as "guaranteed issue." Ex. 7 at 13.

[10] Neither Aliera nor the other entities "facilitate" the transfer of any funds between members as required by law. Aliera receives monthly payments directly from members; Aliera determines what if anything to pay on claims; and on those occasions when Aliera approves some payment, payment goes from the entity, not from members based on their "present ability to assist."

financially incapable of paying their premium, they are terminated. *E.g.*, [Doc. 12-5] at 10; [Doc. 12-6] at 20; [Doc. 12-8] at 13; [Doc.12] at 13; [Doc. 12-13.] at 20. Neither has Aliera ever complied with the requirement that it, as the operator of the supposed HCSM, "provide a written monthly statement to all participants that lists the total dollar amount of qualified needs submitted to the [HCSM], as well as the amount actually published or assigned to participants for their contribution." O.C.G.A. § 33-1-20(a)(5).

**C.    *Aliera's Plans Are "Insurance."***

State laws throughout the country define "insurance" broadly. Insurance is a "contract which is an integral part of a ***plan for distributing individual losses*** whereby one undertakes to indemnify another or to pay a specified amount or benefits upon determinable contingencies." O.C.G.A. § 33-1-2(4) (emphasis added). Similarly, both "the Treasury Department and the IRS have interpreted 'insurance' broadly over the years," as recognized in recently proposed HCSM rules. *See* Certain Medical Care Arrangements, 85 Fed. Reg. 35398, 35400 (June 10, 2020).

Aliera contends its plans are not insurance because they disavow that they are insurance [Doc. 12-1] at ¶¶ 8–9, 13–14, 19–20, 26–27, 31–32. Aliera also calls members' required premiums "voluntary contributions" and refers to a "share box"

contrivance to imply that "voluntary sharing" occurs.[11] But the operation of the plans – not self-serving labels or disclaimers – determines whether they are insurance. *See, e.g.*, O.C.G.A. § 33-1-2(5) ("insurer" is "any person …who issues insurance…***by whatever name called***") (emphasis added). *See Jackson, supra.*

The most detailed judicial analysis of these issues is by *Commonwealth v. Reinhold*, 325 S.W.3d 272 (Ky. 2010). *See also Scott v. Louisville Bedding Co.*, 404 S.W.3d 870, 877 (Ky. Ct. App. 2013). *Reinhold* addresses and rejects every argument Aliera might make in its defense. In that case, Kentucky challenged the HCSM status of   Medi-Share. As here, Medi-Share's plan documents "disclaimed any liability for members' medical expenses and guaranteed payment of no claims." *Id.* at 276. They also stated that (1) "a Medi-Share contract is not an insurance policy" and that it is not "a substitute for an insurance policy;" (2) plans were not "issued by an insurance company, nor offered through an insurance company;" (3) payment of "your medical bills is strictly voluntary" and "you are responsible for payment of your own medical bill;" and (4) "all money [to pay for healthcare expenses] comes from the voluntary giving of Members, not from the Christian Care Ministry, and the Christian Care

---

[11] A portion of premiums collected are perfunctorily accounted as "share box" funds before Aliera disburses them. The Member Guides do not mention share box operation or accounting, but it is mentioned briefly in Trinity's (extremely misleading) YouTube explanation, which states that funds assigned to a member's share box are "used to pay for another member's eligible medical expenses." Ex. 8 at 24–26. There is no actual HCSM voluntary sharing.

Ministry is not liable for the payment of any medical bills." *Id*. at 274. In the face of

how the plans operated in substance, none of those disclaimers or characterizations

worked. Medi-Share's plans were insurance:

> It is immaterial, or at least not controlling, that the term "insurance"
> nowhere appears in the contract the nature of which is to be determined;
> indeed, the fact that it states that it is not an insurance policy is not
> conclusive, and a company may be found to be engaged in an insurance
> business even though it expressly disclaims any intention to sell
> insurance….The nature of a contract as one of insurance depends upon
> its contents and the true character of the contract actually entered into or
> issued—that is, whether a contract is one of insurance is to be determined
> by a consideration of the real character of the promise or of the act to be
> performed, and by a consideration of the exact nature of the agreement
> in light of the occurrence, contingency, or circumstances under which
> the performance becomes requisite, and not by what it is called.

