IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| NOELLE LeCANN, KRISTIN SELIMO, and TANIA FUNDUK, on behalf of themselves and others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>THE ALIERA COMPANIES, INC., formerly known as ALIERA HEALTHCARE, INC.,<br><br>    Defendant. | : : : : : : : : : : : : : : : | CIVIL ACTION NO.<br>1:20-cv-2429-AT |

## **OPINION AND ORDER**

This putative class action arises out of an alleged scheme by Defendant The Aliera Companies, Inc., ("Aliera") to take advantage of state and federal health insurance laws by masquerading its insurance plans as faith-based Health Care Sharing Ministry ("HCSM") plans, which are exempt from federal and state regulations. Plaintiffs allege that, through this scheme, they and others similarly situated were charged significant monthly insurance premiums, but that Defendant, in violation of insurance laws, refused to pay for covered medical procedures and bills, thereby reaping massive profits at Plaintiffs' expense. After thorough briefing, this matter comes before the Court on Aliera's Motion to

Dismiss or Alternatively Motion to Compel Arbitration [Doc. 12].[1] In its Motion, Aliera briefly asks the Court to dismiss without prejudice Plaintiffs' Amended Complaint because Plaintiffs failed to mediate their disputes. Alternatively and more substantively, Aliera asks the Court to compel arbitration pursuant to Sections 3 and 4 of the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 3-4.

Below, the Court first provides the factual backdrop against which this action and Aliera's Motion arises. Next, the Court assesses and denies Aliera's arguments for dismissal based on Plaintiffs' failure to mediate. Then, the Court addresses the "gateway question" of who decides whether Plaintiffs' disputes are arbitrable, the Court or the arbitrator. After finding that it is for the Court to decide the issue of arbitrability, the Court discusses whether the arbitration clauses included in the operative contracts are contracts for insurance and thus invalid pursuant to O.C.G.A. § 9-9-2(c)(3). This Georgia statute prohibits arbitration agreements in insurance contracts and is excepted from preemption by the FAA by virtue of the McCarran-Ferguson Act, a federal law which generally reserves for the states the power to regulate insurance.

The Court concludes that the contracts at issue are contracts of insurance as defined by O.C.G.A. § 33-1-2. As a result, O.C.G.A. § 9-9-2(c)(3) renders invalid any agreement to arbitrate and any delegation of the arbitrability question contained within the contracts. Accordingly, because the contracts do not fall

---

[1] Also before the Court is Aliera's Motion for Leave to File Supplemental Authority. [Doc. 46.] The Court **DENIES** this Motion as the authority provided is not germane to the issues and arguments currently before the Court.

within the ambit of the FAA under Section 2 of the Act, the Court is without authority to compel arbitration under Sections 3 and 4. As a result, and for the reasons detailed at considerable length below, the Court **DENIES** in full Aliera's Motion to Dismiss or Alternatively to Compel Arbitration [Doc. 12].

## I.    Background

This case is factually and legally complex. In this section, the Court describes the alleged health insurance scheme and the individuals involved; details the Plaintiffs' relationships with Aliera and the related entities; identifies the relevant dispute resolution procedures included (or not) in Plaintiffs' membership agreements; outlines relevant developments around the country in connection with Aliera's business practices, upon which Plaintiffs rely; and highlights Plaintiffs' requested relief.

**Aliera and the Alleged Illegal Health Insurance Scheme**

Defendant Aliera is a for-profit business, without religious affiliation, and was originally incorporated in 2015. (First Amended Complaint ("Compl."), Doc. 32 ¶ 32.) As alleged, Aliera was incorporated and is operated by the Moses family: Timothy Moses, his wife Shelly Steele, and their son Chase Moses. (*Id.* ¶ 44.) Of relevance to the facts below, before allegedly forming Aliera, Timothy Moses was convicted by a jury in federal court and served prison time for felony securities fraud and perjury in this district. (*Id.* ¶ 43) (citing *United States v. Moses*, Doc. 86,

1:04-cr-508-CAP-JMF (N.D. Ga.); *see also*, Fulton Injunction, Doc. 26-2 ¶ 49[2].) At all times since Aliera's incorporation in 2015, Ms. Steele has served as CEO of Aliera and Chase Moses has served as its President (Compl. ¶ 32); however, Plaintiffs maintain that Timothy Moses exercises significant control over Aliera through his wife and son (*id.* ¶ 51).

Plaintiffs allege that at some point in 2016, Timothy Moses and Ms. Steele devised a plan to profit by attempting to exploit the fact that the Health Care Sharing Ministries ("HCSMs") are exempt from state and federal insurance laws and regulations, including the Patient Protection and Affordable Care Act ("ACA"). (*Id.* ¶ 53.) A bona fide HCSM allows people of similar religious faith to join together to share responsibility for one another's medical expenses; these plans provide some assurance that members' medical expenses will be paid for by individuals in the same faith community. (*Id.* ¶ 54.) Absent the statutory exemptions[3] qualified HCSMs would constitute health "insurance" under federal and Georgia law. (*Id.* ¶ 55.) But because HCSMs are statutorily exempt, operators of these HCSMs are not

---

[2] Details regarding the Fulton Injunction are described below. But relevant here, the Fulton Injunction explains that, after Mr. Moses was released from federal prison, Judge Pannell revoked Moses' supervised release because he misled his probation officer about his financial affairs and failed to disclose bank account information and new lines of credit. (Fulton Inj. ¶ 49) (citing *United States v. Moses*, Docs. 145, 150, 1:04-cr-508-CAP (N.D. Ga.)).

[3] *See e.g.*, O.C.G.A. § 33-1-20(b) ("A health care sharing ministry which has entered into a health care cost-sharing arrangement with its participants shall not be considered an insurance company, health maintenance organization, or health benefit plan of any class, kind, or character and shall not be subject to any laws respecting insurance companies, health maintenance organizations, or health benefit plans of any class, kind, or character in this state or subject to regulation under such laws, including, but not limited to, the provisions of this title, and shall not be subject to the jurisdiction of the Commissioner of Insurance."); 26 U.S.C. § 5000A(d)(2)(B)(i)-(ii) (explaining that individuals who are members of health care sharing ministries, as defined by the subsection B(ii), are not "applicable individuals" required to maintain minimum essential coverage under the ACA).

subject to federal and state insurance regulations, for example, regulations that limit the percentage of member premiums that can be diverted to purposes other than payment for medical costs and activities to improve health care quality. (*Id.* ¶¶ 2, 56, 75.)[4] The Amended Complaint alleges that, in operating its illegal insurance scheme, Aliera *retains* around 84% of member contributions (*i.e.*, premiums) as "fees" and diverts these fees to Aliera's owners while saddling Plaintiffs and those similarly situated with millions of dollars in covered but unpaid medical bills. (*Id.* ¶ 76.) As alleged, Aliera reaps massive profits at the expense of Plaintiffs and thousands of other members who paid fees (or premiums) to participate in Aliera's purported HCSM plan, charging members hundreds of dollars or more every month but refusing to ultimately pay for medical procedures and bills. (*Id.* ¶¶ 3, 78.)

**The Affiliated Companies**

Because there are state and federal legal limitations regarding what constitutes a valid HCSM, Aliera operated through two other companies, allegedly to lend their plans an appearance of legitimacy. (*Id.* ¶ 33.) Plaintiffs assert that Aliera marketed, issued, sold, and administered the plans and misrepresented the plans as HCSM plans by using these affiliated companies, even though these

---

[4] Under the ACA, the medical loss ratio dictates that, for health insurance issuers offering coverage in the "large group market," 85% of premiums collected must go towards (1) reimbursement for clinical services provided to enrollees; (2) activities that improve health care quality; and (3) on all other non-claims costs, including an explanation of the nature of such costs, and excluding Federal and State taxes and licensing or regulatory fees. 42 U.S.C. § 300gg-18(b)(1)(A)(i). For health insurance issuers in the "small group market," 80% of premiums collected must go towards these expenses. § 300gg-18(b)(1)(A)(ii). Plaintiffs allege that Aliera falls into the "large group market" category.

affiliated companies were operated and/or created by Aliera and did not (and do not) meet the qualifications to be valid HCSMs under federal or Georgia law. (*Id.*) As alleged, Aliera and the affiliated companies portrayed themselves and operated as a single enterprise, such that a reasonable consumer would not appreciate any meaningful difference between Aliera and these other companies; the "HCSM" plans offered are titled "AlieraCare" plans, as illustrated *infra*. (*Id.* ¶ 35.) Below, the Court details the involvement of these two affiliated companies, with a slight detour to start.

The Amended Complaint alleges that Aliera first attempted to break into the HCSM market in 2016 using an entity called Anabaptist Healthshare ("Anabaptist"), a small non-profit Mennonite entity located in Virginia. (*Id.* ¶ 58.) Plaintiffs contend that Timothy Moses and Aliera specifically sought to use Anabaptist as a part of their scheme because Anabaptist had in 2016 been recognized by the Department of Health and Human Services as a valid HCSM. (*Id.* ¶ 59.) In 2016, Timothy Moses approached the leaders of Anabaptist and convinced those leaders to partner with Aliera to market and sell HCSM plans. (*Id.* ¶ 60.) In late 2016, Anabaptist formed Unity Healthshare, LLC ("Unity") for the sole purpose of partnering with Aliera under a contract that allowed Aliera the exclusive license to market, sell, and administer Unity products. (*Id.* ¶ 61.) As alleged, Aliera fully controlled and operated Unity's HCSM plans in every respect. However, Aliera's relationship with Anabaptist fractured after Anabaptist discovered that Aliera was misappropriating member funds and also learned that

Timothy Moses was a convicted felon who was allegedly diverting funds to himself from the partnership operating account. (*Id.* ¶ 62.) In summer 2018, Anabaptist terminated its relationship with Aliera and litigation ensued in the Superior Court of Fulton County, Georgia. (*Id.* ¶ 63.) The Fulton County court ultimately entered an injunction against Aliera and appointed a receiver to protect Anabaptist and its members from misappropriation by Aliera. (Fulton Injunction, Doc. 26-2, at 28-31.) Of note, the superior court found that "[Anabaptist]/Unity delegated the administration of virtually all aspects of the Unity HCSM plans and plan assets to Aliera." (Fulton Injunction at 22.)[5] The Fulton Injunction explains that after the fracturing of the relationship, Aliera *retained* possession of the Unity membership roster, all Unity HCSM plans, all HCSM plan assets, all Unity intellectual property, including the website, and Unity's employees. (Fulton Inj. ¶ 82.) As a result of Aliera's retention of the Unity plans and website, Unity changed its name to Kingdom Healthshare in 2018. (*Id.* ¶ 90.) Subsequently, the Fulton County Superior Court enjoined Aliera from transitioning any Unity members to new Trinity plans, ordered Aliera to provide Anabaptist/Unity with contact and other information regarding Unity members, and appointed a receiver to oversee Unity plan assets and plan administration. (*Id.* at 28-30.)

---

[5] The Fulton County Superior Court injunction details a host of mis-dealings in the Aliera-Unity business, including Aliera's improper handling of Unity's finances; Aliera's failure to segregate Unity funds; Aliera's assertion of ownership over Unity member accounts; Mr. Moses writing $150,000 checks to himself from Unity's operating account, and more. (Fulton Inj. at 12-14, 22.)

Thus, with its relationship with Anabaptist and Unity terminating, Aliera brought about the creation of Trinity Healthshare, Inc. ("Trinity"), which Plaintiffs allege is a mere shell entity operated, administered, and directed by Aliera solely to serve Aliera's scheme. (Compl. ¶ 67.) Trinity was created in June 2018 and the sole employee and CEO is William Thead III, a former Aliera employee and close friend of the Moseses who officiated Chase Moses' wedding. (*Id.* ¶¶ 65-66.) When Trinity was incorporated, it had no members but Aliera sought to unilaterally transition Unity members to Trinity, before being enjoined. (*Id.* ¶ 69.) Plaintiffs allege that Aliera controlled and operated the Trinity HCSM plans.

A Final Investigative Report from the State of Washington Office of the Insurance Commissioner, discussed at length *infra*, includes the following helpful graphic detailing the timeline and relationships of the entities:



(Washington Report, Doc. 26-7 at 3.)[6]

Throughout the Amended Complaint, Plaintiffs allege that neither Unity nor Trinity, as operated by Aliera, conducted a legitimate HCSM, as these companies simply provided a shell to allow Aliera to control and manage every aspect of the HCSM, including marketing, membership, premiums, claims, and all aspects of administering the offered plans. (Compl. ¶ 33.) As alleged, Aliera does not qualify as a valid HCSM under the ACA or Georgia law because *inter alia* it has not existed since 1999[7], has no legitimate predecessor, membership is not genuinely "faith based," members do not play a role in determining benefit guidelines (*id.* ¶ 82), membership is not limited to those of similar faith, plans are available to members of any faith or no faith at all, the plans do not facilitate transfer of funds as contemplated by legally-constituted HCSMs, premiums are not voluntary, and Aliera does not provide monthly statements to participants, as required by Georgia law. (*Id.* ¶ 83.)

**The Plaintiffs**

Plaintiffs here are members who maintained purported HCSM plans through Aliera. (*Id.* ¶¶ 10, 20, 27.) Plaintiff LeCann paid Aliera premiums of approximately $1,700 per month from early 2018 through late 2019. (*Id.* ¶ 10.) She

[6] HealthPass USA LLC is an entity formed by Shelly Steele, Timothy Moses' wife in December 2015. In July 2017, HealthPass USA LLC merged with Aliera, with Aliera being the surviving entity. (Compl. ¶¶ 48, 50.)
[7] Under the ACA, to qualify as a valid HCSM, an organization or its predecessor must have been "in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously ... since at least December 31, 1999." 26 US.C. § 5000A(d)(2)(B)(ii)(IV).

was a member with Unity from August 1, 2018 to May 31, 2019 and then Trinity from June 1, 2019 through November 30, 2019. (Declaration of Kathleem Kromodimedjo[8] ("Kromodimedjo Decl."), Doc. 12-1 ¶ 6.) When Plaintiff LeCann needed shoulder surgery, she received a pre-authorization letter from Aliera, but after she had the surgery, Aliera refused to pay. (Compl. ¶¶ 12-13.) She made numerous attempts to resolve the dispute to no avail, and continues to receive demands for payment of this medical bill today. (*Id.* ¶¶ 16-17.) Plaintiff LeCann eventually stopped paying her premiums and as a result was terminated from her policy in late 2019. (*Id.* ¶ 16.)

Plaintiff Selimo maintained a plan with Aliera beginning in January 2018 whereby she paid Aliera $900 a month for premiums. (*Id.* ¶ 20.) Plaintiff Selimo was a Unity member from February 15, 2018 to November 14, 2019 and was a Trinity member from November 15, 2019 until May 14, 2020. (Kromodimedjo Decl. ¶ 17.) She received assurances from Aliera that medical bills related to her pregnancy, labor, and delivery, as well as medical bills for her children, would be covered but Aliera has allegedly unreasonably delayed and protracted payment, despite Ms. Selimo's attempts to resolve the dispute. (Compl. ¶¶ 22-24.) Plaintiff Funduk was a Unity member from March 1, 2018 through June 30, 2018 and a Trinity member from November 1, 2018 to June 30, 2019. (Kromodimedjo Decl. ¶ 24.) Similarly, Plaintiff Funduk paid monthly premiums of $500 to Aliera but Defendant has delayed and refused payment of her medical bills, employing tactics

---

[8] Kathleen Kromodimedjo is the Director of Risk and Compliance for Aliera. (*Id.* ¶ 2.)

such as requiring that the bills be re-submitted and re-processed numerous times without reasonable basis or representing that Plaintiff Funduk's policy has been cancelled. (Compl. ¶¶ 29-30.)