*Id*. at 277. The court noted that the hallmark of "insurance" in the United States is the

shifting of risk, *id.* at 276 (citing *Grp. Life & Health Ins. Co. v. Royal Drug Co*., 440

U.S. 205 (1979)), and it found that Medi-Share's plans did just that:

> The "commitment" contract…obligates Medi-Share members to pay
> their monthly "share" by the first of each month because their "fellow
> believers in Christ" *rely* upon that payment to satisfy their medical
> needs. In return for paying their monthly "share," Medi-Share members
> remain eligible to receive payment for their medical needs through the
> program. This process clearly shifts the risk of payment for medical
> expenses from the individual member to the pool of sub-accounts from
> which his expenses will be paid. Thus, regardless of how Medi-Share
> defines itself or what disclaimers it includes in its literature, in the final
> analysis, there is a shifting of risk.
> . . .
> Medi–Share argues, however, that the disclaimer in the "commitment"
> contract which states that Medi–Share takes no responsibility for the

payment of the members' medical bills indicates that no risk shifting occurs. Nevertheless, this disclaimer, while perhaps shielding Medi–Share from any liability for its members' medical bills, does not overcome the fact that through the Medi–Share program the individual members pool resources together to distribute the risk of major medical bills amongst each other. As previously stated, one cannot change the nature of an insurance business by simply declaring in the contract that it is not insurance.

*Id.* at 277–78.

The Aliera-Trinty-Unity "HCSM" plans and plan documents mimic the Medi-Share program in *Reinhold*. Indeed, the only significant distinctions between the ventures are that the American Evangelistic Association and its Christian Share Ministry in *Reinhold* were legitimate religious organizations, not a scheme created to take money from unsuspecting victims; and the *Reinhold* entity took only a small portion of the total revenue to cover its expenses, 325 S.W.3d at 275 n.4, rather than funneling most of the premiums into a for-profit company as Aliera does.

Plaintiffs' Complaint details how and why Aliera's Unity and Trinity plans are insurance. [Doc. 1] at ¶¶ 1, 3, 5, 9, 19, 26, 34, 56, 75, 82(a), 83(e), 85, 90, 92, 96(c) & (d), 101, 114, 115–121, 126, *passim*. And even without discovery, the current record overwhelmingly confirms those allegations. Among other things:

• Defendant's plans are marketed as "health care" plans, Ex. 7 *passim*, and other terms are used that are "insurance terms." *Id*. at 12. *See also* O.C.G.A. § 33-20-3(3) (Insurance Code defining "health care plan").

• Before one can enroll in an HCSM plan administered by Aliera, one must go through a typical insurance underwriting process. *See, e.g.,* [Doc. 12-5] at 17; [Doc. 12-6] at 17.

• Defendant uses a "metals nomenclature" like insurance plans under the ACA – namely, "bronze," "silver," or "gold." [Doc. 12-5] at 34–39; [Doc. 12-6] at 36–40; *see also* 42 U.S.C. § 18022(d)(1). Aliera also "follows CMS… guidelines for recommended preventative care required by the ACA." [Doc. 12-2] at 5.

• Medical benefits for health-related contingencies depend on the plan, with greater coverage corresponding to higher premiums. *See, e.g.,* [Doc. 12-2] at 5, 8; [Doc. 12-5] at 18-21; https://www.trinityhealthshare.org/about/.

• The Member Guides speak repeatedly of plan *coverage*, again connoting insurance. *See, e.g.,* [12-5] at 6 ("As part of our solution, the plans *cover* medical services recommended by the USPSTF and outlined in the ACA for preventive care.") (emphasis added); [12-6] at 4 (same); [Doc. 12-5] at 13–14 (explaining that all three levels of AlieraCare plans have unlimited primary care and urgent care visits); [Doc. 12-6] at 12, 14 (same).

• Trinity's YouTube explanation represents that, if a medical expense is covered by a member's plan, the expense *will* be paid. "Eligibility for payment is…determined by a third-party administrator based on membership guidelines. If eligible, the share request is fulfilled." Ex. 8 at 34-37.

• The plans provide coverage for medical expenses like regular insurance plans, including for primary care visits, specialty care visits, hospitalization, emergency room, prescription drugs, labs, preventive care, urgent care, hospice, maternity, and x-rays. [Doc. 12-5] at 34-39; [Doc. 12-6] at 36–41.

• A member's "monthly contribution" is indistinguishable from an insurance "premium." There is nothing about it that is either "voluntary" or a "contribution." Any failure to pay terminates coverage. *Supra* at 11-12.

• The plans require a member to pay a deductible, labeled a "Member Shared Responsibility Amount" ("MSRA"). [Doc. 12-5] at 21, 27, 34–39; [Doc. 12-6] at 21, 27, 36–40.

- 16 -

• After the MSRA is paid, medical bills are supposed to be paid in accordance with a benefits booklet or member guide for the selected program. [Doc. 12-5] at 34–36; [Doc. 12-6] at 38–43.

• As with regular health care insurance, the plans require pre-authorization of certain non-emergency surgeries, procedures, or tests, as well as for certain types of cancer treatments. [Doc. 12-5] at 32–33; [Doc. 12-6] at 31.

• Payments are made by Defendants directly to providers for covered benefits. *See*, *e.g.*, [Doc. 12-5] at 15 (noting that once the member's deductible ("MSRA") has been reached, payments will be "reimbursed directly back to the providers and hospital facilities"); [Doc. 12-6] at 15 (same). Such payments again reflect insurance risk-sharing and risk-distributing.