## Dispute Resolution Procedures

As noted above, all three Named Plaintiffs attempted to resolve their disputes with Aliera to no avail, as Aliera allegedly stalled, delayed, and avoided resolution, thereby frustrating and impeding Plaintiffs' attempts. (*Id.* ¶ 24.)

As members of the Unity and Trinity "HCSMs," Plaintiffs received copies of member guides and agreed to the terms of these guides by tendering their monthly payments. (Kromodimedjo Decl. ¶ 7.) However, because the Plaintiffs were involved with Aliera, Unity, and Trinity (under Aliera's umbrella) over a period of time, there are multiple member guides at issue. For example, Plaintiff LeCann allegedly agreed to the terms of Unity's Member Guide by making "sharing contributions"[9] from August 1, 2018 to May 31, 2019. (*Id.* ¶ 7.) Then, when she became a member of Trinity, she received a copy of a Trinity Member Guide that she agreed to by making "sharing contributions" each month. (*Id.* ¶ 12.) Similarly, Plaintiff Selimo allegedly agreed to a Unity Member Guide and a Trinity Member Guide. (*Id.* ¶¶ 18, 23.) Likewise for Plaintiff Funduk. (*Id.* ¶¶ 25, 30.)[10]

---

[9] What Aliera calls "sharing contributions," Plaintiffs call insurance premiums.

[10] Of note, at least one membership guide notes that the "Guidelines and Trinity member guides are not contracts and do not constitute an agreement, a promise to pay, or an obligation to share." (Supplemental Trinity Guide, Doc. 26-14 at 28.) However, this is not the operative Guide for any of the Named Plaintiffs.

*Almost but not all* of these membership guides include a detailed "Dispute Resolution and Appeal" section. Though the language varies slightly, the "Dispute Resolution and Appeal" sections all include the following six steps:

- <u>1st Level Appeal</u>. Phone call with Trinity or Unity representative.
- <u>2nd Level Appeal</u>. Review by "Internal Resolution Committee," made up of three Trinity/ Unity officials. Appeal must be writing.
- <u>3rd Level Appeal</u>. Review by three Trinity/ Unity "sharing members in good standing" and "randomly chosen" by Trinity/ Unity, who agree to review the matter and "shall constitute an External Resolution Committee."
- <u>Final Appeal</u>. Review by a medical expense auditor who "shall have the matter reviewed by a panel consisting of personnel who were not involved in the original determination."
- <u>Mediation</u>. If the aggrieved member disagrees with the resolution at Final Appeal stage, "then the matter shall be resolved by first submitting the disputed matter to mediation."
- <u>Arbitration</u>.

(Kromodimedjo Decl. ¶¶ 10, 15, 21, 28, 33) (citing the Named Plaintiffs' membership guides, Docs. 12-5, 12-6, 12-8, 12-12, 12-13.) Plaintiffs allege that this "byzantine, six-step internal dispute-resolution procedure that involves no medical professionals" violates the ACA and other laws because the ACA requires that any internal claim appeal process have no more than two levels of internal appeals. (Compl. ¶ 106.) Specifically as to arbitration, Plaintiff LeCann's Unity Member Guides explain that if the matter is not resolved by mediation,

the matter will be submitted to legally binding arbitration in accordance with the Rules and Procedures of the American Arbitration Association. Sharing members agree and understand that these methods shall be the sole remedy to resolve any controversy or claim arising out of the Sharing Guidelines, and expressly waive their right to file a lawsuit in any civil court against one another for such disputes; except to enforce an arbitration decision. Any arbitration shall be held in Atlanta, Georgia ... subject to the laws of Georgia.

> Unity Healthshare, LLC shall pay the filing fees for the arbitration and arbitrator in full at the time of filing. All other expenses of the arbitration shall be paid by each party including costs related to transportation, accommodations, experts, evidence gathering, and legal counsel. Further agreed that the aggrieved sharing member shall reimburse the full costs associated with the arbitration, should the arbitrator render a judgment in favor of Unity Healthshare, LLC, and not the aggrieved sharing member. The aggrieved sharing member agrees to be legally bound by the arbitrator's final decision.

(Kromodimedjo Decl. ¶ 10) (citing LeCann Unity Guide, Doc. 12-5 at 32-33.) The language in Plaintiff LeCann's Trinity Member Guide is virtually identical. (*Id.* ¶ 15) (citing LeCann Trinity Guide, Doc. 12-6 at 34-35.)

Plaintiff Selimo's member guide with Unity reflects slightly different arbitration language. In Selimo's Unity Guide, the appeal details legally binding arbitration in accordance with the Rules of Procedure for Christian Conciliation of the Institute of Christian Conciliation, a division of Peacemaker Ministries, and shall be held in Fredericksburg, Virginia subject to Virginia law. (*Id.* ¶ 21) (citing Selimo Unity Guide, Doc. 12-8 at 17.) Otherwise, the language is the same. Of much dispute between the Parties, Plaintiff Selimo's member guide with Trinity, covering her relationship with Trinity from November 15, 2019 to May 14, 2020, *does not include an alternative dispute resolution provision*.

Plaintiff Funduk's Unity Member Guide also details that arbitration shall be in accordance with the Rules of Procedure for Christian Conciliation of the Institute of Christian Conciliation, a division of Peacemaker Ministries in Fredericksburg, Virginia. (*Id.* ¶ 28) (citing Funduk Unity Guide, Doc. 12-12 at 17.) But her Trinity Member Guide includes the same language as with Plaintiff

LeCann, stating that arbitration shall be in accordance with the Rules and Procedures of the American Arbitration Association in Atlanta. (*Id.* ¶ 33) (citing Funduk Trinity Guide, Doc. 12-13 at 34-35.)

The Dispute Resolution and Appeal section of the member guides note that "any dispute you have with or against Unity HealthShare, LLC [Trinity HealthShare], its associates, or employees, will be settled using the following steps of action." (*See* LeCann Unity Guide, Doc. 12-5 at 32; LeCann Trinity Guide, Doc. 12-6 at 34; Selimo Unity Guide, Doc. 12-8 at 17; Funduk Unity Guide, Doc. 12-12 at 17; Funduk Trinity Guide, Doc. 12-13 at 34.) The Dispute Resolution section does not specifically include or reference Defendant Aliera. However, as noted above, all of the relevant member guides are for "AlieraCare" Plans, and for example, look like this:



(Docs. 12-5, 12-6.)

**Relevant Developments Outlined in Plaintiffs' Complaint**

Aliera and its affiliates have been investigated, sued, enjoined, and subjected to "cease and desist" orders in several jurisdictions, all of which have determined that Aliera's plans do not qualify as HCSMs and that Aliera is engaged in the unauthorized business of insurance. (Compl. ¶ 115.) Aliera has been ordered to cease selling its Unity plans in Maryland, though Aliera has allegedly violated this order by selling Trinity plans. (*Id*. ¶ 116.) The State of Texas has filed suit against Aliera for engaging in the business of insurance. (*Id*. ¶ 119.)[11] Aliera has been issued cease and desist orders by the insurance commissioners or insurance departments/divisions in various other states including Washington[12], New Hampshire[13], Colorado[14], and Connecticut[15], as discussed at length below. (Compl. ¶¶ 117, 118, 120, 121.) According to Plaintiffs, Aliera did not disclose to Plaintiffs and those similarly situated that during the proposed Class period these state

---

[11] *See* Texas Petition Seeking Injunctive Relief, Civil Penalties, Temporary Restraining Order and Temporary Injunction, *State of Texas v. Aliera Healthcare, Inc*., Cause No. D-1-GN-19-003388. (Doc. 26-9.)

[12] *See* Washington Office of the Insurance Commissioner Final Investigation Report. (Doc. 26-7.)

[13] *See* Press Release, New Hampshire Insurance Department, *Aliera Healthcare, Inc. Operating as an Unauthorized Insurance Company in New Hampshire*, Oct. 30, 2019. (Doc. 26-12.); New Hampshire Insurance Department*, In re: Aliera Healthcare, Inc*., Order to Show Cause and Notice of Hearing. (Doc. 26-13.)

[14] *See* Before the Division of Insurance, State of Colorado, *In the Matter of Aliera Healthcare, Inc*., Ex Parte Emergency Order to Cease and Desist the Unauthorized and Unlawful Transaction of the Business of Insurance in the State of Colorado, Case File No. 268068. (Doc. 26-10.)

[15] *See* State of Connecticut Insurance Department, *In the Matter of The Aliera Companies, Inc. and Trinity Healthshare, Inc*., Cease and Desist Order, Docket No. MC 19-109. (Doc. 26-11.)

regulators found that the HCSM plans offered were not qualified HCSMs and that Aliera was illegally selling insurance. (Compl. ¶ 5.)

Also relevant, there is a related lawsuit in federal court in the Western District of Washington that names as defendants Aliera and also Trinity. *See Jackson, et al., v. The Aliera Companies, Inc., et al.*, 10-cv-1281-BJR (W.D. Wash.) ("The *Jackson* Case"). The *Jackson* Case is a putative class action that alleges that Aliera (and Trinity) sold customers unauthorized health insurance plans in violation of Washington law. *See Jackson v. The Aliera Companies, Inc.*, 462 F.Supp.3d 1129, 1131 (W.D. Wash. 2020). The *Jackson* case proceeded along a slightly different route than here. There, Aliera and Trinity filed motions to dismiss, arguing that Trinity was an HCSM and thus exempt from federal and state insurance regulations. *Id.* Aliera and Trinity also argued for dismissal because the plaintiffs allegedly failed to exhaust the same dispute resolution procedures described above (as Aliera argues here). *Id.* In May 2020, the *Jackson* Court denied the motions to dismiss, finding that the plaintiffs sufficiently alleged that Trinity is an insurance company and that the AlieraCare plans created, marketed, and sold by Aliera and Trinity are insurance. *Id.* at 1137. For purposes of resolving the motion, the Court explained that Trinity was subject to Washington insurance regulations and that plaintiffs had adequately alleged the dispute procedures were illegal under Washington law. *Id.*

Later, in August 2020, the *Jackson* Court faced a motion to compel arbitration. *Jackson v. The Aliera Companies, Inc.*, 2020 WL 4787990 (W.D.

Wash. Aug. 18, 2020). The *Jackson* Court granted defendants' motion to compel arbitration, finding that the plaintiffs' challenge to the arbitration clause based on Washington law, which also outlaws arbitration clauses in insurance contracts, must be decided by the arbitrator. *Id.* at *4. In the present case, the Parties have submitted supplemental briefing in connection with this *Jackson* Order, with Plaintiffs arguing that the *Jackson* Arbitration Order is legally wrong, and Aliera attempting to bolster it. This Order is discussed further in the Court's discussion of the arbitrability question.

**Relief Sought by Plaintiffs**

In this suit, Plaintiffs seek to represent a class of all current and former participants in Aliera plans from 2017 forward who have made periodic payments to Aliera to participate in plans presented as HCSM-compliant. (Compl. ¶ 128.) Plaintiffs seek injunctive, declaratory and monetary relief requiring Aliera to reverse and refund unlawful premium charges and to require Aliera to pay for medical expenses that Plaintiffs and putative class members have incurred as members of Aliera's plans. (*Id.* ¶ 7.) Plaintiffs also seek to enjoin Aliera from further conducting its allegedly illegal scheme. (*Id.*) Plaintiffs bring claims for: money had and received, unjust enrichment, breach of contract and breach of covenant of good faith and fair dealing, conversion, breach of fiduciary duty/ confidential relationship, intentional or negligent misrepresentation, violation of the Georgia Fair Business Practices Act ("GFBPA"), O.C.G.A. 10-1-390 *et seq*., violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. 10-1-370

*et seq.*, declaratory judgment that no arbitration provision applies to Plaintiffs' claims and declaratory judgment that no arbitration delegation provision applies to Plaintiffs' claims.

In the instant Motion, Aliera asks the Court to dismiss Plaintiffs' claims without prejudice for failure to exhaust the dispute resolution procedures in the member guides as outlined above. In the alternative, Aliera asks the Court to compel arbitration. (Doc. 12.) Plaintiffs responded (Doc. 26) and Aliera replied (Doc. 28). The Parties have submitted a number of supplemental briefs as well. (Docs. 30, 34, 43, 44, 45.)

## II.    Motion to Dismiss Without Prejudice[16]

Aliera first asks the Court to dismiss without prejudice Plaintiffs' Amended Complaint because Plaintiffs "never attempted to mediate their disputes with Aliera," or use the established dispute resolution processes included in the Unity and Trinity member guides, described above. (Motion to Dismiss or Alternatively to Compel Arbitration ("Mot."), Doc. 12 at 6-7.)  According to Aliera, this failure to comply with a "condition precedent" warrants dismissal. (*Id.* at 6.) Plaintiffs argue in response that mediation is not a prerequisite to this action because (1) nothing

---

[16] A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-556 (2007); Fed. R. Civ. P. 12(b)(6).  In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). Accordingly, for purposes of the motion to dismiss only, the Court takes the facts alleged in the Complaint as true.

in the membership guides requires that a member participate in mediation before filing a civil action (*i.e.*, it is not a condition precedent to filing suit), and (2) any such requirement would be illegal and unenforceable under Georgia law because the multi-stage dispute resolution procedure is illegal under the ACA and Georgia law and also because of Aliera's bad faith in response to Plaintiffs' prior efforts to address their claims issues. (Pl. Resp., Doc. 26 at 34-36.)

Under Georgia law, a condition precedent must be performed before the contract becomes obligatory upon the other party. O.C.G.A. § 13-3-4. "When a plaintiff's right ... depends on a condition precedent, to be performed by him, he must allege, and prove the performance of such condition precedent, or allege a sufficient legal excuse for its nonperformance." *Wolverine Ins. Co. v. Sorrough*, 177 S.E.2d 819, 822 (Ga. Ct. App. 1970) (internal quotations omitted). "Parties can create conditions precedent by language such as 'on the condition that,' 'if' and 'provided,' or by explicit statements that future events are to be construed as conditions precedent.'" *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F.Supp.3d 1303, 1323 (N.D. Ga. 2014) (citing *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000)). But, Georgia law "does not favor interpreting a contract to find a condition precedent." *Id.* "If the contract's terms are clear and unambiguous and do not clearly establish a condition precedent, [courts] cannot construe them to create one." *Choate Constr.*, 541 S.E.2d at 438.

Upon review, the Court is not convinced that the language of the contracts evidences that mediation is a condition precedent to filing a lawsuit. There is no

language stating that a member can only file suit against Aliera, Trinity, or Unity "on the condition that," "if," or "provided" the member has previously engaged in mediation. *Choate Constr.,* 541 S.E.2d at 438. The only contract language that could constitute such a condition precedent is found in the arbitration section and states that, "[s]haring members agree and understand that these methods shall be the sole method to resolve any controversy or claim arising out of the Sharing Guidelines, and expressly waive their right to file a lawsuit in any civil court **against one another** for such disputes…" (LeCann Unity Guide, Doc. 12-5 at 32-33) (emphasis added).