Like the plans in *Reinhold*, Defendant's plans function like insurance. While Georgia appellate courts have not decided an HCSM-insurance case like *Reinhold*, what constitutes insurance is very uniform among the states, and Kentucky law is the same as Georgia's in this regard. *See* K.R.S. § 304.1-030. In Georgia, as in *Reinhold*, a plan is insurance where risk-shifting occurs by "distribut[ing] individual losses among a large group of purchasers." *Love v. Money Tree, Inc.*, 279 Ga. 476, 478 (2005). And like Medi-Share, Aliera's "process clearly shifts the risk of payment for medical expenses from the individual member to the pool of sub-accounts from which his expenses will be paid. Thus, regardless of how [Aliera] defines itself…, in the final analysis, there is a shifting of risk" that constitutes insurance. 325 S.W. 3d at 277. That Aliera itself "takes no responsibility for the payment of the members' medical bills…, does not overcome the fact that through the [Aliera] program the

- 17 -

individual members pool resources together to distribute the risk of major medical bills amongst each other." *Id*. at 278.

### D.   *Rulings of State Agencies Confirm That Aliera's Products Are Not Protected by Their Contrived HCSM Relationships.*

States that have examined Aliera have found it to be selling insurance illegally, not bona fide HCSM plans. The Washington Report is a detailed 35-page analysis and executive summary about Aliera's products and business practices. It concludes that Trinity "does not meet the statutory definition of an HCSM" under Washington or federal laws; that Trinity was "acting as an unauthorized insurer;" and that Aliera's "advertisements on behalf of Trinity are deceptive and have the capacity and tendency to mislead or deceive consumers…." Ex. 7 at 2.

The Washington Report includes the following findings: (1) Trinity did not qualify as an HCSM because it failed the 1999 operating requirement; (2) Trinity lacked a religious conviction, the religious tenets in its bylaws were simply for show, and even those were not followed; (3) Aliera's training materials do not meaningfully address any religious points, and employees are instructed that Aliera's plans are "guaranteed issue;" (4) training materials direct Aliera's sales agents not to ask prospective customers religious questions that might raise an issue, and to tell prospects that Aliera is "not going to at all make it where [you can't] become a

member of the plan." Ex. 7 at 2–3, 8, 13. Sales agents are told that the "statement of beliefs" is broad enough that "we all" believe in them. *Id.* at 14.

The Texas Attorney General filed suit against Aliera for illegally selling unapproved insurance. Ex. 9. In its petition, the State asserted that:

> The Defendant Aliera Healthcare, Inc., is engaged in the business of insurance in this State without a license.... In meetings with State regulators, Aliera representatives have asserted that Aliera is exempt from state regulation because it merely administers a "health care sharing ministry." Aliera is no ministry however, it is a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to "administrative costs."

*Id.* at 1. The Texas determination was based on Aliera's representations not just to consumers, but also state regulators. *Id.*

In August 2019, Colorado ordered Aliera to cease and desist selling plans there because they constituted illegal, unauthorized insurance. Ex. 10. The Colorado Division of Insurance found that Aliera's conduct was "fraudulent, creates an immediate danger to public safety, and/or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury." *Id.* at 4 ¶33. The purported HCSM plans "constitute insurance products." *Id.* at 4 ¶ 30.

Connecticut likewise sanctioned Aliera for selling insurance illegally. Ex. 11. That state's cease and desist order rejected Aliera's claim that its plans qualified as HCSM plans because Aliera and Trinity "do not limit the marketing of their products

to individuals holding any particular religious beliefs," and further because "[n]either Aliera nor Trinity have been in operation and continuously sharing members' health care costs since at least December [3]1, 1999." *Id.* at 2–3, ¶¶ 2 & 5. The plans are "insurance" because they "include an agreement to pay a sum of money, provide services or any other thing of value on the happening of a particular event or contingency, i.e. sickness or injury, or to provide indemnity for loss in respect to a specified subject by specified perils – indemnify their members for costs incurred for medical expenses – in return for consideration." *Id.* at 7, ¶ 17.

The Maryland Insurance Administration (MIA) and Aleira entered into a consent order in April 2018 which stated that the supposed HCSM operated by *Aliera* did not meet the requirements for religious exemption. Notwithstanding the 2018 consent order, Aliera continued to market HCSM plans in Maryland, prompting the MIA to issue an order on February 27, 2020 that stated, in part:

> [Aliera's] failure to comply with the terms of a consent order and its continued solicitation of memberships in an unauthorized insurance plan demonstrates that it does not meet the standard of trustworthiness and competence required of an insurance producer.

https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020249.

"Concerned about potential fraudulent or criminal activity on the part of Aliera," the New Hampshire Insurance Commissioner issued a cease and desist order against Defendant in October 2019 that prohibited it from selling its health insurance

products in that state. Exs. 12 & 13. The Commissioner "determined that Trinity does not meet the legal definition of an HCSM," and that as a result, "Aliera, through its relationship with Trinity, is operating as an unauthorized insurer in the state of New Hampshire." Ex. 13 at 2, ¶ 15.