This language is far less clear than the language in the cases upon which Aliera relies. In those cases, the contract plainly states that *the relevant parties* are required to mediate *before or at the time of filing a lawsuit. See e.g.*, *Houseboat Store, LLC v. Chris-Craft Corp*., 692 S.E.2d 61, 64-65 (Ga. Ct. App. 2010) (affirming trial court's dismissal based on plaintiff's failure to allege that it complied with mediation provision of contract which stated that, "[i]n the event any dispute between the parties cannot be resolved through a discussion between a representative of Dealer and the President of Chris–Craft **the parties agree that, prior to filing any legal action; they shall submit the matter to nonbinding mediation**…"); *World of Beer Franchising, Inc. v. MWB Dev. I, LLC*, 711 F. App'x 561, 563 (11th Cir. 2017) (affirming district court's determination that the franchise agreements prohibited plaintiff from seeking injunction until the parties mediated dispute where the contractual language stated that "both you and

we have the right in a proper case to obtain ... temporary or preliminary injunctive relief from a court of competent jurisdiction. However, **the parties must immediately and contemporaneously submit the dispute for non-binding mediation**").[17] Indeed, the member guides specifically state that sharing members "waive their right to file a lawsuit in any civil court **against one another**" not against Aliera, Unity, or Trinity. (LeCann Unity Guide, Doc. 12-5 at 32-33) (emphasis added). Whatever the intent, the actual language here is not an explicit waiver of a right to file a lawsuit against Aliera. The Court repeats that Georgia law "does not favor interpreting a contract to find a condition precedent." *Ralls Corp.*, 27 F.Supp.3d at 1323.

Regardless of whether the contract language is sufficient to establish that mediation is required before suit, the Court finds that Plaintiffs have adequately pled that Aliera's plans are insurance, and therefore sufficiently alleged that the multi-stage dispute resolution procedure is illegal under the ACA. (Compl. ¶ 106) (alleging that the "byzantine, six-step internal dispute resolution procedure ...

---

[17] Aliera also relies on *Woods v. Holy Cross Hosp.*, 591 F.2d 1164 (5th Cir. 1979). In that case, the court held that a Florida *statute* requiring pre-suit mediation of medical malpractice claims was a condition precedent to the jurisdiction of *any* court in a medical-malpractice based action. *Id.* at 1169 n. 7. This case involves no comparable statute and *Woods* is therefore inapposite. In *Kemiron Atl., Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287 (11th Cir. 2002), the court *denied* the motion to compel arbitration because the *defendant* had not first sought mediation, which was a condition precedent to arbitration under the language of the parties' contract. Thus, the issue in *Kemiron* was **not** whether the plaintiff was barred from filing a civil action for failure to engage in mediation, as here, but whether the defendant's request for arbitration was barred by failing to first seek mediation. Mediation as a condition precedent to arbitration is not the same thing as mediation as a condition precedent to filing suit. Additionally, in *Kemiron*, there was no challenge to the validity of the arbitration provision and no allegations that attempts to engage in pre-arbitration procedures were frustrated and thwarted. *Kemiron* is not applicable to the issue before the Court.

violates the ACA, among other laws"); *See,* 45 C.F.R. § 147.136(b)(3)(ii)(G) (requiring that "a health insurance issuer offering individual health insurance coverage must provide for only one level of internal appeal before issuing a final determination")[18]; *see also*, *Jackson*, 462 F.Supp.3d at 1137 (denying Aliera's motion to dismiss because plaintiffs sufficiently alleged that Aliera's plans were insurance and that the dispute resolution procedure was illegal under Washington law).[19]

On top of this, Plaintiffs have adequately alleged that Plaintiffs attempted to avail themselves of the dispute resolution procedures provided but that Aliera frustrated and impeded all attempts. (Compl. ¶¶ 12-17, 22-24, 29-31) (explaining that LeCann, Selimo, and Funduk made numerous attempts to resolve their claims but Aliera stalled, delayed and avoided resolving the dispute). Further, Plaintiffs allege that Aliera designed this "sham dispute resolution process," not as a bona fide means to settle disputes but instead as a

> means to delay and deny covered claims; force members to accept unreasonable settlements for covered claims; force members to incur costs that would make it impossible or impractical to recover covered claims; deny legally required recourse to the court system; allow Aliera's owners to illegally funnel a large portion of member contributions into their own pockets; unreasonably extend the time for payment of those claims that were eventually paid; and saddle members with substantial medical costs that should have been covered under the plans.

---

[18] The Court notes that under McCarran-Ferguson Act, discussed below, the regulation of insurance is left to the states except where a federal statute specifically regulates the business of insurance, as the ACA does.

[19] As a reminder, although the *Jackson* Court first denied Aliera and Trinity's motion to dismiss for failure to mediate, 462 F.Supp.3d at 1137, it later granted Aliera and Trinity's motion to compel arbitration, as discussed at length below. 2020 WL 4787990 at *3-4.

(Compl. ¶ 109.) Taking the facts alleged as true for purposes of a motion to dismiss, Aliera's conduct in frustrating Plaintiffs' attempts to engage in dispute resolution waives any mediation condition precedent. As the Georgia Supreme Court recently recognized in *GEICO Indemnity Co. v. Whiteside*, ---S.E.2d ---, 2021 WL 1521527 (Ga. Apr. 19, 2021), it is "well settled" that an insurance company may waive provisions in its policy for its own benefit and may by its conduct be estopped from asserting certain defenses. *Id.* at n. 18 (explaining that fulfillment of condition precedent may be waived by conduct of insurer) (quoting O.C.G.A 13-4-23 ("If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance.")); (also quoting *Hammond v. Bank of Newnan*, 456 S.E.2d 678 (Ga. Ct. App. 1995) ("One who hinders fulfillment of a condition precedent cannot rely on [that] condition to defeat liability.")).

Whether performance of a condition precedent has been waived is generally a question for the trier of fact. *DuPree v. South Atlantic Conference of Seventh-Day Adventists, Inc.*, 683 S.E.2d 1, 3 (Ga. Ct. App. 2009). Here, any issues of waiver implicate fact disputes not appropriately before the Court on a motion to dismiss. At this stage, Plaintiffs have plausibly alleged that Aliera blocked Plaintiffs' attempts to resolve their disputes through the internal dispute procedures and thereby waived any mediation condition precedent. *See, Transworld Food Services, LLC v. Nationwide Mutual Insurance*, 1:19-cv-03772-

SDG, 2020 WL 4464611, at *7-8 (N.D. Ga. Aug. 4, 2020) (denying insurer's motion to dismiss, holding that plaintiffs adequately alleged that insurer waived suit limitation by its conduct, and noting that almost all of the relevant cases were decided at the summary judgment stage); *Impac Funding Corp. v. Amica Mut. Ins. Co.*, No. 1:12-cv-873-RWS, 2013 WL 1136860, at *4 (N.D. Ga. Mar. 18, 2013) (finding, at motion to dismiss stage, that issues of fact exist as to whether insurer waived contractual limitations period by its conduct and that court could not rule as a matter of fact or law that claims were barred).

In sum, the Court finds that it is not clear that the contract language evinces that mediation is a condition precedent to Plaintiffs bringing suit against Aliera. Even if it were, Plaintiffs have adequately alleged that (1) AlieraCare is insurance and the dispute resolution procedures (including any required mediation) are illegal under federal law, and (2) Aliera has waived any mediation condition precedent by its conduct of frustration of the delineated procedures. For these reasons, the portion of Defendant's Motion arguing for dismissal is **DENIED.**

## III.   Motion to Compel Arbitration

After that appetizer, the Court turns to the main course: whether this matter should be sent to arbitration in full, in part, or not at all. Aliera asks the Court to compel Plaintiffs to submit all their claims to arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3,4, because (1) the member guides indicate that "any dispute" with Unity, Trinity, or its associates, shall be submitted to arbitration; (2) interstate commerce is present; and (3) the arbitration clauses

24

encompass "any dispute" and thus all of Plaintiffs' claims. (Mot. at 11-15) (citing 9 U.S.C. § 2.) Plaintiffs' central argument in response is that, under Georgia law § 9-9-2(c)(3), arbitration agreements are illegal and void in insurance contracts, and that because Aliera's member guides constitute insurance contracts, any purported agreements to arbitrate are illegal and void. Plaintiffs further explain this Georgia statute, O.C.G.A. § 9-9-2(c)(3), is excepted from preemption by the FAA, which therefore does not apply. (Pl. Resp. at 23-27.) Secondarily, Plaintiffs also argue that: Aliera is not party to any arbitration agreement; the member agreements state that they are "nonbinding;" and Plaintiffs' claims are not covered by any arbitration clauses. (*Id.* at 27-32.)

The Parties also dispute the antecedent or "gateway" question of *who decides* whether Plaintiffs' claims are arbitrable: the Court or the arbitrator. Aliera contends that any question about the enforceability of arbitration provisions has been delegated to, and must be decided by, the arbitrator. (Mot. at 15-18.) Challenging both the alleged arbitration and delegation provisions, Plaintiffs contend that the Court must decide the arbitrability question, as they argue that the FAA does not apply and thus the Court is without authority to compel arbitration under that statute. (Pl. Resp. 25-26; Pl. Supp. Br. I, Doc. 30 at 2-13.)

To further complicate things, there is an arbitration side-issue—what the Court deems the Selimo Question. Plaintiffs contend that regardless of Plaintiffs LeCann and Funduk's claims, Plaintiff Selimo's claims based on her time as a Trinity member are assuredly not subject to arbitration because the Trinity

Member Agreement covering her from November 15, 2019 to May 14, 2020 undisputedly *does not include* any Dispute Resolution Procedures section *at all.* (Pl. Supp. Br. II, Doc. 44 at 15.)  Besides arguing that this Selimo Question is also for the arbitrator to decide, Aliera essentially argues that the earlier arbitration clause in Plaintiff Selimo's *Unity* Member Guide extends to cover any dispute with Aliera while she was a member of the *Trinity* HCSM. (Def. Supp. Br., Doc. 43 at 3-5.)

In considering the thicket of disputes recounted above, the first issue the Court must address is whether the Court or the arbitrator should determine if this case is arbitrable.

## A. The Arbitrability Question

### 1.  Legal Standard

The Federal Arbitration Act requires courts to enforce private arbitration agreements. *New Prime v. Oliveira*, 139 S.Ct. 532, 536 (2019). Section 2 of the FAA embodies a policy favoring arbitration and places arbitration agreements on equal footing with all other contracts, as follows:

> A written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract ... shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*.

*Buckeye Check Chasing, Inc. v. Cardegna*, 546 U.S. 440, 443-444 (2006) (citing 9 U.S.C. § 2) (emphasis added). In addition, the FAA "establishes procedures by

which federal courts implement § 2's substantive rule." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010). "Under § 3, a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Id.* Further, "under § 4, a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such an agreement.'" *Id.* Thereafter, "'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue[,]'" the court *shall* order arbitration. *Id.* The FAA creates a "presumption of arbitrability" such that doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016).

Yet, under this framework and "like most laws, [the FAA] bears its qualifications." *New Prime,* 139 S.Ct. at 536. "While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *Id.* at 537. As the Supreme Court further detailed in *New Prime*,

> If two parties agree to arbitrate future disputes between them and one side later seeks to evade the deal, §§ 3 and 4 of the Act often require a court to stay litigation and compel arbitration "accord[ing] to the terms" of the parties' agreement. But this authority doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration.

*Id.* Under the FAA, the antecedent statutory provisions, §§1 and 2, "limit the scope of the court's powers under §§ 3 and 4." *Id.*

At issue here is a challenge to the arbitration provisions and any delegation clauses under § 2, which, to repeat, explains that agreements to arbitrate "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2. (emphasis added). "Challenges to arbitration agreements [under § 2] 'upon such grounds as exist at law or in equity for the revocation of any contract' can be divided into two types." *Buckeye*, 546 U.S. at 444.

The first type "challenges specifically the validity of the agreement to arbitrate." *Id.* (citing *Southland Corp. v. Keating*, 465 U.S. 1 (1984) (challenging agreement to arbitrate as void under California law insofar as it purported to cover claims brought under state Franchise Investment Law)). Since Plaintiffs challenge specifically the agreements to arbitrate (and the delegation provisions) as void under a particular provision of Georgia law regarding arbitration agreements in insurance contracts, this first type is at issue here.

The second type challenges the arbitration contract as a whole on grounds "that directly affect the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* (assessing challenge of the "second type" where the crux of the complaint was that contract as a whole, including arbitration provision, was rendered invalid by usurious finance charge). In *Rent-A-Center*, the Court further explained that "[i]n a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a court's

determination whether an arbitration agreement at issue is enforceable." 561 U.S. at 70. (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 403-404 (1967); *Buckeye*, 546 U.S. at 444-446; *Preston v. Ferrer*, 552 U.S. 346, 353-354(2008)). As to the second type,

> [Section] 2 states that a "written provision" "to settle by arbitration a controversy" is "valid, irrevocable, and enforceable" without mention of the validity of the contract in which it is contained. Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye*, 546 U.S. at 445, 126 S.Ct. 1204; see also *id*., at 447, 126 S.Ct. 1204 (the severability rule is based on § 2).

*Rent-A-Center*, 561 U.S. at 70-71 (finding issue of arbitrability was for arbitrator where plaintiff challenged the arbitration contract as a whole based on grounds that it was substantively and procedurally unconscionable, and did not specifically challenge the agreement's delegation provision).

Some arbitration agreements involve the added complexity of a delegation clause. "A delegation clause gives an arbitrator authority to decide even the initial question of whether the parties' dispute is subject to arbitration." *New Prime*, 139 S. Ct. at 538 (citing *Rent-A-Center*, 561 U.S. at 68-69). Under the "severability principle," courts "treat a challenge to the validity of an arbitration agreement (or a delegation clause) separately from a challenge to the validity of the entire contract in which it appears." *Id.* (citing *Rent-A-Center*, 561 U.S. at 68-69); *see also, Henry Schein, Inc. v. Archer and White Sales, Inc.,* 139 S.Ct. 524, 529 (2019) ("[W]e have held that parties may agree to have an arbitrator decide not only the

merits of a particular dispute but also "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.") And, "[u]nless a party specifically challenges the validity of the agreement to arbitrate [or the delegation clause], both sides may be required to take all their disputes—including disputes about the validity of their broader contract—to arbitration." *Id.* However, where a party does challenge the delegation clause under § 2, "the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Center,* 561 U.S. at 70-71.

Yet, as the Supreme Court explained in *New Prime*, because a delegation clause is merely a specialized type of arbitration agreement, and the FAA operates on this additional agreement as it does on any other, a court may only use §§ 3 and 4 to enforce a delegation provision within an arbitration contract *consistent with §§ 1 and 2*. Thus,

> the Act's severability principle applies only if the parties' arbitration agreement appears in a contract that falls within the field §§ 1 and 2 describe. We acknowledged as much some time ago, explaining that, before invoking the severability principle, a court should "determine [ ] that the contract in question is within the coverage of the Arbitration Act." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

*New Prime*, 132 S.Ct. at 537-38 (finding that the court should decide for itself whether an exclusion in § 1 of the FAA applied before ordering arbitration, even where plaintiff did not specifically challenge the delegation clause in the agreement to arbitrate).