## II.   ARBITRATION IS NOT REQUIRED IN THIS CASE

Aliera contends that this case should be sent to arbitration and that an arbitrator should decide all arbitrability questions [Doc. 12-14] at 26, but Aliera ignores controlling law that dictates the opposite conclusion.

### A.   *Motions to Compel Arbitration Generally.*

 "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Comcn. Workers of Am.*, 475 U.S. 643, 648 (1986). Before a court can compel arbitration, the movant must establish

> that (a) the plaintiff entered into a written arbitration agreement that is enforceable "under ordinary state-law" contract principles and (b) the claims before the court fall within the scope of that agreement. *See* 9 U.S.C. §§ 2–4; *see also Paladino v. Avnet Computer Tech. Inc.,* 134 F.3d 1054, 1056 (11th Cir. 1998).

*Lambert v. Austin Indus.*, 544 F.3d 1192, 1195 (11th Cir. 2008). In determining whether arbitration is required here, several issues must be decided. First, applying Georgia contract law, did the parties actually agree to submit any claims to arbitration? Second, is the arbitration provision Aliera relies upon legal and

enforceable? And third, are the claims encompassed by that arbitration provision? The Court need not address this last question in light of the answers to the first two.

Aliera's contention that this Court cannot even decide if there is a legal arbitration provision is incorrect. Certain "gateway" questions of arbitrability can be assigned to an arbitrator, but only if the parties clearly agreed to do so. If the parties did not specifically

> agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently. [This] flow[s] inexorably from the fact that arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). There is a heavy presumption against such delegation. *Id.* at 944–45. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable evidence' that they did so." *Id.* at 944 (citations omitted).

Where there has been maximum delegation to an arbitrator, including explicit authority to pass on "arbitrability," a court must still determine the fundamental prerequisites to arbitration, including the legality of the provision:

> An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other. The additional agreement is valid under § 2

- 22 -

"save upon such grounds as exist at law or in equity for the revocation of any contract.…"

. . .

> **If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4**.

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70, 71 (2010) (emphasis added). Even where arbitrability is delegated, "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. *See* 9 U.S.C. § 2." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, ___ U.S. ___, 139 S. Ct. 524, 530 (2019); *Nebraska Machinery Co. v. Cargotec Solutions, LLC,* 762 F.3d 737, 741 n.2 (8th Cir. 2014) (even with delegation, court must determine "whether the arbitration agreement itself is valid"). Aliera's delegation contention "puts the cart before the horse." *Id*.

## B. *The Arbitration Provision And The "Delegation" Provision, To The Extent There is One, Are Illegal and Void.*

Whether an arbitration agreement has been formed by the parties, whether it applies to the particular case, and whether it is legally enforceable are determined by state law. "[S]tate law… is applicable to determine which contracts are binding under § 2 and ***enforceable*** under § 3." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (emphasis added); *First Options*, 514 U.S. at 944. Under Georgia law, arbitration provisions like the one here are illegal, void, and unenforceable. O.C.G.A.

- 23 -

§ 9-9-2(c)(3). [12] "Arbitration clauses…are impermissible in contracts between insurers and insureds." *McGowan v. Progressive Preferred Ins. Co.*, 281 Ga. 169, 172–73 (2006); *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1169 n.1 (11th Cir. 2011); *Love v. Money Tree, supra*. Because Georgia's anti-arbitration statute "regulates the business of insurance," it is preserved from FAA preemption by the McCarran-Ferguson Act. *Love*, 279 Ga. at 476; *Continental Ins. Co.*, 255 Ga. App. at 447–48 (statute regulates insurance because, among other things, it "transfer[s] or spread[s] risk by preserving the possibility of a jury verdict"):

> § 9–9–2(c)(3) is a law enacted to regulate the business of insurance within the meaning of the McCarran–Ferguson Act. Thus, § 9–9–2(c)(3) is excepted from preemption by the Federal Arbitration Act.

*McKnight*, 358 F.3d at 858–59 (citations omitted).

---

[12] Georgia law governs this question no matter where a Plaintiff or class member resides. Trinity's arbitration provisions state that "any arbitration shall be held in Atlanta, Georgia, and conducted … subject to the laws of the State of Georgia." [Doc. 12-1 at 14]. Even were that not the case, the rule of *lex fori* dictates that the forum state's law determines the applicability of arbitration. *Continental Ins. Co. v. Equity Residential Props. Trust*, 255 Ga. App. 445, 445 (2002) (arbitration provision invalid under Georgia law even though insured was Illinois resident and contract stipulated that Illinois law would apply). The same result is required by public policy:

> § 9–9–2(c)(3) establishes the public policy of Georgia that insureds shall not be compelled…to give up their common law right to access to the courts to resolve disputes arising under the contract. Georgia courts will not enforce a contractual provision choosing the law of another state where to do so would contravene the public policy of Georgia. As the procedural law and public policy of Georgia, [§ 9–9–2(c)(3)] appl[ies] in this case.