Before assessing the gateway question of who decides arbitrability, a bit more context is required. Plaintiffs' challenge to the arbitration provisions is set amidst a knot of three relevant statutes: the FAA, the McCarren-Ferguson Act, 15 U.S.C. § 1012(b), and the Georgia Arbitration Act, specifically the section that prohibits arbitration agreements in insurance contracts, O.C.G.A. § 9-9-2(c)(3). Luckily, the Eleventh Circuit and the Georgia Supreme Court have already untangled this knot, describing the intersection of these three statutes as follows.

As noted, the FAA provides the general rule that written provisions in contracts to settle a dispute by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This federal rule, that arbitration provisions in contracts involving commerce will be enforced, generally preempts state law to the contrary." *McKnight v. Chicago Title Ins. Co., Inc.*, 358 F.3d 854, 857 (11th Cir. 2004) (citing *Volt Info. Scis., Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

However, the McCarran-Ferguson Act provides an exception to that general rule by vesting regulation of the insurance industry to the states, absent contrary federal law specifically relating to insurance:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b); *McKnight*, 358 F.3d at 857.  The *McKnight* Court reasoned that, faced with this exception, a court applying Georgia law should refuse to enforce an arbitration clause under certain circumstances:

> In the right circumstances, the McCarran-Ferguson Act provides an exception to the general rule of arbitration under the Federal Arbitration Act. **If the state has an anti-arbitration law enacted for the purpose of regulating the business of insurance, and if enforcing, pursuant to the Federal Arbitration Act, an arbitration clause would invalidate, impair, or supersede that state law, a court should refuse to enforce the arbitration clause.** *Standard Sec. Life Ins. Co. of New York v. West*, 267 F.3d 821, 823 (8th Cir. 2001) (stating and applying this exception). The parties and we agree that the Federal Arbitration Act does not itself specifically relate to the business of insurance.

*McKnight*, 358 F.3d at 857 (emphasis added). *See also*, *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 455 (4th Cir. 2017) (evaluating Virginia law and explaining that the McCarran-Ferguson Act authorizes "reverse preemption" of generally applicable federal statutes by state laws enacted for purpose of regulating the business of insurance).

The Parties agree that the Court must look to Georgia law to determine whether the arbitration provisions here apply and are enforceable. (Mot. 11-12; Pl. Resp. at 23.)[20] The Georgia Arbitration Act states that:

> (c) [The Act] shall apply to all disputes in which the parties thereto have agreed in writing to arbitrate and shall provide the exclusive

---

[20] Whether an arbitration agreement has been formed, whether it applies in a particular case, and whether it is legally enforceable is determined by state law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) ("[S]tate law ... is applicable to determine which contracts are binding under § 2 and enforceable under § 3."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (explaining that when deciding whether the parties agreed to arbitrate a certain matter, including determining issues of arbitrability, courts should apply ordinary state-law principles that govern the formation of contracts).

means by which agreements to arbitrate disputes can be enforced, except the following, to which this part shall not apply...

> (3) Any contract of insurance, as defined in Code Section 33-1-2; provided, however, that nothing in this paragraph shall impair or prohibit the enforcement of or in any way invalidate an arbitration clause or provision in a contract between insurance companies...

O.C.G.A. § 9-9-2(c). Accordingly, Georgia courts refuse to enforce arbitration provisions in insurance contracts. *McKnight*, 358 F.3d at 857 (collecting cases).

The Eleventh Circuit in *McKnight* accordingly held that O.C.G.A. § 9-9-2(c)(3) "is a law enacted to regulate the business of insurance, within the meaning of the McCarran-Ferguson Act. Thus, § 9-9-2(c)(3) is excepted from preemption by the Federal Arbitration Act." *McKnight*, 358 F.3d at 859 (affirming the district court's denial of motion to compel arbitration). Subsequently, in *Love v. Money Tree, Inc.*, 614 S.E.2d 47, 50 (Ga. 2005), the Georgia Supreme Court, citing *McKnight* and other cases, reasoned that, "courts have consistently held such State laws have been enacted for the purpose of regulating insurance; that application of the FAA would impair those laws; and that the [McCarran-Ferguson Act] thus precludes the FAA from preempting those State laws." (reversing the lower court's granting of motion to compel); *see also Continental Ins. Co. v. Equity Residential Props. Trust*, 565 S.E.2d 603, 605 (Ga. Ct. App. 2002) (concluding that § 9-9-2(c)(3) is exempted by the [McCarran-Ferguson Act] from the preemptive effect of the FAA and affirming denial of insurer's motion to compel arbitration). The Fourth Circuit similarly explained, when addressing a Virginia statute prohibiting arbitration agreements in insurance contracts, that "state laws invalidating

33

arbitration agreements in insurance policies 'reverse preempt[]' the Federal Arbitration Act." *Minnieland*, 867 F.3d 454.

With this framing, it is clear that *if* the Court (and not the arbitrator) is tasked with determining the question of arbitrability, and *if* the Aliera plans at issue are insurance, as Plaintiffs argue, then § 9-9-2(c)(3) would "reverse preempt" the FAA, or be exempt from preemption by the FAA, leaving the Court without authority to enforce any arbitration agreement under §§ 3 and 4 of that Act.

### 2. Discussion of the Gateway Question

As dictated by the above framework, the Court must first determine who decides whether this case is arbitrable, the Court or the arbitrator. Again, Aliera argues that the arbitrator decides issues of arbitrability because the alleged arbitration provisions include delegation provisions that delegate all issues as to the validity and enforceability of the arbitration agreement to the arbitrator. (Mot. at 16-17) (arguing that "any challenge that Plaintiffs could possibly raise to defeat or avoid the arbitration provisions must be decided in the first instance by the arbitrator"). In response, Plaintiffs argue that Aliera's argument "puts the cart before the horse" because, under the FAA, a court must first determine the enforceability of an arbitration provision and/or a delegation provision therein when a statutory prohibition on arbitration is present. (Pl. Resp. at 22-23; Pl. Supp. Br. I, Doc. 30 at 2) ("Delegation provisions do not empower arbitrators to determine 'whether the district court has the authority to act under the FAA—specifically, the authority under § 4 to compel the parties to arbitration'") (quoting

*Oliveira v. New Prime, Inc.*, 857 F.3d 7, 14 (1st Cir. 2017) *aff'd* 139 S. Ct. 532 (2019)).

To refresh, the member guides explain that if the dispute is not resolved by mediation, "the matter will be submitted to legally binding arbitration in accordance with the Rules and Procedures of the" American Arbitration Association ("AAA") or the Rules of Procedure for Christian Conciliation of the Institute of Christian Conciliation ("the Christian Conciliation Rules"). (*See e.g.*, Docs. 12-5 at 33, 12-12 at 17.) Aliera contends that the AAA and Christian Conciliation Rules both provide that the arbitrability question is to be determined by the arbitrator, and thus the reference to those arbitration rules operates as a delegation provision within the agreement to arbitrate, citing *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (holding that incorporation of AAA commercial arbitration rules was clear and unmistakable delegation of arbitrability question to arbitrator). (Mot. at 16.)[21]

Although Aliera refuses to acknowledge it (Reply at 5), Plaintiffs directly challenge both the arbitration provision of the member guide contracts and also any delegation provisions included therein in both the Amended Complaint and in

---

[21] Plaintiffs disagree that the reference to the AAA and Christian Conciliation rules evinces clear and unmistakable proof of delegation. (Pl. Resp. at 25, n. 13.) While Plaintiffs' argument is unavailing in light of *Terminix, supra*, 432 F.3d at 1332, for the reasons below, regardless of whether the AAA and Christian Conciliation rules constitute an unmistakable delegation, Plaintiffs have clearly challenged the arbitration and delegation provisions under § 2 of the FAA, arguing that § 9-9-2(c)(3) is exempted from preemption by the FAA. It is therefore for the Court to determine arbitrability, as discussed throughout. *Rent-A-Center*, 561 U.S. at 71 ("If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with the agreement under § 4.").

their initial response brief. Plaintiffs assert these challenges under § 2 of the FAA on the basis that there is a specific statutory prohibition against arbitration agreements in insurance contracts under Georgia law, O.C.G.A. § 9-9-2(c)(3), and thus the arbitration and delegation provisions are void and illegal. (Compl. ¶¶ 244-268) (detailing Counts IX and X, seeking declaratory judgment that any arbitration provisions and included delegation provisions are unenforceable as a matter of law because the contracts under § 9-9-2(c)(3) are exempted from the FAA).[22] Not only do Plaintiffs challenge the delegation provision as an entire claim in the Amended Complaint, but they also included this argument in their initial response in opposition to Defendant's motion. Indeed, Plaintiffs entitled one of their response brief sections: "The Arbitration Provision *And the 'Delegation' Provision*, To the Extent There is One, Are Illegal and Void." (*See* Doc. 25 at 23) (emphasis added.) This section includes argument that there is no agreement to delegate gateway enforceability issues to arbitration, and "even if there were a clear written agreement to that effect, O.C.G.A. § 9-9-2(c)(3) would render it an illegal nullity, and it would be this Court's responsibility to decide that issue pursuant to the FAA." (Pl. Resp. at 25-26) (*See also*, Pl. Supp. Br. I at 9-10) ("The arbitration and delegation provisions – not the contract as a whole – are illegal and unenforceable

---

[22] Plaintiffs do not argue that some other provision of the contract renders the arbitration provision unenforceable, or that the broader agreements as a whole were unconscionable or fraudulently induced or another general contract defense, as in *Buckeye*, 546 U.S. at 444, where the plaintiff argued that the whole contract was rendered invalid by a usurious finance charge.

by virtue of O.C.G.A. § 9-9-2(c)(3), which 'reverse preempts' the FAA from application.")

As noted above and throughout, the Supreme Court has explained that, "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with the agreement under § 4." *Rent-A-Center*, 561 U.S. at 71. Further, to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration pursuant to a delegation provision, a court must first know whether the arbitration provision itself falls within or beyond the boundaries of §§ 1 and 2, as follows:

> A delegation clause is merely a specialized type of arbitration agreement, and the Act "operates on this additional arbitration agreement just as it does on any other." *Id.*, at, 70, 130 S.Ct. 2772. *So a court may use §§ 3 and 4 to enforce a delegation clause only if the clause appears in a "written provision in ... a contract evidencing a transaction involving commerce" consistent with § 2 .... In exactly the same way, the Act's severability principle applies only if the parties' arbitration agreement appears in a contract that falls within the field §§ 1 and 2 describe.* We acknowledged as much some time ago, explaining that, before invoking the severability principle, a court should "determine [ ] that the contract in question is within the coverage of the Arbitration Act." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.E.2d 1270 (1967).

*New Prime*, 139 S.Ct. at 537-38 (finding that court must decide arbitrability question based on argument that contracts were exempt under § 1 of the FAA, even where the delegation provision was not directly challenged) (emphasis added). Thus, in *New Prime* "the Supreme Court reasoned that §§ 3 and 4 cannot apply to an arbitration agreement that is excluded from the FAA's coverage by the terms of

§§ 1 and 2 ... Pursuant to the rationale offered by *Rent-A-Center*, the Court viewed a delegation clause as 'merely a specialized type of arbitration agreement,' and, as a result, held that the same reasoning applied." *Singh v, Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019).

On this gateway arbitrability issue, the Fourth Circuit in *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, addressed a situation analogous to the one now before the Court. 867 F.3d 449, 455 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 926 (2018). There, as here, the plaintiff argued that the case should not be sent to arbitration because under the applicable state law (there, of Virginia), a state-law statute prohibited arbitration agreements in insurance contracts. *Id.* at 452. The district court denied the motion to compel arbitration. On appeal, the defendant argued that even if the plaintiff challenged the arbitration agreement generally, it failed to specifically challenge the delegation provision of the contract, or specifically challenge it for a different reason than the arbitration agreement itself, and therefore it was still for the arbitrator to determine issues of arbitrability. The *Minnieland* Court disagreed and concluded that the plaintiff's argument that the applicability of the Virginia statute "rendered void 'any' arbitration provision" "necessarily include[d] the delegation provision, which is simply 'an additional, antecedent agreement' to arbitrate." 867 F.3d at 455. Thus, where the plaintiff challenged arbitration based on a statutory prohibition against arbitration provisions in insurance contracts, the plaintiff had sufficiently challenged the delegation provision. *Id.* at 455-456. *See also, Citizens*

*of Humanity, LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 909 N.W.2d 614, 633 (Neb. 2018) (finding that district court erred in sending arbitrability question to the arbitrator where plaintiff argued that arbitration provision in contract was invalid under Nebraska law which prohibited arbitration agreements in contracts "concerning or relating to an insurance policy"), *cert. denied* 139 S.Ct. 274 (2018).

Other courts have relatedly held that "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *MacDonald v. Cashcall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018) (explaining that to challenge a delegation clause, "the party must at least reference the provision in its opposition to a motion to compel arbitration"); *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 338 (4th Cir. 2020) (holding that plaintiffs specifically challenged delegation provision in opposition to motion to compel where they argued that the "delegation clause[s] [are] unenforceable for the same reason as the underlying arbitration agreement—the … wholesale waiver of the application of federal and state law[,]" noting that under *Rent-A-Center*, "such a challenge is all that is required to dispute the viability of the delegation provision" and thus arbitrability was for court to decide); *see also, Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (holding that plaintiffs sufficiently challenged the delegation provision where the complaint attacked it for the same reasons as the arbitration clause,

alleging that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent.").

Under different factual circumstances, the Eleventh Circuit has also articulated that where a plaintiff raises a "direct challenge to the delegation clause in his opposition to a motion to compel," the court must consider it. *Parm v. National Bank of California, N.A.*, 835 F.3d 1331, 1335 n. 1 (11th Cir. 2016) (citing *Rent-A-Center*, 561 U.S. at 72.) This interpretation, like the Fourth Circuit's holdings in *Minnieland* and *Gibbs*, comports with the Supreme Court's guidance in *Rent-A-Center* and *New Prime*. As Plaintiffs here have lodged challenges under § 2 specifically against the arbitration provisions in the member guides and the included delegation provisions, the Court "must decide whether the delegation provision is enforceable 'upon such grounds as exist at law or in equity.'" *Gibbs,* 967 F.3d at 338. (citing *Minnieland*, 867 F.3d at 455 (quoting 9 U.S.C. § 2)); *see also, In re Van Dusen*, 654 F.3d 838, 844 (9th Cir. 2011) (reversing district court's decision to send case to arbitration pursuant to delegation clause, explaining that § 4 of the FAA "has no applicability" where a contract was exempted from the FAA, there by § 1, "and private contracting parties cannot, through insertion of a delegation clause, confer authority upon a district court that Congress chose to withhold").[23]

---

[23] *Van Dusen* was later reaffirmed after remand and a later appeal. 544 F. App'x 724 (9th Cir. 2013), *cert denied*, 573 U.S. 916 (2014).