255 Ga. App. at 446 (citations omitted).

To the extent Aliera contends that reference in a Member Guide to arbitration by the American Arbitration Association ("AAA") might somehow "overrule" those authorities and require delegation of this threshold issue to an arbitrator [Doc. 12-14] at 16, Aliera is mistaken. The Supreme Court's *Rent-A-Center* and *Schein* decisions require a court to decide, before reference to an arbitrator, whether a valid arbitration agreement exists if a party specifically challenges the arbitration agreement and any delegation provision. Here, in addition to challenging the validity and applicability of the arbitration provision, Plaintiffs specifically deny that there is any agreement by the parties to delegate gateway enforceability issues to arbitration, much less the required "clear and unmistakable" proof of delegation.[13] Even if there were a clear written agreement to that effect, O.C.G.A. § 9-9-2(c)(3) would render it an illegal

---

[13] Even if AAA rules were "incorporated" in an agreement between the parties here, nothing in those rules *requires* delegation of gateway arbitrability. The rule simply *authorizes* arbitrators to decide those issues when the parties agree to do so. *See, e.g.*, AAA Consumer Arbitration Rule R-14 (arbitrator has "the power to rule…on the validity of the arbitration agreement"). That does not constitute an "agreement" by the parties that arbitrability is delegated, much less the required "clear and unmistakable" proof of such delegation. *First Options*, 514 U.S. at 944. While some courts under other facts have treated AAA rules as constituting delegation, *see, e.g., Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005), their rationale cannot be justified based on the language of the AAA rules, nor does it survive the Supreme Court's decision in *Schein, supra*. There, in the face of the same AAA argument, 139 S.Ct. at 528, the Supreme Court declined to hold that the parties had agreed to delegation of arbitrability because courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 531. Plaintiffs would also note the blatant conflict of interest in allowing an arbitrator to determine whether s/he has jurisdiction over a case. Arbitrator's fees dwarf the kind of financial interests the Supreme Court has long condemned as intolerable for judicial officers. *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); *Tumey v. Ohio*, 273 U.S. 510 (1927).

nullity, and it would be this Court's responsibility to decide that issue pursuant to the FAA. *See* 9 U.S.C. § 4 (court must be "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue"). *Minnieland Private Day School, Inc. v. Applied Underwriters Assurance Co*., 867 F.3d 449, 455–56 (4th Cir. 2017) (court decides legality of arbitrability delegation where challenged); *In re Van Dusen*, 654 F.3d 838, 843–45 (9th Cir. 2011). *See also Lavigne v. Herbalife, Ltd*., ___ F.3d ___, 2020 WL 4342671 (11th Cir. 2020) (court decided whether there was an enforceable agreement and whether equitable estoppel applied, notwithstanding AAA delegation provision).

The dispute resolution provisions relied upon by Aliera also violate the Affordable Care Act, which prohibits requiring an insured to go through more than one level of internal appeal to resolve a claim. 42 U.S.C. § 300gg-19(a)(1); 45 C.F.R. § 147.136(b)(3)(ii)(G). The Dispute Resolution and Appeal section of the Member Guide that Aliera relies on includes four levels of internal appeal, plus mediation, plus arbitration. *E.g.*, [Doc. 12-1] at 12–13. As Judge Rothstein ruled in *Jackson*, since the multi-stage Dispute Resolution and Appeal process is illegal, each and every one of its parts, including the fifth part (section E) that addresses Mediation and Arbitration, is illegal and unenforceable:

> Because Trinity's dispute resolution procedures clearly require more
> than "one level of internal review before issuing a final determination"

and binding arbitration that deprives the Court of the jurisdiction of this action, the Court finds that Plaintiffs have sufficiently pled that Trinity's dispute resolution procedures are illegal under the Washington insurance law. *See* WAC 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(7);[14] RCW 48.18.200(b).

*Jackson,* 2020 WL 2733722 at *7.

## C.   *No Arbitration Agreement Exists That Covers Plaintiffs' Claims.*

The illegality of the arbitration provision and any possible arbitrability delegation language, is fatal to Aliera's motion, but for completeness, Plaintiffs will address other defects in Aliera's position.

1.   <u>*What language would apply, if any?*</u> While Aliera asserts there is a "binding arbitration clause" [Doc. 12-4] at 17 and has submitted certain Guides that include the term "binding arbitration," *e.g.*, [Doc. 12-5] at 18, it neglects to mention contrary language in other documents provided to members. For example, *Trinity HealthShare Plan Review, Rates, and Enrollment* states that the **entire** membership agreement is **nonbinding**: "This membership is not a legal binding agreement…." Ex. 14 at 11. Enrollment documents similarly state: "This is not a contract" and "Enrollment in the ministry sharing program is not a contract." [Doc. 12-7] at 5. Furthermore, some versions of the Member Guides have no arbitration provision, *see,*

---

[14]   WAC 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(7) includes the same kind of prohibition against multiple level appeals as does the ACA. (Footnote added).