Aliera also suggests that because Plaintiffs have not challenged the delegation provision for a different reason than they challenge the arbitration provision, such as fraud or duress, they have not properly challenged it. (Reply at 4-7.) But there is no binding authority that dictates that Plaintiffs cannot challenge the alleged delegation provision on the same grounds that they challenge the broader agreement to arbitrate. Indeed, the holdings of *New Prime*, *Minnieland*, *Gibbs*, *MacDonald, In re Van Dusen,* and the other cases cited above hold otherwise.

Plaintiffs' clear challenges to the arbitration provisions and any included delegation provisions pursuant to § 2 of the FAA therefore warrant judicial review. The Court's finding here is further bolstered by the well-established principle that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options*, 514 U.S. at 944 (alterations omitted); *see also, Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1416-17 (2019) ("[W]e presume that parties have *not* authorized arbitrators to resolve certain "gateway" questions, such as "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.") (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)).

The Court acknowledges that in so finding, it holds differently than the *Jackson* Court. There, the Court determined that the plaintiffs challenged the contract as a whole and did not specifically challenge the validity of the arbitration

provision, and thus it was for the arbitrator to decide the issue of arbitrability. 2020 WL 4787990 at *3. Even though the plaintiffs argued that the arbitration provisions were void because a specific provision of Washington law prohibits arbitration agreements in insurance contracts, the *Jackson* Court determined the challenge was to the contract as a whole because the "crux of the complaint" also generally asserted that the Aliera and Trinity plans were illegal insurance plans under Washington law. *Id.* at *4.

The "crux of the complaint" concept comes from language in the Supreme Court's *Buckeye* decision, a case in which the respondents argued that the overall contract was rendered invalid by a usurious finance charge, and did not separately or specifically challenge the arbitration provision. 546 U.S. at 444. In finding that the issue of arbitrability was for the arbitrator, the *Buckeye* Court explained that, in that case, the respondents' challenge was to the contract as a whole and not specifically the arbitration provision because "[t]he crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge." *Buckeye*, 546 U.S. at 444. Because an arbitration provision is severable from the broader contract, the respondent's challenge to the contract as a whole was insufficient to challenge the arbitration provision, which was enforceable apart from the remainder of the contract. *Id.* at 446. The challenge was therefore an issue for the arbitrator. *Id.* Thus, a party's challenge to arbitration based only on the argument that the whole contract is invalid generally is not a

specific challenge to the agreement to arbitrate such that a court must decide rather than the arbitrator.

But that is fundamentally not the situation here. Plaintiffs' arbitration arguments do not rely on the broader invalidation of the contracts based on general contract defenses, such as the usurious finance charge in *Buckeye*. Instead, Plaintiffs specifically and precisely invoke a statutory challenge to the arbitration provisions (and included delegation provisions) pursuant to § 2 of the FAA as void under O.C.G.A. § 9-9-(c)(3). This question is distinct from the issues asserted in the complaint regarding the member guide contracts as related to the broader claims. Accordingly, the Court does not find the short analysis included in the *Jackson* Arbitration Order instructive and disagrees with its ultimate conclusion.[24]

Instead, the Court follows the logic of *New Prime, Rent-A-Center, Minnieland,* and the other authority cited above, which conflicts with the *Jackson* Court's holding. As the Supreme Court noted in *Rent-A-Center*, and as the Court has echoed many times herein, "[i]f a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Center*, 561 U.S. at 71. And, as the Supreme Court later explained in *New Prime*, the antecedent provisions §§ 1 and 2 of the FAA "limit the scope of the Court's powers under §§ 3 and 4." *New Prime*, 139 U.S. at 537. The "question of the court's

---

[24] Based on the Court's review, it appears that the issues were briefed differently and with different focus in the *Jackson* case. Here, the Court had the benefit of significant (and supplemental) briefing on the gateway question.

authority to act under the FAA is an 'antecedent determination' for the district court to compel arbitration under the Act." *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 14 (1st Cir. 2017) *aff'd*, 139 S. Ct. 532 (2019). To send the question of arbitrability to the arbitrator under the present circumstances would be to "put the cart before the horse" because § 4 has no applicability where § 2 exempts a contract from the FAA. *In re Van Dusen*, 654 F.3d at 844.

The Court also understands that there is overlap between the issues raised by Plaintiffs' defense to arbitration and the overall claims in this case and that courts should not decide the overall merits of a case on a motion to compel arbitration, as Aliera argues. (Reply at 8.) Yet, it is plain that a court must first determine whether the FAA applies to the contracts at issue, and whether the court has authority to compel arbitration under the FAA before ordering the parties to arbitrate. *New Prime*, 139 S.Ct. at 537-38; *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 14 (1st Cir. 2017); *In re Van Dusen*, 654 F.3d at 844; *Minnieland*, 867 F.3d at 456; *Gibbs,* 967 F.3d at 339.

Recapping, Plaintiffs have specifically challenged the member guides' arbitration provisions and the delegation provisions therein under § 2 of the FAA; thus, the Court, not the arbitrator, must decide the question of whether the member agreements are insurance for purposes of the motion to compel arbitration such that the FAA is inapplicable as a result of O.C.G.A. § 9-9-2(c)(3). In so doing, the Court is not resolving the ultimate merits of the case but makes its

findings for purposes of this motion and based on its thorough review of the record and arguments presented by the Parties.

## B. Whether the Contracts are Contracts of Insurance

As it is for the Court to determine whether the case should be sent to arbitration, the Court must now assess the issue of whether Aliera's plans are insurance under Georgia law, such that O.C.G.A. § 9-9-2(c)(3) makes illegal and void any arbitration agreement (and delegation clause) in the member guides.

District courts in this Circuit have regularly held that "[m]otions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Mullinax v. United Mktg. Grp., LLC*, No. 1:10-CV-03585-JEC, 2011 WL 4085933, at *8 (N.D. Ga. Sept. 13, 2011) (citing *Bell v. Atl. Trucking Co.*, 2009 WL 4730564, at *1 (M.D. Fla. Dec. 7, 2009), *aff'd,* 405 F. App'x 370 (11th Cir. 2010)). Because these motions are factual attacks on the existence of subject matter jurisdiction, a reviewing court may consider evidence beyond the allegations in the complaint. *Id. See also*, *Agostino v. Ally Fin. Inc.,* 2018 WL 6019197, at *2–3 (M.D. Fla. Nov. 16, 2018) ("On a factual attack, the trial court may weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims."); *Walker v. Hyundai Cap. Am., Inc.,* 2018 WL 1352173, at *2 (S.D. Ga. Mar. 15, 2018) (explaining that on a motion to compel arbitration "the Court may

consider matters outside the pleading, such as the written agreements between the parties"); *United States v. Int'l Fid. Ins. Co.*, 232 F. Supp. 3d 1193, 1200 (S.D. Ala. 2017) (explaining that motions to compel are treated as motions to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), or alternatively, in the Seventh Circuit, treated as a venue challenge under Fed. R. Civ. P. 12(b)(3), but "[b]oth rules permit the consideration of material beyond the pleadings…") (citing *Grasty v. Colorado Technical University*, 599 Fed.Appx. 596 (7th Cir. 2015)).[25]

Here, the Court finds it appropriate to consider the exhibits, affidavits, and other documents provided by the Parties. The Court notes that neither Plaintiffs nor Aliera has requested to pursue limited discovery on the issue of whether the user guides are contracts of insurance for purposes of the motion to compel. In addition, neither side has requested further briefing on this front. Indeed, the Parties have submitted principal and supplemental briefs on this question and both sides have presented evidence in support. "The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983). Thus, under the circumstances, it is within the Court's authority to decide

---

[25] *See also*, *Andersen v. Delta Funding Corp.*, 316 F.Supp.2d 554, 558 (N.D. Ohio 2004) (explaining that, in considering a motion to compel arbitration, a court should "exercise its wide discretion to look beyond the complaint at pleadings and documents submitted by either party"); *Fox v. Nationwide Credit, Inc.*, 2010 WL 3420172, at *2 (N.D. Ill. 2010) ("Because a motion to compel arbitration is treated as an assertion that the court lacks subject-matter jurisdiction, the court may also consider background information in the form of exhibits and affidavits in that context as well.").

the legal issue presented on the record submitted by the Parties without further delay. *Id.*

As noted above, O.C.G.A. § 9-9-2(c)(3) instructs that arbitration provisions cannot be enforced in "any contract of insurance," as defined by O.C.G.A. § 33-1-2. Section 33-1-2 defines insurance as "a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specific amount or benefits upon determinable contingencies." § 33-1-2(4). The Georgia Supreme Court has explained that when an entity undertakes to pay a specified amount of money to its members upon the occurrence of determinable contingencies and by distributing individual losses among a large group of members, it is engaging in the business of insurance. *Love, supra*, 614 S.E.2d at 48-49 (reversing Georgia Court of Appeals and concluding that auto memberships that charged a monthly fee in exchange for certain benefits – coverage for 50% of moving traffic violations up to $200, $50 for emergency road services, $75 for emergency ambulance services, *etc.* — were insurance). Under Georgia law, the operation and substance of the plan determines whether or not the plan is insurance, regardless of the labeling. O.C.G.A. § 33-1-2(5) (defining "insurer" as "any person ... who issues insurance, annuity, or endowment contracts, subscriber certifications, *or other contracts of insurance by whatever name called*") (emphasis added).

In approaching this question, the Court evaluates whether the member guides are contracts of insurance in two steps. First, the Court considers whether

the plans meet the definition of insurance under Georgia law. After finding that they do, the Court next weighs whether the companies at issue are valid HCSMs and therefore exempt from insurance regulation under federal and state law.

### 1. AlieraCare Plans Are Insurance

After thorough review of the record and evidence presented by the Parties, the Court concludes that the language of the member guides, the findings of insurance commissioners and departments across the country that have been furnished as part of the record to the Court, and Aliera's own admissions demonstrate that Aliera's plans are insurance under Georgia law.

First and primarily, the member guides (*i.e.*, the operative contracts) clearly outline a plan to indemnify members or pay certain amounts upon determinable contingencies and distribute losses among members, and therefore meet the definition of insurance under Georgia law.[26]

Generally speaking, the member guides detail the coverage available for: preventative care, primary care, chronic maintenance, labs and diagnostics, telemedicine, prescription drug programs, urgent care, specialty care, hospitalization, surgery, emergency room visits, and more. (*See e.g.*, LeCann 2019 Trinity Guide, Doc. 12-6 at 4-5.) Members pay Aliera a certain amount every month — which Aliera calls a "sharing contribution" and Plaintiffs call a premium — in order to maintain membership and coverage. While the contracts state in some

---

[26] Though the Plaintiffs had different member guides, the language is identical within the guides, except for the slight differences in the dispute resolution provisions described *infra*. Substantively however, the term language is the same.

places that these contributions are "voluntary" (LeCann Trinity Guide, Doc. 12-6 at 3), other language of the member guides clearly establishes that these contributions are anything but voluntary and instead are required to maintain membership. Specifically, the member guides detail that "membership will become inactive" if a monthly payment is not received by the end of the month, as follows:

> **Financial Participation.** Monthly contributions are requested to be received by the 1st or 15th of each month depending on the member's effective date. If the monthly contribution is not received within 5 days of the due date, an administrative fee may be assessed to track, receive, and post the monthly contribution. <u>If the monthly contribution is not received by the end of the month, a membership will become inactive as of the last day of the month in which a monthly contribution was received.</u>
>
> Any member who has a membership that has become inactive will be able to reapply for membership under the terms outlined to them in writing by Trinity HealthShare. A member will not be able to reapply for membership if their account has been made inactive a total of three times.
>
> <u>Needs occurring after a member's inactive date and before they reapply are not eligible for sharing.</u>

(*Id*. at 17) (emphases added). Indeed, Plaintiff LeCann was terminated from her plan when she stopped paying her monthly fees. (Compl. ¶ 16.)

When signing up for an AlieraCare plan, a member must submit an application and provide a medical history, (LeCann 2019 Trinity Guide, Doc. 12-6 at 17), as with the typical insurance underwriting process. If a member does not submit a complete or accurate medical history, she can be denied, or can be "retroactively" denied membership. (*Id*.) The membership contracts also plainly state that "*membership is issued in consideration of the Member's application and*

*the Member's payment of a monthly fee as provided under these Plans*." (*Id.* at

43) (emphasis added)[27]. In connection with the submission of a member's medical

history, the member guides explain that "[o]missions and misstatements, or

incorrect, incomplete, fraudulent, or intentional misrepresentation *to the assumed*

*risk* in your application may void your membership, and services may be denied."

(*Id.*) (emphasis added). Coverage, thus, is conditioned on timely payment and

providing a truthful accounting of one's medical history.

In addition, the member guides also include language indicating that Aliera

(through Trinity or Unity) distributes losses among members, noting that "[b]y

submitting monthly contributions, the contributors instruct Trinity HealthShare

to share clearing house funds in accordance with the membership instructions."

(*Id.* at 22.)

In exchange for accurately filling out the application and payment of

monthly fees, an AlieraCare member has her expenses paid upon certain

determinable contingencies. The member guides detail "unlimited" urgent care

visits and primary care visits, and "zero out of pocket expense" for "any scheduled

preventive care service or routine in-network check-up, pap smear, [or] flu shot."

(*Id.* at 4, 12, 14.) Certain care, however, is not covered until a member has met her

"Member Shared Responsibility Amounts" ("MSRA") which operates like a typical

health insurance deductible. The plans define the MSRA as "[t]he amounts of an

---

[27] *See also, id.* at 11 (noting that upon arrival to your primary care physician, "If you have not activated your Membership Card, or if Membership fees are not current, your Plan will not share the costs of the provider").

eligible need that do not qualify for sharing because the member is responsible for those amounts." (*Id.* at 21.) A member must meet her MSRA before certain care is covered, for example, diagnostic lab and pathology, hospice services, or cardiac rehabilitation (*Id.* at 24.) As another example, after a member has met her MSRA, Aliera *promises to pay* for hospitalization coverage:

> HOSPITALIZATION
> Your hospitalization cost-sharing is provided to you in an effort to alleviate the stress during times of crisis and medical needs.
>
> 1. Members are required to pre-authorize all hospitalization services and visits unless it is an obvious medical emergency. Please see pre-authorization section for instructions.
>
> 2. The member will be responsible for first reaching their MSRA before any cost-sharing will be available. **Once the MSRA has been reached in full, the sharing _will_ then be reimbursed directly back to the providers and hospital facilities**.
>
> 3. Several plans allow for fixed cost-sharing in the emergency room. Please see Appendix for your exact plan details.