*e.g.*, Ex. 14, creating a question as to what, if any, would apply to the claims against Aliera here. Consistent with that fact, Aliera cites to no mediation or arbitration provisions while Plaintiff Selimo was a Trinity member during 2019-2020. [Doc. 12-1] at 16 ¶ 23.

Unity Guides for Plaintiffs Selimo and Funduk refer to arbitration not by the AAA, but by the Rules of Procedure for Christian Conciliation of The Institute for Christian Conciliation. [Doc. 12-1] at 17, 20. Those rules leave the scope of arbitration to the parties' agreement at the time of arbitration, and there is no hint of an arbitrability delegation:

> At the outset of arbitration, the parties shall describe the issues and desired remedies that they wish the arbitrators to consider. The arbitrators shall consider only those issues that are consistent with the parties' original arbitration or mediation/arbitration agreement, or which are contemplated by an earlier contract between the parties that contains a conciliation clause.

Ex. 15 at Rule 25. Aliera itself cannot even figure out which of the many versions of the Member Guides and arbitration, or non-arbitration, provisions would apply to the claims here. Movant has submitted five different versions (Selimo's non-provision being a sixth) [Doc. 12-1] at 9-24, but does not suggest which one would apply to the present claims, apparently throwing it up to the Court to conjure an answer.

    2.    *Aliera is not a party to any arbitration agreement*. Because Aliera is not a party to any arbitration provision, it wrongly contends that it should be read in

because the provision it cites addresses disputes with Trinity or "its associates, or employees." [Doc. 12-14] at 14.[15] The Eleventh Circuit has ruled against construing arbitration provisions to include a non-named party under stronger facts than Aliera relies on here. *See, e.g., Lawson*, 648 F.3d at 1171-72; *Herbalife*, 2020 WL 4342671 at *4. "Associates" here clearly means *individuals* associated with Trinity, such as those who might handle the first-level telephonic appeals, the "three Trinity HealthShare officials" on the second-level internal resolution committee, members selected to the third-level external resolution committee, or the medical expense auditor or panelists at the final appeal level. [Doc. 12-1] at 11-12.

Aliera cites the Merriam-Webster definition of "associate" as encompassing "business associates," but every one of the examples referenced refers to *individual* associates such as "employee," "worker," "partner," and "colleague." [Doc 13] at 19. None references other *business* entities. https://www. merriam-webster.com/dictionary/associate. From both the context of the agreement and the dictionary definition, it is clear that "associates" refers to Trinity's employees and other *individual* associates, not Aliera.

---

[15] Aliera complains that Plaintiffs did not sue Trinity and Unity, supposedly as an additional way to avoid arbitration. [Doc. 12–14] at 11. A plaintiff is the "master of her complaint," *Holmes Group, Inc. v. Vornado Air circulation Syst., Inc.*, 535 U.S. 826, 831 (2002), and the reasons for suing Aliera in this case are obvious. Aliera conceived, created, and operated the scheme at issue using the two shells, and the illegally collected premiums are funneled to Aliera.

Furthermore, Aliera itself wrote the arbitration provision pursuant to its plenary authority to develop Unity and Trinity documents and administer the plans. *Supra* at 4-6. It is inconceivable that Aliera, as the author of the Member Guides, intended to include itself in the arbitration provision, but did not mention its own name. Aliera should not be allowed to rewrite the provision now. The provisions Aliera cites are also telling because, by their own terms, they do not even contemplate an award against Aliera. They speak only of the possibility of "the arbitrator render[ing] a judgment in favor of" Unity or Trinity HealthShare." [Doc. 12-1] at 9, 14.

Under Georgia law, if the language of an insurance policy is clear and unambiguous, the contract must be enforced according to its plain terms." *Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1252 (11th Cir. 2019). But if a policy is ambiguous, "it is construed strictly against the insurer/drafter and in favor of the insured." *Id.*; *see also* O.C.G.A. § 13-2-2(5). At most, the contract here is ambiguous and must be construed against the insurer and in favor of Plaintiffs.