(*Id.* at 15) (emphases added.) The membership guides reflect that a member may sign up for a "Bronze, Silver, or Gold" plan, using the same metal designations as numerous other health insurance plans, and providing different levels of coverage. (*See e.g., id.* at 24) (noting that all three plans, Bronze, Silver, and Gold, have full maternity offerings including coverage up to $8,000 for an emergency cesarean section, subject to the MSRA.) The member guides' Appendices detail the coverage for the three different metal plans. For example, Appendix B illustrates the Plan Details Silver Level:

**APPENDIX B: PLAN DETAILS SILVER LEVEL**

| | PPO Multiplan PHCS | |
|---|---|---|
| PPO Network | | |
| Eligible Medical Cost-Sharing | Network | Non-Network |
| Eligible prior to meeting Member Shared Responsibility Amount (MSRA) | | |
| **Wellness & Preventive Care** | 100% | 60%<br>after MSRA |
| **Telemedicine** | Unlimited | Unlimited |
| **Primary Care** | $35<br>Consult Fee | 60%<br>after MSRA |
| **Specialty Care** | $75<br>Consult Fee | 60%<br>after MSRA |
| **Urgent Care** | $75<br>Consult Fee | 60%<br>after MSRA |
| **Emergency Room Services**[1]<br>Emergency room services including hospital<br>facility and physician charges. | $300<br>Consult Fee | $500<br>Consult Fee |
| Eligible after meeting Member Shared Responsibility Amount (MSRA)[3] | | |
| **MSRA**<br>Per member 1 (1–2 members) | $1,000, $2,500,<br>$5,000, $10,000 | 60% towards MSRA |
| **MSRA**<br>Family maximum (3+ members) | $3,000, $7,500,<br>$15,000, $30,000 | 60% towards MSRA |
| **Out-of-Pocket Maximum**<br>Per member 1 (1–2 members) | $3,000, $7,500,<br>$15,000, $30,000 | $6,000, $15,000,<br>$30,000, $60,000 |
| **Out-of-Pocket Maximum**<br>Family maximum (3+ members) | $9,000, $22,500,<br>$45,000, $90,000 | $18,000, $45,000,<br>$90,000, $180,000 |
| **Co-expense (Plan Pays)** | 70% after MSRA | 60% after MSRA |
| **Hospitalization In-Patient** | 70% after MSRA | 60% after MSRA |
| **Hospitalization Out-Patient** | 70% after MSRA | 60% after MSRA |
| **Imaging**<br>Eligible charges for CT, PET<br>scans, MRIs, and the charges for related<br>supplies. | 70% after MSRA | 60% after MSRA |
| **Laboratory Out-Patient and Professional<br>Services**<br>Sharing eligible for professional components of<br>labs, including office,<br>out-patient, and in-patient charges. | 70% after MSRA | 60% after MSRA |
| **X-rays and Diagnostic Imaging**<br>Sharing eligible for the professional compo-<br>nents of labs, including the office, out-pa-<br>tient, and in-patient charges. | 70% after MSRA | 60% after MSRA |
| **Generic Prescription Drugs** | No Cost-Sharing | Not eligible |
| **Preferred Brand Drugs** | 50% Cost-Sharing[5] | Not eligible |
| **Non-Preferred Brand Drugs** | No Cost-Sharing | Not eligible |
| **Mail-Order** | 75% Cost-Sharing[6] | Not eligible |

See Legal Appendix on page 38

As shown in this coverage chart, a member with a "Silver" plan is "100%" "eligible" for Wellness & Preventive Care in-network, has "unlimited" telemedicine coverage, has a "$35 consult fee" (like a copay) for an in-network primary care visit, and is afforded "60%" coverage for a non-network specialty care visit or non-network

urgent care visit, and more. (*Id.* at 39.) This type of plan is emblematic of typical health insurance. In addition, the following member guide language also evinces an agreement by Aliera to pay upon certain determinable contingencies:

- "[T]he plans *cover* medical services recommended by the USPSTF and outlined in the ACA for preventive care. There is *zero out of pocket expense and zero obligation to reach the Member Shared Responsibility Amount (MSRA) for any scheduled preventive care service* or routine in-network check-up, pap smear, flu shot and more." (*Id.* at 4.)
- "Labs at in-network facilitates *are included*." (*Id.*)
- "AlieraCare Bronze, Silver, and Gold plans have *unlimited* Urgent Care visits … X-rays *are included*, and subject to a $25 per read fee at Urgent Care." (*Id.* at 12.)
- "AlieraCare Bronze, Silver, and Gold plans have *unlimited* Primary Care visits. Annual Physicals are available immediately…. If your medical issue cannot be resolved after a *no fee consultation* with [a] telemedicine doctor, visit the closest in-network Primary Care facility." (*Id.* at 14.)
- For hospital visits, "Once the MSRA has been reached in full, the sharing will then be reimbursed *directly back to the providers and hospital facilities*." (*Id.* at 15)
- Describing plan coverage of "Up to six (6) visits per membership year" without cost for occupational therapy and physical therapy. (*Id.* at 25.)
- "Telemedicine is included in all AlieraCare programs offered by Trinity HealthShare and Aliera Healthcare as your first line of defense. Your membership provides you and your family 24/7/365 access to a U.S. Board certified medical doctor." (*Id.* at 26.)
- A series of services are described as available once the MSRA is met including cardiac rehabilitation, diagnostic lab & pathology, home health care, hospice services, home infusion services, podiatry services, preadmission testing, routine nursing care of newborn infant, skilled nursing facility. (*Id.* at 24-25.)
- "Maternity. AlierCare Bronze, Silver, and Gold plans have *full maternity offerings*. Medical expenses for maternity ending in a delivery by emergency cesarean section that are medically necessary, are eligible for sharing up to $8,000, subject to the applicable Member Shared Responsibility Amount." (*Id.* at 24.)

(emphases added). All of this language shows that Aliera has undertaken to pay certain amounts — whether full coverage, 60% after the deductible is met, or the like — upon certain contingencies, *i.e.*, sickness, illness, maternity, *etc.*

Though the Parties nor the Court have found a directly comparable Georgia case on this point, the Kentucky Supreme Court faced analogous circumstances in *Commonwealth v. Reinhold*, 325 S.W.3d 272 (Ky. 2010). Before diving into the similarities, the Court notes that Kentucky's definition of insurance is substantively the same as Georgia's. *Compare* K.R.S. § 304.1-030 (defining insurance as "a contract whereby one undertakes to pay or indemnify another as to loss from certified specified contingencies or perils called 'risks,' or to pay or grant a specified amount or determinable benefit or annuity in connection with ascertainable risk contingencies, or to act as surety") *with* O.C.G.A. § 33-1-2 (defining insurance as "a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specific amount or benefits upon determinable contingencies").

In *Reinhold*, the State of Kentucky brought claims against the operator (Medi-Share) of an alleged health care sharing ministry (Christian Care Ministry), arguing that the Medi-Share plans were actually insurance and not exempt from regulation under Kentucky law. *Id.* at 273. Like the Aliera plans, the Medi-Share plans included the following disclaimers and statements: that it "guaranteed payment of no claims"; that "a Medi-Share contract is not an insurance policy" and is "not a substitute for an insurance policy;" that monthly payments were

"voluntary"; and that money came from "voluntary giving of Members," not from the Christian Care Ministry (which was operated by Medi-Share). *Id.* at 274, 276. Despite these disclaimers, the Kentucky Supreme Court, in the first of two holdings, determined that Medi-Share's plans were insurance, noting that certain phrasing in the contracts was not controlling:

> It is immaterial, or at least not controlling, that the term "insurance" nowhere appears in the contract the nature of which is to be determined; *indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance….****The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued****—* that is, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called.

*Id.* at 277 (quoting 43 Am. Jur.2d Insurance § 4 (1982) (emphasis added)). The "nature and effect" of the contracts at issue clearly demonstrated that they were ones for insurance since they

> obligate[] Medi-Share members to pay their monthly "share" by the first of each month because their "fellow believers in Christ" rely upon that payment to satisfy their medical needs. In return for paying their monthly "share," Medi-Share members remain eligible to receive payment for their medical needs through the program. This process clearly shifts the risk of payment for medical expenses from the individual member to the pool of sub-accounts from which his expenses will be paid. Thus, regardless of how Medi-Share defines itself or what disclaimers it includes in its literature, in the final analysis, there is a shifting of risk.

*Id.* at 277-78 (further noting that Medi-Share's disclaiming of responsibility to pay medical expenses "does not overcome the fact that through the Medi-Share program the individual members pool resources together to distribute the risk of major medical bills amongst each other").[28] The *Reinhold* Court also noted that Medi-Share's advertising as an "alternative to expensive health insurance" supported the court's conclusion that it was not a charity but a type of insurance. *Id.* at 278.

Here, in the face of the language in the user guides, Aliera's arguments are unavailing. As noted above, Aliera argues that monthly payments are not mandatory, a position which is clearly contradicted by the language of the contracts detailing how the plans actually operate. Aliera also relies on a disclaimer in the agreements which states that "[t]his is not a legally binding agreement to reimburse any member for medical needs a member may incur" as follows:

---

[28] As noted above and below, Aliera's plans clearly include promises to pay for unlimited telehealth and primary care coverage, hospital visits after the MSRA is met, and more. (LeCann 2019 Trinity Guide, Doc. 12-6 at 4-12,14,15.) Also discussed throughout, the member guides acknowledge that "sharing contributions" are mandatory and that Trinity/Unity assumes a risk in providing members coverage, as evidenced by the section in the member guides detailing the truthful application requirement. (*Id.* at 43) ("Omissions and misstatements, or incorrect, incomplete, fraudulent, or intentional misrepresentation *to the assumed risk* in your application may void your membership, and services may be denied.") In light of how Aliera's plans actually operate, its reliance on *Baberton Rescue Mission, Inc. v. Insurance Div. of Iowa Dept. of Commerce*, 586 N.W.2d 352 (Iowa 1998) and *Altrua HealthShare, Inc. v. Deal*, 299 P.3d 197 (Idaho 2013) are unpersuasive and distinguishable. In those cases, the courts found that the defendants did not assume any risk or promise to pay any amounts for coverage, and, in *Baberton*, that there had been no member complaints about the program.

**DISCLAIMER**

AlieraCare offering by Trinity HealthShare, through Aliera Healthcare, Inc., is a faith-based medical needs sharing membership. Medical needs are only shared by the members according to the membership guidelines. Our members agree to the Statement of Beliefs and voluntarily submit monthly contributions into a cost-sharing account with Trinity HealthShare, acting as a neutral clearing house between members. Organizations like ours have been operating successfully for years. We are including the following caveat for all to consider:

> This publication or membership is not issued by an insurance company, nor is it offered through an insurance company. This publication or the membership does not guarantee or promise that your eligible medical needs will be shared by the membership. This publication or the membership should never be considered as a substitute for an insurance policy. If the publication or the membership is unable to share in all or part of your eligible medical needs, or whether or not this membership continues to operate, you will remain financially liable for any and all unpaid medical needs.
>
> This is not a legally binding agreement to reimburse any member for medical needs a member may incur, but is instead, an opportunity for members to care for one another in a time of need, to present their medical needs to other members as outlined in the membership guidelines. The financial assistance members receive will come from other members' monthly contributions that are placed in a sharing account, not from Trinity HealthShare.

(LeCann Trinity Guide at 3.)   But like Medi-Share in *Reinhold*, Aliera "cannot change the nature of an insurance business by simply declaring in the contract that it is not insurance." *Reinhold*, 325 S.W.3d at 278. The "content and true character" of the AlieraCare member guides demonstrate that the "nature" of the contracts are ones of insurance.[29] *Id.* Aliera does not attempt to distinguish *Reinhold*'s first holding, that the Medi-Share plans were insurance but focuses only on the second holding, that Medi-Share was not a valid HCSM under Kentucky law. (Reply at 14-15.) But as noted *supra* at n. 29, the Court relies on *Reinhold* only in finding that

---

[29] Besides finding that the Medi-Share plans were insurance under Kentucky law, the *Reinhold* Court also determined, in a separate holding, that Medi-Share did not qualify for Kentucky's "religious publication" exemption from insurance regulation. *Id.* at 278-79. In this second holding, the *Reinhold* Court quickly determined that the Medi-Share plans were not subject to the religious exemption under a provision of Kentucky law that is not included in the Georgia health care ministry exemption. *Id.*  For this reason, the Court  does not rely on *Reinhold* in connection with its finding below that Aliera's plans are not valid HCSM plans under Georgia law.

Aliera's plans are insurance and not with respect to its analysis of Aliera's HCSM status under Georgia law.

Besides the membership contracts, there is additional record evidence to support that Aliera's plans are insurance. Plaintiffs have provided a series of reports and investigations by various state insurance commissioners and departments – in Colorado, Connecticut, New Hampshire, Washington, and Maryland — that have determined that Aliera and Trinity/Unity were engaging in the insurance business and acting as insurers in the relevant state. While these insurance departments were assessing whether Aliera's plans were insurance under the laws of those respective states and not under Georgia law, their findings are nevertheless illuminating, as what constitutes insurance is fairly uniform amongst the states. *Compare* C.R.S. § 10-1-102(12) (Colorado statute defining 'insurance' as, "a contract whereby one for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies") *with* O.C.G.A. § 33-1-2 (defining 'insurance' as "a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specific amount or benefits upon determinable contingencies."); *See also e.g.*, Conn. General Statutes § 38a-1 (defining 'insurance' as "any agreement to pay a sum of money, provide services or any other thing of value on the happening of a particular event or contingency or to provide indemnity for loss in respect to a specified subject by specified perils in return for a consideration").

Below, the Court highlights some of the relevant analyses and findings included in the state insurance commissioner reports and orders.   In this connection, the Court notes that, in *Minnieland,* 913 F.3d 409, 422 (4th Cir. 2019), the Fourth Circuit relied on the findings of various out-of-state insurance commissioners in holding that the program at issue was insurance. *Id*. ("[W]e are not the first to determine that the program marketed by Applied Underwriters, Inc. is insurance. In fact, several state insurance commissioners have determined that the EquityComp program and its sister program, SolutionOne, are not only subject to insurance regulations, but also violate those regulations…").

**Colorado**

The Colorado Insurance Commissioner first determined that Aliera was the administrator, marketer, and program manager for Trinity's HCSM plans with the exclusive rights to design, market, and sell Trinity HCSM plans. (*See Ex Parte Emergency Order to Cease and Desist The Unauthorized and Unlawful Transaction of the Business of Insurance in the State of Colorado, In the Matter of Aliera Healthcare, Inc.,* Doc. 26-10 ¶¶ 19, 21). The Order further found: that Trinity was not a valid HCSM (*id*. ¶ n. 2); that Trinity was instead an insurance company (*id.* ¶ 28); and that the Trinity HCSM products offered by Aliera were insurance under Colorado law (*id.* ¶ 30).

**Connecticut**

The Insurance Department of Connecticut issued a similar Cease and Desist Order. (Doc. 26-11.) The Connecticut Insurance Commissioner found that "Aliera

and Trinity [] *are engaging in an insurance business and acting as insurers* in the State of Connecticut by providing health insurance to Connecticut residents or persons authorized to conduct business in Connecticut." (*Id.* ¶ 2) (emphasis added.) Further, Aliera and Trinity were soliciting and entering into "*health insurance contracts … whereby [Aliera and Trinity], upon payment of a fee, agree to provide coverage for costs the members incur when receiving medical, dental, optical, hearing, vision and chiropractic services.*" (*Id.* ¶ 4) (emphasis added.) The Connecticut Order relied on evidence that the Aliera plans "come in gold, silver, and bronze, using the same metal designations as insurance plans offered under the [ACA] in the Connecticut exchange" (*id.* ¶ 6); that Aliera's website stated that it operates by *pooling members' contributions* to pay providers *directly*, just like a regular insurance company (*id.* ¶ 7); and that the member guides include "information about the coverages available, exclusions and limitations of coverage, lifetime or per incident maximum limits and amounts of deductible for each type of service, claims adjudication process and information about the use of provider networks." (*Id.* ¶ 8). In more detail, the Order notes:

> [T]he products marketed by the [Aliera and Trinity] *include an agreement to pay a sum of money, provide services or any other thing of value on the happening of a particular event or contingency, i.e. sickness or injury, or to provide indemnity for loss in respect to a specified subject by specified perils - indemnify their members for costs incurred for medical expenses - in return for a consideration.* As it relates to the contracts issued by the [Aliera and Trinity], members have an interest which is subject to a risk of loss through destruction or impairment of that interest, which risk is assumed by the [Aliera and Trinity] as part of a general scheme to distribute losses

among a large group of persons bearing similar risks in return for a
ratable contribution or other consideration by each member.