3. *Plaintiffs' claims are not covered by the provisions*. The Dispute Resolution and Appeal procedure Aliera relies on does not encompass the claims here. Rather, the procedure is a means to resolve "differences of opinion" regarding medical claim "determinations." [Doc. 12-1] at 7, 12, 15, 19, 23. If a member disagrees with "a determination," s/he may appeal that determination. *Id.* After a telephonic attempt

to resolve the determination, the member may submit a written appeal that addresses any "incomplete or incorrect" information on which Trinity relied, the manner in which Trinity "misinterpreted the information already on hand," and how Trinity "applied incorrectly" its "HealthShare Guidelines." *E.g., id* at 20. At each of the next two levels of appeal, the procedures speak of reviewing ***medical*** – and only medical – documentation. *Id.* at 24. The final appeal stage utilizes "a medical expense auditor" and a decision is made "unless additional ***medical*** documentation is required to make an accurate decision." *Id.* at 24. The scope of mediation and arbitration is the same as for the individual claims and appeals, as those latter stages arise only "[i]f the aggrieved sharing member disagrees with the conclusion of the Final Appeal Panel." *Id.* Were this not clear enough, mediation and arbitration are expressly limited to claims "arising out of the Sharing Guidelines." *Id.*

Plaintiffs' claims here bear no relation to individualized medical claims that could fall within the Dispute Resolution and Appeal procedures, if they were otherwise applicable and enforceable. The crux of Plaintiffs' claims is that Aliera sold Plaintiffs and the Class health care plans as purported HCSM plans that were actually illegal insurance contracts and that Aliera illegally funneled premiums into its own pockets. Those claims, and the specific legal basis set out in the various counts of the Complaint for those claims, would remain even if Aliera and its pseudo-HCSMs had

scrupulously paid every claim in accordance with the guidelines. Even Count III of the Complaint (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is not based on "breaches" of the guidelines. Indeed, allegations regarding Aliera's bad faith refusal to pay medical claims is based on more than the language of the guidelines because, as Aliera notes, they disavow any obligation to pay any claim. [Doc. 12-14] at 3–4. Plaintiffs' contract claim is more of a quasi-contract claim arising from Aliera's breach of the legal duties imposed upon it by law. *See* Complaint [Doc. 1] at 46 ¶¶ 172-75.

Of course, *if* there were a legal and enforceable arbitration provision, *if* Aliera were a party, and *if* one of Plaintiffs' claims were subject to arbitration, Plaintiffs' other claims would still remain before the Court. *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011); *Klay v. All Defendants*, 389 F.3d 1191 (11th Cir. 2004).

4. *Equitable estoppel*. Equitable estoppel is irrelevant since the arbitration provision is illegal, but Plaintiffs will briefly address the issue since Aliera has done so. Equitable estoppel, which was created and is determined by courts, allows for arbitration by some parties not explicitly mentioned in an arbitration provision, but equitable estoppel cannot change the clearly discernable intent of the parties because of the cardinal rule that "a party cannot be required to submit to arbitration any dispute

which he has not agreed so to submit." *AT&T Techs., Inc.*, 475 U.S. at 648. Here, the intent *not* to include Aliera in the provision is unmistakable, *supra* at 29-30.

The cases relied upon by Aliera do not support a different result. "In all cases, the lynchpin for equitable estoppel is equity, and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012).[16] Aliera's position is divorced from equity. Equitable estoppel never applies just because there are connections between a contract with an arbitration provision and a plaintiff's claims:

> [I]t is not enough that the alleged misconduct is somehow connected to the obligations of the underlying agreements; the misconduct must "be *founded in* or *inextricably bound up with*" such obligations.
> . . .
> Moreover, in deciding whether equitable estoppel is appropriate, we must remember the purpose of the doctrine, which is to prevent the plaintiff from "hav[ing] it both ways." …"[T]he signatory 'cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory."

*Herbalife*, 2020 WL 4342671 at *6 (citations omitted). As just shown, Plaintiffs' claims are far afield of those requirements for equitable estoppel. Plaintiffs are not in

---

[16] This, too, is an issue for the Court to resolve, not an arbitrator, because equitable estoppel speaks directly to the existence of an agreement to arbitrate. *Autonation Fin. Servs. Corp. v. Arain*, 264 Ga. App. 755, 755–57 (2003) (even where arbitration clause incorporated reference to AAA rules, question whether non-signatory could invoke arbitration was properly decided by the court).

any way trying to "have it both ways."

### III.   MEDIATION IS NOT A PREREQUISITE TO THIS ACTION

Aliera contends that this case should be dismissed because there was no pre-suit mediation. There are many flaws in that contention, one being that nothing in the Membership Guides or any other plan document requires that there be mediation before *filing a civil action* in this or any other court. Moreover, had there been some such requirement, it would be illegal, and it would also be unenforceable because of Aliera's bad faith in "response" to Plaintiffs' prior efforts to address claim issues. Complaint [Doc. 1] at ¶¶ 12-17, 22-24, 29-31, 109-13.[17]  Dismissal would also be inappropriate regardless. This Court can always order mediation if required or desired, but if that were to occur, the case would be stayed pending mediation, not dismissed.