(*Id.* ¶ 17) (emphasis added.)

**New Hampshire**

The Insurance Department of the State of New Hampshire first issued a
Show Cause Order to Aliera to demonstrate why the New Hampshire Insurance
Commissioner should not order the cease and desist of their operations in New
Hampshire. (Doc. 26-13.) This Order outlines the Insurance Department's findings
that Aliera markets, solicits, and administers health plans in New Hampshire on
behalf of Trinity, and before August 10, 2018, on behalf of Unity. (*Id.* ¶ 4.) The
Order concludes that: New Hampshire consumers agreed to pay monthly amounts
to Aliera to cover specific healthcare costs included in membership guidelines and
marketing materials (*id.* ¶ 14); that Trinity is not a valid HCSM (*id.* ¶¶ 15, 25-28);
and that Aliera was operating as an unauthorized insurer (*id.* ¶¶ 15, 29).
Subsequently, the Insurance Department issued a press release stating:

> **Aliera Healthcare, Inc. Operating as an Unauthorized
> Insurance Company in New Hampshire**
> *1,400 NH Residents with Aliera Healthcare Plans Need to Find New
> Health Insurance Options for 2020*
>
> CONCORD, NH – Today, Insurance Commissioner John Elias
> ordered Aliera Healthcare, Inc. and Trinity Healthcare, Inc. to
> immediately stop selling or renewing illegal health insurance in New
> Hampshire…

(Doc. 26-12.)

**Washington**

The State of Washington Office of the Insurance Commissioner issued a detailed 35-page report of its investigation of Aliera and Trinity, with discussion of Aliera's relationship with Unity, as well. (Doc. 26-7.) The Washington Report the concludes that Trinity was acting as an unauthorized insurer in Washington because it "undertakes to indemnify a consumer or pay a specified amount upon a determinable contingency of bodily injury, sickness or other health-related matters." (*Id.* at 31.) The Report also finds that Trinity is not a valid HCSM.

Relying on the Management Agreement between Aliera and Trinity, the Washington Report paints a picture of Aliera's full control over Trinity and its HCSM plans, noting that Aliera was granted exclusive license to develop, market, and sell the HCSM plans; Aliera provides enrollment and other administrative services relating to the HCSM plans; Trinity had no members at the time of its creation and the Parties intended that members who enrolled in Trinity HCSM plans would become "customers" of Aliera; Aliera maintains ownership over membership rosters; Trinity delegates accounting functions to Aliera; evidence in the fee schedule shows that Trinity retains virtually no funds, as the funds are largely returned to Aliera for various purposes. (*Id.* at 17.)

**Maryland**

In April 2018, the Maryland Insurance Administration ("MIA") and Aliera entered into a consent order specifying that Unity, the HCSM operated by Aliera, did not meet HCSM requirements. *See, Maryland Insurance Administration*

*issues order revoking license of Aliera Healthcare Inc.*, Feb. 27, 2020, avail. at:
https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020
249 (last accessed Apr. 25, 2021). Then, in February 2020, the MIA issued an
order revoking Aliera's license because the company was actively trying to sell an
unauthorized health insurance plan in Maryland in violation of state law and the
prior consent order. (*Id.*)

**Texas**

Besides the findings of these five states' insurance departments and
commissioners, the State of Texas had filed suit against Aliera (Texas Lawsuit, Doc.
26-9), asserting that Aliera was engaged in the business of insurance, operating to
facilitate the sharing of medical expenses, and that Aliera was not a valid HCSM.
(*Id.* at 1-2.) The Texas Petition relies on the member guides to allege that Aliera
was collecting money in exchange for assuming risk. (*Id.*¶ 15.) The Petition relies
on much of the same language in the member guides cited above, including that
the membership is issued "in consideration" of the member's application and
payment of a monthly fee and that misstatements or misrepresentations "to the
assumed risk" in a member's application may void their membership. (*Id.* ¶ 48.)
The Texas Petition thus concludes that "the 'sharing arrangement' offered by Aliera
is insurance. Members each contribute present consideration to the sharing
reserve to protect against future risk." (*Id.* ¶ 50.)

The Court reiterates that the definition of what constitutes insurance does
not vary widely amongst these states. In addition, the state insurance departments

and commissioners have significant experience in the field of insurance and the Court finds the analyses and findings of the reports and orders outlined above to be thorough and reasoned. Consequently, while these reports do not assess Georgia law, the Court finds the reports persuasive evidence that reinforces the Court's interpretation that the member agreements constitute contracts of insurance.

In addition, other evidence that Aliera's contracts are ones for insurance can be found in Aliera's own marketing materials. The Washington Report details Aliera's representations to both customers and prospective brokers who market, solicit and sell Aliera products that describe its products as insurance. (Doc. 26-7.) For example, the Washington Report details specific language in Aliera's training videos for agents who sell the HCSM products which provides that the agents will have the opportunity to sell "the next generation of Healthcare products" and suggests the agents can offer employers "a healthcare plan that saves money." (*Id.* at 5) (noting that "[t]he terms 'healthcare' and 'health plan' are insurance specific terminology"). The Washington Report also includes descriptions from Aliera's training videos that use insurance phrasing:



(*Id.* at 9.) In addition, the Washington Report details marketing to consumers including a promotional video on YouTube titled "Aliera Healthcare—A New Era in Healthcare Choices," with a video description stating "Aliera is committed to redefining the healthcare experience for individuals, families, and employers, with innovative services and solutions that simplify the complexities of healthcare and unlock the freedom and power of choice." (*Id.* at 12.)

To summarize, the Court concludes that Aliera's plans are insurance as defined by Georgia law, O.C.G.A. § 33-1-2 (defining 'insurance' as "a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specific amount or benefits upon determinable contingencies."). The language of the member guides clearly establishes that the plans operate to distribute individual losses whereby Aliera undertakes to indemnify members and pay specific amounts and benefits upon determinable contingencies. This interpretation of the member guides is bolstered by the findings of the insurance commissioners and departments of at least five

states which have investigated Aliera and its health plans, as well as by Aliera's own admissions in its advertising.

As the Court determines that the plans are contracts for insurance, it must next determine whether the plans are exempted from insurance regulation as valid Health Care Sharing Ministries.

### 2. The AlieraCare Plans Are Not Valid HCSM Plans

Aliera argues that the contracts at issue are not insurance because the plans are offered by valid HCSMs and therefore the plans are exempt from regulation. To be clear, Aliera concedes that *it* is not a valid HCSM but contends that Trinity and Unity are or were. (*See*, Mot. at 4) ("Aliera is not an HCSM and does not purport to be one.") Plaintiffs, on the other hand, argue that Aliera, Trinity, and Unity do not meet the requirements to be a valid HCSM under federal or Georgia law for a host of reasons described below.

Under the ACA, the term "health care sharing ministry" means an organization—

(1)    which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(2)    members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(3)    members of which retain membership even after they develop a medical condition,

(4)    which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

> (5)     which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii).

First, the Court concludes that Aliera, Trinity, or Unity are not (and were not) valid HCSMs under the ACA definition. To repeat, Aliera does not purport to be an HCSM. Trinity was formed in 2018 and undisputedly was not in existence "at all times since December 31, 1999," and medical expenses of its members have not been "shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii)(4). This finding is bolstered by the conclusions of numerous state insurance commissioners or departments who have similarly found that Aliera and Trinity are not valid HCSMs. For example, the Washington Report, (Doc. 26-7), concluded that Trinity was not a lawful HCSM because: (1) its representations about its religious convictions are contradictory, (2) it has not been operating as a 501(c)(3) legal entity and sharing member medical needs (costs) continuously since December 31, 1999, and (3) evidence indicates Trinity was formed in 2018 for the express purpose of entering into a marketing agreement with Aliera. (*Id.* at 29–30.) The other state insurance commissioners similarly found that Trinity is not a valid HCSM under federal law. (*See* Colorado Cease & Desist Order, Doc. 26-10, n. 2) (finding that Trinity does not qualify as a HCSM under federal law, as it has not been in operation and continuously sharing member health care costs since at least December 31, 1999);

(Connecticut Cease & Desist Order, Doc. 26-11 ¶ 2) (finding that neither Aliera nor Trinity have been in operation and continuously sharing members' health care costs since December 31, 1999, as required by 26 U.S.C. § 5000A(d)(2)(B), and also finding that members did not share a common religious belief, discussed at length below); (New Hampshire Cease & Desist Order, Doc. 26-13 ¶¶ 15, 25-28) (determining that Trinity did not meet the legal definition of a HCSM because it had not been in existence since December 31, 1999, had no members as of August 2018, had no predecessor organization in which Trinity's members were sharing costs, and Trinity failed to establish that it is faith-based and limits membership to individuals who share a common set of religious beliefs).

Unity, as operated by Aliera, was also not a valid HCSM as defined by the ACA. Unity, while benefitting from its connection to Anabaptist, was *de facto* operated and fully controlled by Aliera and was created in 2016 and 2017 for the purpose of entering into a marketing agreement with Aliera that provided Aliera that full control. (Washington Report at 31.) Indeed, the Fulton County Superior Court explicitly held that Anabaptist/Unity "delegated the administration of virtually all aspects of the Unity HCSM plans and plan assets to Aliera." (Fulton Injunction ¶ 75; at 22.)[30] Further, Unity, as operated and controlled by Aliera, was

---

[30] As a reminder, the case in Fulton Superior Court was brought by Anabaptist against Aliera after it learned of Aliera and Mr. Moses' various alleged wrongdoings relating to the operation of Unity. The Fulton Court also highlighted the contract between Anabaptist and Aliera and detailed that: Anabaptist granted Aliera exclusive license to sell and distribute Unity products to the public markets (*id.* ¶ 39); Unity entrusted Aliera with all Unity HCSM member information and plan assets (*id.* ¶ 55); Aliera did not segregate Unity HCSM plan assets and instead unilaterally

not an organization in which members shared a "common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs," as contemplated by 26 U.S.C. § 5000A(d)(2)(B)(ii)(2), as described at length below. As Plaintiffs pled (Compl. ¶ 116) and argued in briefing (Pl. Resp. at 20-21), the Maryland Insurance Administration also found that Unity, the "did not meet the requirements for a religious exemption." *See supra,* MIA Article, avail at: https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020 249 (last accessed Apr. 25, 2021).[31]

The Court now turns to whether Aliera, Trinity, and Unity are valid HCSMs under Georgia law and thus exempt from insurance regulation. O.C.G.A.§ 33-1-20(b). The definition of an HCSM under Georgia law shares some of the same requirements as under federal law, including tax-exempt status, a common faith, and the sharing of expenses among members. Specifically, under Georgia law, a HCSM is a "*faith based*, nonprofit organization that is tax exempt under the Internal Revenue Code," which:

> (1)  *Limits its participants to those who are of a similar faith*;
>
> (2)  *Acts as a facilitator* among participants who have financial or medical needs and matches those participants with other participants *with the present ability to assist* those with financial or medical needs in

---

allocated revenues in the manner in which Aliera saw fit, keeping as much of the incoming member funds for Aliera's own benefit as it desired (*id.* ¶ 68); and, after the fall out, Aliera retained possession of Unity membership rosters, all Unity HCSM plans, plan assets, intellectual property (including the Unity website), and Unity's employees (*id.* ¶ 82).

[31] Aliera also argues in three sentences in its Reply brief that the ACA's HCSM provision was nullified when Congress rescinded the individual mandate penalty in 2017. (Reply at 17.) Aliera provides no support or authority to support this briefly-mentioned contention. Further, this contention is belied by the findings of various insurance commissioners that concluded *after 2017* that Aliera, Trinity, and Unity did not meet the ACA's HCSM requirements.

accordance with criteria established by the health care sharing ministry;

(3)   Provides for the financial or medical needs of a participant though contributions from one participant to another;

(4)   *Provides amounts that participants may contribute with no assumption of risk or promise to pay among the participants* and *no assumption of risk or promise to pay by the health care sharing ministry* to the participants;

(5)   Provides a *written monthly statement to all participants that lists the total dollar amount of qualified needs* submitted to the health care sharing ministry, as well as the amount actually published or assigned to participants for their contribution; **and**

(6)   Provides a written disclaimer on or accompanying all applications and guideline materials distributed by or on behalf of the organization that reads, in substance: "Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills."

O.C.G.A. § 33-1-20 (emphases added). The use of the word "and" in the statute makes clear that, to qualify, an organization must meet all six requirements. § 33-1-20(5).

After thorough review of the evidence presented, the Court holds that Aliera, Unity, and Trinity are not valid HCSMs under Georgia law. First, as a for-profit company, Aliera plainly does not qualify, nor does it argue, that *it* is a valid HCSM. Trinity and Unity also do not qualify, as the record evidence indicates that they do

not meet the requirements under the Georgia statute because they: (1) do not limit participants to those of similar faith; (2) do not act as a facilitator matching participants with needs with those who have the present ability to pay; (3) do not provide amounts that participants may contribute with no assumption of risk or promise to pay among participants or by Unity/ Trinity; and (4) do not provide written monthly statements to participants listing the dollar amount of qualified needs. O.C.G.A. § 33-1-20.

- **Faith-based non-profit**

Georgia law contemplates that an HCSM will be a bona fide faith-based non-profit. O.C.G.A. § 33-1-20. To start, the Court is not convinced that Trinity and Unity are or were bona fide "faith based" organizations. The record demonstrates that Trinity was formed in 2018 for the purpose of entering into a marketing agreement with Aliera. The Member Agreement between Trinity and Aliera (Doc. 26-6), dated six weeks after Trinity incorporated, gives Aliera effectively full control over Trinity, providing that: Trinity grants Aliera exclusive license to develop, market, and sell Trinity HCSM plans; Aliera will be responsible for plan design and plan pricing; Aliera will enroll members in the plans; Aliera has exclusive rights over the Membership Roster and Trinity *is not authorized to contact any members*; Trinity delegates all responsibility for providing and paying accounting staff to Aliera; Trinity has no current members and the Parties intend that the members who enroll in the plans become *customers of Aliera*; and Aliera controls a Trinity bank account. (Doc. 26-6.)  Trinity's recent IRS filings show that

it has only one W-2 employee, a former Aliera employee. (Trinity IRS Form 990 Doc. 26-5 at 5, 7.) The Washington Report investigation found that Trinity was created for the sole purpose of entering into an agreement to allow Aliera to market and sell AlieraCare. (Washington Report at 29-30.) There is no evidence that Trinity's operation was grounded in or guided by any religious faith or belief.