### A.   *Plaintiffs Have Not Failed to Satisfy a Condition Precedent to Suit.*

Aliera asserts that Plaintiffs failed to comply with the "condition precedent contained in their Unity and Trinity Member Guides" to mediate their claims [Doc. 12-14] at 15, but the Member Guides do not designate mediation as a condition precedent to anything, much less to filing this action. Under Georgia law, not every

---

[17] Georgia law has long held that insurers' failure to process claims in good faith excuse insureds from pre-suit procedures like submitting proof of loss. *Aetna Cas. & Sur. Co. v. Sampley*, 108 Ga. App. 617 (1963). Notably, Aliera's conduct in this regard continued right up to filing of this action, as it never responded – much less mentioned mediation – to Plaintiffs' pre-suit demand letter. Ex. 16.

contractual requirement is a "condition precedent." To the contrary, as this Court has

previously explained, such conditions are disfavored:

> In Georgia, a party must perform a condition precedent in order for the
> contract to become binding on the other party. O.C.G.A. § 13-3-4. Put
> another way, "[a] condition precedent is one which must be performed
> before any right to be created thereby accrues." *Brogdon ex rel. Cline v.
> Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1335 (N.D. Ga. 2000)
> (quoting *Wolverine Ins. Co. v. Sorrough*, 122 Ga. App. 556, 177 S.E.2d
> 819, 822 (1970)). Parties can create conditions precedent "by language
> such as 'on condition that,' 'if' and 'provided,' or by explicit
> statements that future events are to be construed as conditions
> precedent." *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.* 246 Ga.
> App. 626, 541 S.E.2d 435, 438 (2000). ***But Georgia law does not favor
> interpreting a contract to find a condition precedent; thus, "[i]f the
> contract's terms are clear and unambiguous and do not clearly
> establish a condition precedent, [courts] cannot construe the contract
> to create one."*** *Id.*

*Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1323–24 (N.D. Ga.

2014) (emphasis added).

Here, none of the dispute resolution clauses that Aliera relies on contains

language suggesting that mediation is a condition precedent to the commencement of

litigation. *See* [Doc. 12-1] at 9-24. They simply state that arbitration is to follow

mediation, something that falls well short of the language in *Ralls* that is necessary to

create a condition precedent. *See, e.g., Plantation Pipeline Co. v. Stonewall Ins. Co.*,

335 Ga. App. 302, 312–13 (2015) (notice provision in insurance policy requiring

insured to provide prompt notice of claims did not create a condition precedent).

This case differs markedly from the cases on which Aliera relies. In *Woods v. Holy Cross Hospital*, 591 F.2d 1164, 1169 n.7 (5th Cir. 1979), a Florida statute requiring pre-suit mediation of medical malpractice claims had been construed as creating "a condition precedent to the jurisdiction of any court in a medical malpractice-based action." *Woods* says nothing about whether the language in Defendant's Guides creates a condition precedent. In *Houseboat Store, LLC v. Chris-Craft Corp.*, 302 Ga. App. 795, 799 (2010), the court was not called upon to decide whether the dispute-resolution clause made mediation a condition precedent, as the parties agreed on the issue. Like the notice provision in the insurance contract addressed in *Plantation Pipeline*, the mere mentioning of mediation in the Member Guides does not make mediation a condition precedent to anything.

### B.   *If There Were a Mediation Requirement Here, It Would Be Unenforceable as a Matter of Law.*

Aliera's argument relies on a Dispute Resolution and Appeal procedure in some of the Members Guides, but as shown *supra* at 26-27, that multistage procedure is illegal under both the ACA and Georgia law. For the same reasons, any mediation requirement would be illegal here. As Judge Rothstein ruled in *Jackson,* the dispute procedures are illegal both in their individual requirements and together.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion To Dismiss Or Compel Arbitration and allow this case to proceed on the merits of Plaintiffs' claims.

Respectfully submitted this 14th day of August 2020.[18]

> */s David F. Walbert*
> David F. Walbert
> Georgia Bar No. 730450
> Jennifer K. Coalson
> Georgia Bar No. 266989
> **Parks, Chesin & Walbert, P.C.**
> 75 14th St. NE, 26th Floor
> Atlanta, Georgia 30309
> Telephone: (404) 873 – 8000
> dwalbert@pcwlawfirm.com
> jcoalson@pcwlawfirm.com
>
> Stephen J. Fearon, Jr.
> Paul Sweeny
> **Squitieri & Fearon, LLP**
> 57th St., 12th Floor
> New York, New York 10022
> Telephone: (212) 421 – 6492
> stephen@sfclasslaw.com
> paul@sfclasslaw.com
>
> *Attorneys for Plaintiffs and the Proposed Class*

---

[18] Pursuant to Local Rule 7.1(D), undersigned counsel certifies that this filing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

# CERTIFICATE OF SERVICE

I hereby certify that on the date below, I served a true and correct copy of PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR COMPEL ARBITRATION by filing the same using the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated this 14th day of August, 2020.

/s Jennifer K. Coalson
Jennifer K. Coalson
Georgia Bar No. 266989
Parks, Chesin & Walbert, P.C.
jcoalson@pcwlawfirm.com