Benefitting from its relationship with and founding by Anabaptist, Unity was arguably a more legitimate faith-based organization. However, there is scant evidence that Unity, as operated by Aliera, was guided by any religious faith. The Fulton County Superior Court Injunction indicates that Anabaptist created Unity to allow Aliera to market, service, cover claims, handle bills, and generally operate Unity's HCSM plans. (Fulton Inj. ¶ 32.) The contract between Anabaptist and Aliera ultimately granted Aliera an exclusive license to sell and distribute Unity products. (*Id.* ¶ 39.) The Fulton Court ultimately noted that Aliera assumed "complete control over" Unity's HCSM plans. (Fulton Inj. ¶ 75) and found that that Anabaptist/Unity "delegated the administration of virtually all aspects of the Unity HCSM plans and plan assets to Aliera." (*Id.* at 22.) However, assuming *arguendo* that Trinity and Unity were bona fide faith-based organizations, they still do not meet a number of requirements for HCSM status under Georgia law, as discussed below.

- **Limits participants to those of a similar faith, § 33-1-20(1)**

The first enumerated requirement for a valid HCSM under Georgia law mandates that the HCSM limit participants to those of similar faith. The evidence before the Court indicates that Trinity and Unity do meet this requirement.

Investigations by various state insurance commissioners found that Aliera, Trinity and Unity participants were enrolled irrespective of faith. For example, the Connecticut Insurance Division's investigation found that:

> Aliera represents…that it administers a faith-based cost sharing program on behalf of Trinity and that it provides assistance to individuals with common religious and ethical beliefs, _when in fact the Respondents do not limit the marketing of their products to individuals holding any particular religious beliefs, but enroll in their program all individuals irrespective of faith and, through their marketing representatives, simply require that members enrolling in their program agree to a series of general belief statements,_ such as "helping others and/or maintaining a healthy lifestyle and avoid foods, behavior, or habits that produce sickness or disease to ourselves or others", or "believe that personal rights and liberties originate from God and are bestowed on us by God", or "believe that every individual has a fundamental religious right to worship God in his or her own way."

(*Id*. ¶ 5) (emphasis added.) The "generic belief statement" included in the Trinity guides states:

## STATEMENT OF BELIEFS

At the core of what we do, and how we relate to and engage with one another as a community of people, is a set of common beliefs. Our Statement of Shared Beliefs is as follows:

1. We believe that our personal rights and liberties originate from God and are bestowed on us by God.

2. We believe every individual has a fundamental religious right to worship God in his or her own way.

3. We believe it is our moral and ethical obligation to assist our fellow man when they are in need per our available resources and opportunity.

4. We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors, or habits that produce sickness or disease to ourselves or others.

5. We believe it is our fundamental right of conscience to direct our own healthcare in consultation with physicians, family, or other valued advisors.

(LeCann Trinity Guide at 20.) This Statement of Belief included in the Trinity guides is the *exact same* as the Statement of Belief in the Unity guides:

## Statement of Beliefs

At the core of what we do, and how we relate to and engage with one another as a community of people, is a set of common beliefs. Our Statement of Shared Beliefs is as follows:

1. We believe that our personal rights and liberties originate from God and are bestowed on us by God.

2. We believe every individual has a fundamental religious right to worship God in his or her own way.

3. We believe it is our moral and ethical obligation to assist our fellow man when they are in need per our available resources and opportunity.

4. We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors, or habits that produce sickness or disease to ourselves or others.

5. We believe it is our fundamental right of conscience to direct our own healthcare in consultation with physicians, family, or other valued advisors.

(LeCann Unity Guide at 20.) The New Hampshire Insurance Commissioner also determined that Trinity failed to establish that it is faith-based or that it limits membership to individuals who share a common set of religious beliefs. (Doc. 26-13, ¶ 28.) The Washington Report found that members did not share common religious beliefs, explaining:

> If Trinity and its members do not share a religious or ethical motivation, then it cannot be an HCSM. Trinity's contradictory representations about the nature of its religious ethic to State and Federal government agencies and to consumers indicates it either does not understand its religious motivation, or fails to communicate a consistent message about its religious ethic to State and Federal regulators and its own members.

(Washington Report at 22-23) (detailing that the Trinity bylaws propound an "explicitly Protestant expression of the Christian faith and message" that all members must adhere to, but the marketing and member guides put forth a broader, generic faith statement that merely require members to believe in God and in fact contradicts its bylaws).  As further support, the Washington Report points to an Aliera training video intended for brokers who would market Aliera products, in which the Aliera trainer states that the belief statement:

> It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't ... it doesn't matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits - things that, you know, cause us illness that are in our control.
>
> As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're

gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

(Washington Report at 11.) The Report also compared the advertising for a legitimate HCSM to Trinity to highlight the difference:





(*Id.* at 25-26.)[32]

The Maryland Insurance Administration also found that Aliera's operation of Unity violated Maryland insurance laws. Indeed, Aliera and Maryland entered into a voluntary consent order *agreeing* that Unity *did not meet the requirements for religious exemption*.[33]

Plaintiffs also cite to online material from an online marketer of Trinity plans, which explains that membership is not limited to those of the same faith. One FAQ asks, "Can different Faiths Enroll in Trinity HealthShare?" for which the included answer states,

> "Yes! As it should be! This is one reason why we really like Trinity Healthshare for the health sharing through Trinity Healthshare. It's un-American to exclude people because they have a different belief system. Whether Christian, Jewish, Muslim, or non-denominational, there's just a statement of belief that's required with Trinity HealthShare. [sic] health plans. Technically, you don't need a specific faith to qualify. This is the most flexible eligibility on the market."

Goodacre Insurance Services, *Are There Non-Religious or Secular Health Care Sharing Plans*, Calhealth.net, available at: https://www.calhealth.net/Secular-non-religious-health-sharing-plan.htm#who (last accessed June 3, 2021).

While the Court is highly cautious of assessing the genuineness of an individual or entity's religious beliefs, the case here is not a close call. The Court here does not weigh the credibility of evidence about the legitimacy of any alleged

---

[32] The first image is Trinity's webpage. The second image is from Samaritan Ministries, available at https://samaritanministries.org/.

[33] *See*, *MIA issues order revoking license of Aliera Healthcare Inc.*, Feb. 27, 2020 available at: https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020249      (last accessed Apr. 25, 2021).

religious beliefs but finds that, in the administration or marketing of the plans at issue, there is no indication of a faith requirement at all. There is no evidence in the record that Trinity, or Unity, as operated by Aliera, limited members to those of a particular faith.

Moreover, even if Trinity and Unity did limit members to a particular faith, they still are not valid HCSMs as they do not meet additional requirements under the Georgia statute.

- **Acts as a facilitator among participants who have financial or medical needs and matches those participants with other participants with the present ability to assist those with financial or medical needs. O.C.G.A. § 33-1-20(2)**

Next, Trinity and Unity do not meet the second requirement. First, it is undisputed that Trinity and Unity themselves do not "act as a facilitator" to match participants with needs with those who have the ability to pay. Even Aliera admits that it is *Aliera* (not Trinity or Unity) which performs the facilitating function. (*See* Reply Br. at 12) ("*Through Aliera*, both Unity and Trinity act as a facilitator...") (emphasis added). Aliera, as noted, is not a valid HCSM. Aliera has presented no evidence or argument that an HCSM can outsource one of the key HCSM requirements to a for-profit company and still maintain viable HCSM status. Moreover, even assuming an HCSM could outsource key aspects of HCSM status, Unity and Trinity still do not meet this second requirement because the contracts do not describe plans that operate to match participants with needs to those who have *the present ability to pay*. § 33-1-20(2). The monthly payments ("sharing

contributions") are **mandatory**, as detailed above, and the "present ability to assist" is no factor. If a member does not have "the present ability to assist," and thus does not pay her monthly contribution, the user guides make plain that she will lose coverage, as Plaintiff LeCann did when she stopped paying. (LeCann 2019 Trinity Guide, Doc. 12-6 at 17) ("If the monthly contribution is not received by the end of the month, a membership will become inactive.).

- **Provides amounts that participants <u>may</u> contribute with no assumption of risk or promise to pay among the participants and no assumption of risk or promise to pay by the health care sharing ministry to the participants. O.C.G.A. § 33-1-20(4)**

Next, Trinity and Unity do not meet the fourth requirement because (1) the AlieraCare plans do not provide amounts that participants "may" contribute; (2) there is a clear assumption of risk described in the member guides; and (3) both members and Trinity/Unity make promises to pay.

As repeated throughout, the monthly contributions are mandatory—they are not amounts that the participants "may" contribute. (LeCann 2019 Trinity Guide, Doc. 12-6 at 17) ("If the monthly contribution is not received by the end of the month, a membership will become inactive.) Further, members do in fact "promise to pay" these monthly contributions, or else they lose coverage. Similarly, as detailed thoroughly *supra*, under the language of the member guides, Trinity/Unity/Aliera "promise to pay" for certain coverage, whether that is "unlimited" telehealth visits, hospital costs after the MSRA (deductible) is met, or for unlimited X-rays or urgent care visits.

Additionally, in requiring members to complete a full and accurate medical history, the member guides clearly acknowledge that Unity/Trinity/Aliera assumes a risk in taking on members. (2019 LeCann Trinity Guide, Doc. 12-6 at 17.) If a member does not submit a complete and accurate medical history, they can be denied, or can be "retroactively" denied membership, as follows:

> This membership is issued in consideration of the Member's application and the Member's payment of a monthly fee as provided under these Plans. Omissions and misstatements, or incorrect, incomplete, fraudulent, or intentional misrepresentation _to the assumed risk in your application_ may void your membership, and services may be denied.

(_Id._ at 43.) For these three separate reasons, Trinity and Unity do not meet the fourth requirement under the Georgia statute.

- **Provides a written monthly statement to all participants that lists the total dollar amount of qualified needs submitted to the health care sharing ministry, as well as the amount actually published or assigned to participants for their contribution. O.C.G.A. § 33-1-20(5)**

Finally, the Court determines, based on the record before it, that neither Trinity nor Unity provide a monthly statement to participants listing the total amount of needs submitted and paid. § 33-1-20(5). Plaintiffs allege that neither Trinity, Unity, nor Aliera provides such a statement. (Compl. ¶ 83f.) Aliera does not contend that _Trinity_ or _Unity_ provides this monthly statement but argues that _Aliera_ does. (Reply at 13.) As noted, it is by no means apparent that Trinity and Unity can outsource requirements for HCSM status to a for-profit company. Moreover, Aliera has not presented evidence that _it_ provides these required

monthly statements, for example, in the form of an exemplar statement; rather, Aliera provides two declarations which merely state that such statements are provided to members. (Reply Ex. A ¶ 7; Reply Ex. D ¶ 13.)

Consequently and to wrap up this section, the Court concludes that neither Trinity nor Unity are valid HCSMs under the Georgia definition because the record establishes *inter alia* that: they do not limit members to those of a similar faith; they do not facilitate the sharing of costs between those in need and those with the present ability to assist; they do not provide for amounts that members may pay without a promise to pay or assumption of risk by members or the HCSM; and they do not provide monthly statements listing the total dollar amount of qualified needs submitted.  O.C.G.A. § 33-1-20.

Because the Court finds that Aliera, Trinity, and Unity are not valid HCSMs and the contracts at issue are ones for insurance, O.C.G.A. § 9-9-2(c)(3) operates on the contracts. Under this statute, the arbitration and delegation provisions included in the member guide contracts are illegal and void. And because O.C.G.A. § 9-9-2(c)(3) is excepted from preemption by the FAA (by way of the McCarran Ferguson Act), the FAA does not apply to the member guide contracts and the Court is therefore without authority to order Plaintiffs to arbitrate under Sections 3 or 4 of that Act. For this reason, the Court **DENIES** the Motion to Compel [Doc. 12].

### C. The Selimo Question

Before concluding, and as the last dessert course of this heavy arbitration meal, the Court separately and specifically finds that Plaintiff Selimo is not required to arbitrate any of her claims based on Aliera's conduct while she was a Trinity member from November 15, 2019 to May 14, 2020 because Aliera has presented no evidence that the operative member guide contract for that timeframe incudes any alleged agreement to arbitrate at all. "In the absence of an agreement to arbitrate, a court cannot compel the parties to settle their dispute in an arbitral forum." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (citing *AT&T Techs., Inc. v. Commincations Workers of Am.*, 475 U.S. 643, 648 (1986)). Aliera's arguments that Selimo's contract with Unity extends to cover her time as a Trinity member, and while under a different member guide contract, stalls out. *Id.* at 1201 ("Because arbitration can only be compelled when the subject of the dispute has been agreed to be settled by arbitration, having one contract which contains a broad arbitration agreement does not necessarily mean that arbitration can be compelled when the subject of the dispute arises from a separate contract which does not have an arbitration clause.")

Here, there is no question that the contract in effect for Plaintiff Selimo from November 15, 2019 to May 14, 2020 did not include an arbitration provision; thus, Plaintiff Selimo did not agree to arbitrate claims for conduct falling within that time period. *Id.* at 1203 (finding that district court properly refused to compel arbitration of claims from disputes which arose outside of the effective dates of

arbitration agreements) ("Because arbitration is strictly a matter of contract, we cannot compel arbitration for disputes which arose during time periods in which no effective contract requiring arbitration was governing the parties.")[34]

## IV.   Conclusion

To sum up a final time, the Court denies Aliera's request for dismissal based on failure to mediate because the language of the user guides does not plainly establish the mediation is a condition precedent to suit, because Plaintiffs have adequately alleged that the contracts at issue are ones of insurance and the six-step alternative dispute procedure is illegal under the ACA, and because Plaintiffs have adequately pled that Aliera has waived any mediation condition precedent by its own conduct.

The Court also denies Aliera's request that the Court compel Plaintiffs to arbitrate. Because Plaintiffs specifically challenge the arbitration clauses and any delegation provisions under § 2 of the FAA as void and illegal based on Georgia state law prohibiting arbitration agreements in insurance contracts, it is for the Court to decide whether this case should be sent to arbitration. In so deciding, the Court determines that Plaintiffs have sufficiently shown that the contracts at issue are ones for insurance. Accordingly, under O.C.G.A. § 9-9-2(c)(3), the contracts at

---

[34] Aliera argues that, if the Court concludes that there are legitimate fact issues about whether an arbitration agreement exists between Selimo and Aliera during the period she was a member of Trinity, then the solution is to conduct a summary trial on the issue. (Supplemental Reply, Doc. 45 at 3.) However, the Court finds that there is no fact issue to be tried. Aliera has not provided a contract containing an arbitration provision that governs Plaintiff Selimo's relationship with Trinity at all.

issue are excepted from preemption by the FAA. Therefore, FAA preemption does not apply here and the Court cannot compel Plaintiffs to submit to arbitration under the FAA. For the reasons stated herein, Aliera's Motion to Dismiss or Alternatively Compel Arbitration [Doc. 12] is **DENIED**.

As the Court has denied Aliera's Motion, discovery shall commence at once. Pursuant to this Court's August 2020 Order (Doc. 24), the Parties should immediately confer for purposes of fulfilling their obligations to complete conferences, reports, and disclosures under the Local and Federal Rules. The Court **ORDERS** the Parties to file the Joint Preliminary Report and Discovery Plan and Initial Disclosures within 14 days of the date of this Order.

**IT IS SO ORDERED** this 22nd day of June 2021.

Honorable Amy Totenberg
**United States District Judge**